# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Olga Issaenko,<br><br>Plaintiffs,<br><br>vs.<br><br>University of Minnesota and Martina Bazzaro, in her individual and official capacity as faculty of the University of Minnesota,<br><br>Defendants. | CIVIL NO. 13cv 3605 JRT/SER<br><br>COMPLAINT |

## PRELIMINARY STATEMENT

For her Complaint against Defendants University of Minnesota and Martina Bazzaro, Plaintiff Dr. Olga Issaenko ("Plaintiff"), states and alleges the following causes of action. The stated causes of action stem from the continual, intentional, and malicious conduct of the Defendants resulting in multiple violations of the Copyright Act, Title 17, United States Code, §§ 101 *et seq.,* and violations of the laws of the State of Minnesota. Plaintiff seeks actual, statutory, enhanced, and punitive damages, costs, and attorney fees.

## JURISDICTION AND VENUE

1.     Jurisdiction of this Court arises under his the Copyright Act, Title 17, United States Code, §§ 101 *et seq.*

2.     This Court has original jurisdiction over the claims in this Complaint that arise under the Acts of congress relating to copyrights pursuant to 28 U.S.C.



SCANNED
DEC 2 3 2013
U.S. DISTRICT COURT MPLS

§1338(a).

3.       This Court has original jurisdiction over the claims in this Complaint

that arise under the state statutory and common law of the State of Minnesota pursuant

to 28 U.S.C. § 1338(b) because the state law claims are so related to the federal

copyright claims that they form part of the same case or controversy and derive from a

common nucleus of operative facts.

4.       Supplemental Jurisdiction also arises pursuant to 28 U.S.C. § 1367(a) over

all of Plaintiff's other claims that are so related to claims in this action within such

original jurisdiction that they form part of the same case or controversy.

5.       Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the

Defendant resides in and has its principal place of business in this district, and because

this action arises from transactions, events, or occurrences within this district as

contemplated by Title 28 U.S.C. Sections 1391(b) and (c).

6.       Venue is proper in this district pursuant to 28 U.S.C. §1400(a) because this

action arises under an Act of Congress relating to copyrights and the Defendant and/or its

agents reside and/or may be found herein.

## PARTIES

7.       Plaintiff, Dr. Olga Issaenko, is a natural person who resides in the City of

Minnetonka, County of Hennepin, State of Minnesota.

8.       Defendant University of Minnesota is a state operated institution of higher

education that has a principal place of business in Minnesota, including its Academic

Health Center, including the Department of Genetics, Cell Biology and Development,

Department of Medicine, Surgery, Pediatrics, Integrative Biology and Physiology.   On information and belief, Defendant University of Minnesota has more than 100 employees.

9.     Defendant Martina Bazzaro is a natural person residing in the City of St. Paul, County of Ramsey, State of Minnesota.

## FACTUAL ALLEGATIONS

10.     Plaintiff is an academic cancer research Ph.D. scientist with an exceptional education and in depth knowledge in her professional field who has a Bachelor of Science degree in Biology, Chemistry, and Education, a *Summa Cum Laude* Master of Science degree in Biology, Chemistry, and Education and a Doctor of Philosophy, Ph.D., degree in Biology.

11.     Plaintiff arrived in the United States by invitation of the United States Government to conduct her research at the University of Chicago with the support from the United States National Science Foundation. Her research was also supported by other national and private agencies.

12.     In the year 2002, Plaintiff accepted a three year Research Associate position in the Department of Genetics, Cell Biology and Development at the University of Minnesota. The position, however, was terminated prematurely without good cause. After her termination, Plaintiff's research findings were published by faculty member Dr. Thomas Neufeld of the University in a number of research articles/grant applications without listing Plaintiff as an author or other acknowledgement of her intellectual contribution.

13.     Dr. Neufeld subsequently obtained federal funding and was promoted to a tenure position; whereas Plaintiff had to seek another position. Dr. Neufeld, also transferred to other investigators outside of the University mutant strains of model organism (*Drosophila melanogaster*), which Plaintiff created using sophisticated genetic approach. Those scientists used them as a system to screen new therapeutics for the tuberous sclerosis disease, and also received federal funding.  Plaintiff's work regarding these mutant strains of model organism which Plaintiff created using sophisticated genetic approach was never acknowledged.

14.     In years 2004-2009, Plaintiff was then employed as a Research Associate in the Department of Medicine/Surgery with a Letter of Merit and the Department of Pediatrics.

15.     In 2009-2011, Plaintiff was then employed as a Scientist at the Masonic Cancer Center and Department of Integrative Biology and Physiology.

16.     On September 28, 2009, Plaintiff accepted a Scientist position at the Masonic Cancer Center, University of Minnesota. See **Exhibit 4 (Job Offer).**

17.     In her capacity as a Scientist, the job duties included, *inter alia,*

Duties/Responsibilities

\*\*\*

This position will employ molecular biology approaches for studying the role of protein degradation pathways in cancer setting for targeted treatment of ovarian and cervical cancer. This position is responsible for independently performing a full range of tasks for assigned research projects.

70%: Responsible to conduct research investigations from experimental

4

design and reagent preparation to interpretation of experimental results. Evaluate, suggest alternate methods, modify or develop new procedures and techniques to aid in the investigation of a total research problem or program.

20%: Analyze research data. Write reports and papers on research results. Author or co-author manuscripts for publication. Make presentations at professional meetings. Discuss and plan new avenues of investigation. Assist in drafting proposals to procure research funding. Required meetings with supervisor.

10%: Laboratory management including inventory of laboratory supplies, reagents, and equipments. Train new personnel, including undergraduate and graduate students. Ensure compliance with necessary record keeping for all members of the Lab.

See **Exhibit 5 (Online Job Posting).**

18.     According to this position description, Plaintiff was involved in 3 major functions: i) research; ii) teaching/supervising/training; iii) service/management. Pursuant to University's Copyright Policy, these 3 major duties describe "faculty-like" appointments, unless a decision is otherwise entered by the Dean or the chair/head of the relevant unit.  See http://www.policy.umn.edu/Policies/Research/COPYRIGHT.html. No such decision contesting Plaintiff's "faculty-like" appointment in respect of her copyrights was issued.

19.     In addition, the job description noted specifically that besides analysis and research, the Scientist would "Author and co-author manuscripts for publication." See **Exhibit 5**.

20.     Moreover, the University of Minnesota Copyright Policy states, in pertinent part: "Section IV. Copyright Ownership. Subd. 1. Ownership of Academic Works. Consistent with academic tradition, University faculty and students shall own the

copyrights in the academic works they create. unless otherwise provided in a written agreement between the creator(s) and the University." <u>See</u> http://regents.umn.edu/sites/default/files/policies/Copyright.pdf

21.    No restriction existed in Plaintiff's right to the intellectual property that she developed while in the position of a Research Professional Scientist and she did not execute any other agreements allowing the University, or its employees, agents, or assigns the use, licensing or sharing of licensing revenues in respect of her works, including, but not limited to, either her academic works or other works she created outside of the University.  Plaintiff also did not sign any other agreements, including but not limited to "work for hire agreements", "non-compete agreements", "non-disclosure agreements", etc. permitting the University or its employees, agents, or assigns the use, licensing or sharing of licensing revenues in respect of her works, including, but not limited to, either her academic works or other works she created outside of the University.

22.    From the date of Plaintiff's employment, Plaintiff managed the lab (ordering chemical supplies and equipment) for the first three months of her work (October – December 2009) without assistance from Defendant Bazzaro.

23.    Thereafter in January-mid March 2010, Defendant Bazzaro would instruct Plaintiff on what to perform. However, Plaintiff expanded experiments to correct incorrect assumptions, modify the protocol deficiencies, or enhance the experiments.

24.    During Plaintiff's work, Defendant Bazzaro provided little to no input to the development of research projects. Defendant Bazzaro was also evasive, abusive and

obstructive. Defendant Bazzaro refused to provide certain, necessary software and support for Plaintiff to perform the experiments. Furthermore, Defendant Bazzaro was dismissive of the work/experimentation Plaintiff was conducting. Defendant Bazzaro often failed to discuss the research and attend scheduled meetings. Defendant Bazzaro also treated Plaintiff and other staff at the Cancer Center rudely.

25.     Indeed, in March 2010, Defendant Bazzaro yelled at Plaintiff so loudly that other people in other areas of the Cancer Center Building could hear her. When Plaintiff tried to leave the area to end the verbal attack, Bazzaro followed her to the elevator and then into the research room. There, Defendant Bazzaro smashed a plate with human cervical cancer cells and cell culture medium. Those cells were infected with human papilloma virus and they splashed into Plaintiff's face and onto her clothing thereby creating a health hazard.

26.     Although on the University's web-site Defendant Bazzaro claims that she has a PhD degree in Pharmaceutical Chemistry from the University of Ferrara, Italy, and a few paragraphs below on the same web-page claims she has a PhD degree in Medicinal Chemistry from the same University, and that she was a guest researcher at the Lausanne University, Switzerland, and Karolinska Institute, Sweden, none of these Universities have, on information and belief, any information about any position or degree allegedly awarded to Defendant Bazzaro.     See   http://www.med.umn.edu/obgyn/faculty-staff/gynecologic-oncology-faculty/martina-bazzaro/index.htm.

On the same web-page, in the list of Bazzaro's publications, she has omitted my name from the list of authors in 2011 Journal of Medicinal Chemistry article. Compare to:

http://www.ncbi.nlm.nih.gov/pubmed/21186794 where Plaintiff is properly identified.

27.    In January-April 2010, Plaintiff worked on two separate projects under the general supervision of Defendant Bazzaro. General supervision of the research group does not entitle Defendants to authorship in scientific articles nor does it entitle to copyrights: See http://www.icmje.org/ethical_1author.html;

See http://www.icmje.org/new_recommendations.html

28.    The first project concerned the survival of ovarian and cervical cancer cells after combinatorial treatment with Bortezomib (PS341) and SAHA (Vorinostat) or Chloroquine. Plaintiff obtained the raw data in the laboratory of Dr. Vitaly Polunovsky, her former supervisor at the Department of Medicine. Nevertheless, she provided raw data to Defendant Bazzaro.

29.    Additionally, without Defendant Bazzaro's knowledge or input or instruction, Plaintiff, having legitimate access to all raw data, also used these raw data to compile tables and create graphs at home.   Plaintiff sought and received copyright protection for these compilations.   Moreover, without Defendant Bazzaro's knowledge, input or instruction, Plaintiff also used breast cancer cells in these experiments, and performed additional experiments.

30.    For example, for the analysis of the cell proliferation and death, Plaintiff decided to perform experiments using Fluorescence Activated Cell Sorting (FACS). When on March 22, 2010 Plaintiff suggested to do FACS experiments to Defendant Bazzaro, Defendant Bazzaro declined and decided they were not needed. When Plaintiff insisted on doing them, Defendant Bazzaro wrote a sarcastic note to the Plaintiff stating

"Good luck with *your* FACS. I hope it tells *you* something." (emphasis added).  See **Exhibit 6.** Thus, Plaintiff proceeded with these experiments independently.

31.    Plaintiff treated cells with the compounds, and fixed and stained samples with the DNA-specific dye (Propidium Iodide, PI for short). However, Defendant Bazzaro had no active account to use the cytometer to perform the FACS assay.

32.    Plaintiff asked her former supervisor and Professor of Medicine, Dr. Vitaly Polunovsky, to join him during the time when he was using cytometer for his research tasks. In the time booked by Dr. Polunovsky and the remaining unused time, Dr. Polunovsky and Plaintiff together ran samples through the cytometer (which draws cells in, then laser scans the cell, and notes/tracks the DNA content) to know what specifically happened to the cell.

33.    For the statistical data analysis of FACS, Plaintiff asked Defendant Bazzaro to provide Plaintiff the software needed to analyze the data, but Defendant Bazzaro declined. Plaintiff then asked Defendant Bazzaro to use her Mac computer for data analyses, and Defendant Bazzaro declined. As emails dated April 21, 2010 show, Plaintiff gave a copy of her data to Defendant Bazzaro, but Defendant Bazzaro did not even know how to analyze the data, asking: "Is PI in FL1 channel?" Whereupon, Plaintiff responded: "FL2." See **Exhibit 7**

34.    Because Plaintiff had no financial ability to purchase the $1,000 software for the analysis, she asked Dr. Polunovsky to allow her to analyze results on his software (CellQuest) on his desktop (MAC) computer after hours.  In fact, Dr, Issaenko informed Defendant Bazzaro of her actions, writing, "I am talking to Vitaly to see when and much

9

how I can do this on his office Mac." "- it is after 5:30pm." See **Exhibit 8**

35.    Accordingly, Plaintiff had legitimate access to all raw data and did the statistical analysis on Dr. Polunovsky's computer.

36.    In addition, Plaintiff performed data analysis at her home because the University lab did not have the software necessary to create the tables and perform the required analysis. Plaintiff did all further and additional statistical analyses at her own initiative after hours on her free and unpaid time at home, on which she used her own software (MS Office Excel) to generate tables and figures, which became part of one of the independent compilations and intellectual property submitted to the United States Copyright Office and for which a copyright certificate was issued. This work was done during nights, evening, and weekends, and was not instructed or paid by the University or Defendant Bazzaro.

37.    During January-April 2010, Plaintiff also worked on the second project. The project regarded novel inhibitor K-59 (RA-1). Plaintiff provided raw data to Defendant Bazzaro and also worked at home on compilations of tables and graphs, and drafts of a joint manuscript. This joint manuscript was planned to be submitted to the Journal of Medicinal Chemistry in May 2010.

38.    Plaintiff conducted experiments with compounds named PS-341, AM-146, K58 and K59. When on or about January 4, 2010 she asked Dr. Bazzaro for help with experimental work, Dr. Bazzaro was not aware what the experiments were about and in return asked: "What was HeLa plated for the PS-341, AM-146, K58 and K59 4 and 8 hours?" and at the end did not help. See **Exhibit 9**. During this time, Dr. Bazzaro was

not reachable to discuss experimental work. On or about March 14, 2010 when Dr. Issaenko attempted do discuss urgent scientific question over email, Dr. Bazzaro attested: "I do need to see all the data before I can say anything." See **Exhibit 10.**

39. When on or about April 20, 2010 while drafting the JMC manuscript, Dr. Bazzaro indicated that she was not aware how Plaintiff did the experiments, writing: "RE the luciferase experiment in HeLa with PS-341 and K-59 how did you procede (sic) for the transfection." See **Exhibit 11**. Nor did Defendant Bazzaro know on or about April 21, 2010 how to analyze them, writing: "Is it significant or not ($P<0.05$)."

40. Plaintiff worked on statistical analyses for this project at her own home used her own software because none was provided Defendants. Defendants did not pay for this after hours work.

41. When Plaintiff wrote to Defendant Bazzaro asking to purchase software to analyze the data and prepare figures, Defendant Bazzaro declined, suggesting in writing to "eyeball" the results. See **Exhibit 12.** Plaintiff did all statistical analyses at her own initiative, after hours on her free and unpaid time at home, for which she purchased software with her own funds.

42. Moreover, without Defendant's instruction, Plaintiff conceived, designed and performed additional experiments. These included proteasome activity assay, which determines whether compound K-59 affects function of the intra-cellular protein degradation machinery, called proteasome. Plaintiff also conducted FACS experiments with K-59 compound together with proteasome inhibitor Bortezomib (PS341) or alone. Plaintiff also conducted clonogenic tests, which determine whether these compounds

affect ability of cancer cells to form colonies and survive the treatment.

43.    Based on these independent experiments, Plaintiff created compilations of tables, graphs and images. She presented them to Defendant Bazzaro and asked to include them into the manuscript proposed to be submitted jointly to the Journal of Medicinal Chemistry.

44.    Plaintiff also wanted to experiment with electrophoretic protein separation and blotting, called Western Blot, and asked Defendant Bazzaro on April 26, 2010: "Are you positive you don't want ubq WB PS+K59?"  Dr. Bazzaro responded: "Yes I am positive Olga. Thank you. I do not think that that specific experiment/figure is needed for the manuscript."  See **Exhibit 13**.   Nevertheless, Plaintiff did those Western blot experiments and sent her figures she made at home to Defendant Bazzaro.

45.    Similarly, without Defendant Bazzaro's instruction or knowledge, Plaintiff also did another experiment and shared her pictures made at home with Defendant Bazzaro. Defendant Bazzaro responded on April 23, 2010: "This (sic) pics are beautifully done. I am just confuse (sic) RE what they are." (about clonogenic test). See **Exhibit 14**.

46.    On May 6, 2010 Defendant Bazzaro denied Plaintiff's request to include her work in the manuscript and started threatening Plaintiff. Defendant Bazzaro yelled threats and intimidated Plaintiff, saying: "I can do *anything* to you. I can include your data in manuscript, or I can remove your data. I can list you as an author, or I can remove your name. I can hire you or I can fire you. I can do *anything* to you. *You are nothing. Your job is just to shut up and swallow.*" (emphasis added)

47.    Indeed, as Plaintiff discovered in August 2010, Defendant Bazzaro kept her

promise. She used Plaintiff's research findings in the JMC manuscript, which she claimed

to Plaintiff lists Plaintiff's name as an author. Yet, Defendant Bazzaro submitted a

separate version of the manuscript with Plaintiff's data but without listing Plaintiff as an

author. See **Exhibit 15.** Worse yet, she signed a publishing license agreement with the

journal and transferred Plaintiff's copyright to the Publisher without Plaintiff's

knowledge or consent. See **Exhibit 16.**

48.     In May 2010, Defendant Bazzaro on behalf of Plaintiff transferred her

copyrights to the ACS (American Chemical Society) to publish an article in the Journal

of Medicinal Chemistry, JMC. According to this agreement, Plaintiff retained non-

exclusive copyrights and all proprietary rights on the research presented with that article.

However, while making a promise to Plaintiff that her name would be listed as an author,

Defendant Bazzaro submitted the manuscript to the JMC without listing Plaintiff as an

author.

49.     Plaintiff contacted Dr. Carol Lange, Professor of the Cancer Center, and

Dr. Peter Bitterman, Vice Chair for Research, Dept. of Medicine, to discuss her concerns.

Dr. Lange wrote to Plaintiff that "it would be odd to remove your name now."  Dr.

Bitterman advised Plaintiff that Defendant Bazzaro's behavior would be against

University's Policy, Code of Conduct, and suggested Plaintiff to submit formal

notification to the Department. See **Exhibit 17.**  On August 26, 2010 Plaintiff submitted

such notification, but received no response to participate in the investigation. See **Exhibit

18.**

50.     Leading scientist on the project, Dr. Saeed Khan, was shocked with

Defendant Bazzaro's outlandish lies and scientific misconduct. He called Defendant Bazzaro to set forth objection to her wrongful actions. Defendant Bazzaro yelled at him, demanded that he contact Plaintiff to settle the personal relationship with her before she would even consider crediting Plaintiff's work. Defendant Bazzaro continued to scream at Dr. Kahn on the phone and then slammed the phone down and ended the call.  During the phone conversation with Plaintiff, Dr. Khan described Defendant Bazzaro's behavior, and also provided explicit permission to Plaintiff to continue her work and research with his compounds outside of the Defendant's Bazzaro's lab.

51.    Subsequently, following communication from the Publisher's Counsel in September 2010, Office of Vice President of Research at the University of Minnesota investigated the matter and granted authorship credit on JMC article to Plaintiff.  See **Exhibit 19.**  Plaintiff was not invited to take part of the investigation.

52.    Defendant Bazzaro thereupon made damaging statements to the University Administration that Plaintiff "improperly shared" with her co-authors, Dr. Roden and Dr. Khan, Plaintiff's independently created works, specifically works created based on independent experiments of Plaintiff: proteasome activity, FACS analysis and clonogenic test (see ¶¶ 42, 43, 45 *supra*). At or about the same time, she wrote to Dr. Khan that Plaintiff "improperly shared" Plaintiff's author's works with somebody else. See **Exhibit 20.**

53.    These were author's works, which Plaintiff has created without the knowledge of or instruction from Defendant Bazzaro.  Plaintiff independently conceived, designed and performed experiments, culled and analyzed the raw data, compiled tables

and created images and graphs. Plaintiff shared these works only with Defendant Bazzaro, who wrote: "*Olga, these pictures are beautifully done. I'm just confused Re: what they are?*" See **Exhibit 21**. Yet, Defendant Bazzaro claimed to the University's administration and co-authors Drs. Saeed Khan and Richard Roden that these works belong to her and accused Plaintiff of inappropriately sharing these works (See **Exhibit 22**), which resulted in a defamatory Memorandum being issued to Plaintiff by the University.

54.     When work on the two projects described above was completed in April 2010, Plaintiff came to Defendant Bazzaro's office to ask about future experimental plans. Defendant Bazzaro stated that she was leaving for vacation in early May and that Plaintiff should also take vacation and "do nothing,"

55.     On or about April 26, 2010, various testing compounds (including, but not limited to, AM146, RA-9 (KVI-9); and RA-14 (KVI-14)) arrived from Johns Hopkins University for use in experiments to treat cancer cells grown by Plaintiff. Although Plaintiff's job title referred to ovarian and cervical cancer, Plaintiff also performed experiments using breast cancer cells.

56.     Unlike Plaintiff, Defendant Bazzaro has no work experience or scientific publication employing a breast cancer model. Defendant Bazzaro also had no breast cancer cell lines provided to her or purchased by her. Plaintiff has publications in breast cancer research and has had breast cancer cell lines for her use.

57.     Between the time of arrival and receipt of the compounds on April 26, 2010 and Defendant Bazzaro's departure for vacation on May 10, 2010, Plaintiff only

interacted with Defendant Bazzaro on two occasions. On one of the occasions, when Plaintiff asked Defendant Bazzaro what she wanted done with the compounds, Defendant Bazzaro replied "I don't give a shit." She then yelled at Plaintiff "Go fuck yourself!" When Plaintiff insisted on discussing the work, Defendant Bazzaro screamed: "I am not your slave! You are harassing me! Get out!" On the other occasion, Plaintiff wished Defendant Bazzaro a safe trip and Defendant Bazzaro suggested that Plaintiff perform enzyme assays while Defendant Bazzaro was on vacation.

58.   Shortly thereafter, Defendant Bazzaro went on vacation to Italy for 1½ months. Plaintiff performed the requested experiments and provided raw data and her compilations to Defendant Bazzaro when she returned from vacation.

59.   Without inquiry from Defendant Bazzaro, Plaintiff also conceived ideas and designed several additional experiments. However, she was not able to perform them at her work place because: i) When leaving for vacation, Defendant Bazzaro blocked financial accounts so that no purchase of necessary reagents and supplies could have been made; ii) when Plaintiff attempted to discuss her experimental plans with Defendant Bazzaro, Defendant yelled, threated and intimidated Plaintiff; and was dismissive; iii) the incubator, needed to be used to culture cells was not functioning, specifically it would not hold a specific humidity; and iv) Defendant Bazzaro would not respond to Plaintiff's inquiry to allow the incubator to be fixed.

60.   Therefore, in May-June 2010 while Defendant Bazzaro was on vacation Plaintiff could only do enzyme assays asked by Defendant Bazzaro. However, on her free time, Plaintiff sought to do additional experiments in Dr. Polunovsky laboratory. Plaintiff

grew cells in plastic dishes, which Dr. Polunovsky provided to her. Plaintiff would grow cells in Dr. Polunovsky's incubator and used his and her own reagents she procured before joining Defendant Bazzaro's lab, to do those experiments. Plaintiff performed FACS experiments, clonogenic test, Western Blotting, and other tests.

61.    Plaintiff then compiled the results in tables, graphs and images created for the "DUBs" compilation, which is now copyrighted, using her own software. The aforesaid software included statistical software including MS Excel, and Graph Prism, and other software to create images, including the Adobe Suite, Photoshop, and PowerPoint which Plaintiff paid for herself.

62.    Again, Defendant Bazzaro took no part in that experimentation, research, or analysis that led to the data that form the basis for Plaintiff's Copyrighted Images and Works.

63.    After completing experimentation and analysis Plaintiff left for two weeks of vacation. When Defendant Bazzaro returned from vacation, she called Plaintiff, who was on vacation, at 7:00 a.m. requesting a meeting. Plaintiff obliged, even being on vacation, appeared for a meeting on June 16, 2010. The meeting lasted from 9:00 a.m. to 5:30 p.m. with no break and no lunch.

64.    For the first half of meeting, Plaintiff discussed enzyme assays previously requested by Defendant Bazzaro and also what assignments Defendant Bazzaro wanted her to perform once Plaintiff returned from vacation on July 1, 2010.

65.    For the second half, Plaintiff disclosed her now Copyrighted Images and Works based on the research done in Dr. Polunovsky's lab at her own initiative. At first,

Defendant Bazzaro laughed. Defendant told Plaintiff that Dr. Issaenko "did more in one month than eleven people did in three years, [but] I am not going to build a statue for you."

66.     Subsequently, Defendant Bazzaro suggested that she would draft a joint manuscript based on Plaintiff's author's works.  When Plaintiff responded that further experiments were needed, Defendant Bazzaro became abusive and threatened Plaintiff and demanded that Plaintiff provide her with Plaintiff's digital files compiled by Plaintiff at home, her raw data produced in Dr. Polunovsky's lab and kept by Plaintiff in a separate research notebook (binder) at home. Bazzaro stated in a threatening tone: "In MY world you have to live by MY rules. You don't know who I am and who is behind me and if you open your mouth I will destroy you." She then continued to threaten Plaintiff while yelling: "You have your rights but if you open your mouth, I swear with my kids that I will destroy you!"

67.     Plaintiff responded "Are you threatening me? I don't know what your world is. I live and work in the world of academic science."

68.     After the meeting, Defendant Bazzaro sent emails to Plaintiff seeking Plaintiff's author's works and binder with raw data (x-ray films), so that Defendant Bazzaro could allegedly draft a joint manuscript where Plaintiff would be a first author. See **Exhibit 23.**

69.     Plaintiff provided the requested information to Defendant Bazzaro. However, when Plaintiff returned from vacation on July 1, 2010, she was escorted out of the building and her job appointment was terminated before its expiration.  Defendants

never returned Plaintiff's research binder, an envelope with x-ray films she produced in Dr. Polunovsky's lab, and the USB drive with digital files of all of her compilations and now Copyrighted Images and Works. Plaintiff never received back her CD with the software for Plaintiff's personal $450.00 Canon digital camera (which she cannot use now because Defendant Bazzaro has the software).   Defendants also never returned Plaintiff's handwritten notes where Plaintiff drafted future grant proposals.

70.     In early 2011, Plaintiff retained legal counsel to take steps to protect the intellectual property in her images and collective works, including but not limited to assisting her in the preparation and filing of copyright applications.

71.     Plaintiff sought and was granted copyright protection for her collection of i) Digital Files on the synergistic effect of Bortezomib (PS341) and RA-1 (K-59); ii) Digital Files on the synergistic effect of Bortezomib (PS341) and Chloroquine, Bortezomib (PS341) and SAHA (Vorinostat); and iii) DUBS "Novel small molecule inhibitors of deubiquitinating enzymes in breast, ovarian, and cervical cancers" for the following compounds – AM-146, KVI-9 (RA-9), KVI-14 (RA-14), RA-7, KVI-15 (RA-15) AND KVI-55 (RA-55) (collectively, the "Copyrighted Images and Works").  Dr. Olga Issaenko is the exclusive owner of all right, title and interest in and to the copyrights in these three compilations of original images and works.  See **Exhibits 1, 2, and 3. (Copyright Certificates)**

72.     On January 28, 2011, Plaintiff further informed Defendants of her concerns, *inter alia*, her intellectual property and authorship rights and reserved her rights regarding defamatory statements by Defendant Bazzaro and the University accusing

Plaintiff of inappropriate sharing of her works with co-authors. Plaintiff also informed Defendants of her intention to secure copyright protection for her collection of images and works including for the Copyrighted Images and Works. See **Exhibit 24**. (Memorandum)

73.    Since that date, Plaintiff has consistently attempted to provide notice to Defendants of her rights in the Copyrighted Images and Works through Cease and Desist notice and other means.

74.    Furthermore, some additional experiments were done by Plaintiff in January-February 2011 in the laboratory of Dr. Zukowska, who gave explicit permission to Plaintiff to perform this work and publish the results. However, after Plaintiff notified the University of her intent to seek copyright protection for her work, Plaintiff's employment was shortly terminated.

75.    After Plaintiff was terminated from Defendant University of Minnesota, additional samples were stained and FACS-analyzed personally by Dr. Polunovsky in March-April 2011. Plaintiff used this information in addition to her previously collected research findings to generate figures for an article to be published in a scientific journal.

76.    Plaintiff has expended significant resources in creating and attempting to expand, publish, and exploit her works of authorship and the intellectual property contained therein the Copyrighted Images and Works.    Plaintiff drafted the early manuscript in late April 2011.

77.    When Defendants learned of Plaintiff's intent to publish her authors' works, they engaged in intimidation and threats and allegations of unlawful and/or illegal

activity.

78.    Dr. Olga Issaenko sought permission from the Johns Hopkins University (Office of Technology Transfer) to use all the compounds she used and discussed in her article.  There was also no objection to Plaintiff using the compounds or publishing the article from either Johns Hopkins University, Dr. Khan, or Dr. Roden.   Plaintiff's manuscript was read and approved by all contributors, including Dr. Polunovsky and Dr. Zukowska.  In fall, 2011 Plaintiff submitted her manuscript to the Journal of Molecular Cancer Therapeutics.  However, Defendant Bazzaro made false allegations to the journal that Plaintiff was under a "misconduct investigation" by the University of Minnesota. **See Exhibit 25.** Defendant Bazzaro also engaged others into further contacting the journal with more false allegations. As a result, the Journal of Molecular Cancer Therapeutics refused to publish Plaintiff's article.

79.    Plaintiff published the article in the May 1, 2012 issue of the Cell Cycle journal. In December 2012, Defendants contacted the Cell Cycle journal and the Publisher and set forth false allegations against Plaintiff and persuaded the Cell Cycle journal to retract Plaintiff's article. **See Exhibit 25.**   However, the article was only temporarily retracted.  When their retraction efforts failed, Defendants then threated the journal and demanded that it publish defamatory statements about Plaintiff and her work. Under the threat, an "Expression of Concern" was published in May 2013 and a subsequent "Comment on Expression of Concern" was published in August 2013.  **See Exhibit 26.**

80.    Defendants' actions resulted in the inability of Plaintiff to secure

employment in academic science or the scientific industry and led to her inability to further develop her research or procure funding to support such research with grant applications.

81.    Defendants' conduct further and irreparably harmed Plaintiff's professional reputation and standing as well as her career development.

82.    In addition,  the actions of Defendants destroyed all of the Plaintiffs educational investments, hard work and effort to advance the knowledge in her field of cancer research science.

## DEFENDANT'S UNLAWFUL CONDUCT

83.    Dr. Olga Issaenko has not authorized Defendants to copy, reproduce, solicit for grants, duplicate, disseminate, distribute, sell, offer for sale, use, or display images that are the same, substantially similar, or confusingly similar to any of Plaintiff's works of authorship, including her Copyrighted Images and Works.

84.    On information and belief, Defendants had knowledge of and access to Dr. Olga Issaenko's Copyrighted Images and Works and engaged in the copying, reproduction, duplication, grant solicitation, marketing, dissemination, distribution, displaying offer for sale, sale and use of infringing copies or derivative.

85.    On information and belief, Defendants are marketing, making grant applications, soliciting grants, displaying, distributing, selling, offering for sale, utilizing in patent applications, and using infringing unauthorized copies or derivative works of Dr. Olga Issaenko's Copyrighted Images and Works.

86.    On information and belief, Defendants are intentionally using, promoting,

marketing, making grant applications, publicly displaying, distributing, selling, offering for sale, and soliciting grants utilizing images as substitutes for Dr. Olga Issaenko's Copyrighted Images and Works.

87.     Defendants have copied, incorporated, utilized and infringed Dr. Olga Issaenko's protected copyright information on at least the following occasions.

a.     Defendant Bazzaro submitted a patent application containing Dr. Olga Issaenko's Copyrighted Images and Works under the title: "Design, Synthesis and in vivo-selectivity Profile of New, Chalcone-based, Broad-Spectrum Small-molecules Proteasome Inhibitors for treatment of HPV- associated Cancers"

b.     Defendant Bazzaro made a presentation at the ASCO Annual Meeting, June 2011, containing Plaintiff's Copyrighted Images and Works. See http://meeting.ascopubs.org/cgi/content/short/29/15_suppl/e15542?rss=1. and "Bortezomib and vorinostat as antitumor therapy for epithelial ovarian cancer." See http://meetinglibrary.asco.org/content/75128-102.

c.     On or about February 5, 2011, Defendants made the NIH grant proposal under PRF ID#: 682750 containing Dr. Olga Issaenko's Copyrighted Images and Works entitled "Novel Small-Molecules Inhibitors of de-Ubiquitinating Enzymes for Cervical Cancer Treatment". With this grant application for Federal Funding, Defendant Bazzaro sought $1,887,500.00, out of which 51% would go to the University of Minnesota and 30% would go to Defendant Bazzaro's personal salary.

d.      In April 2011, Defendant Bazzaro submitted a "late-breaking" Poster Presentation to the American Association of Cancer Research in Orlando, FL containing Dr. Olga Issaenko's Copyrighted Images and Works entitled: "Small-molecule inhibitors of de-ubiquitinating enzymes for cervical cancer treatment" See URL at:

http://cancerres.aacrjournals.org/cgi/content/meeting_abstract/71/8_MeetingAbstr acts/LB-258.

e.      In November 7, 2011, Defendants submitted a grant application containing Dr. Olga Issaenko's Copyrighted Images and Works to the NIH identified as PRF ID#: 708199 and entitled: "Novel Small-Molecules Inhibitors of de-ubiquitinating Enzymes for Cervical Cancer Treatment".  Defendants sought $1,878,551 with 51% going to Defendant University of Minnesota and 30% towards Defendant Bazzaro's personal salary.

f.      On February 9, 2012 at MD Anderson, TX, Defendant Bazzaro presented a talk with a slide presentation containing Dr. Olga Issaenko's Copyrighted Images and Works.  The talk was on February 9, 2012 and titled "Small-molecule inhibitors of de-ubiquitinating enzymes for cancer treatment". See  url  at:  http://www.mdanderson.org/education-and-research/departments-programs-and-labs/departments-and-divisions/cardiology/sumo/past-programs/2012-program.html.

g.      In 2012, Defendant Bazzaro received an award of $25,000.00 from the Randy Shaver Research and Community Fund for the project "Targeting

ubiquitin-dependent protein degradation pathways for treatment of aggressive ovarian cancer" containing Dr. Olga Issaenko's Copyrighted Images and Works. See the following:

http://www.med.umn.edu/obgyn/prod/groups/med/@pub/@med/@obgyn/docume nts/content/med_content_433521.pdf (picturing on page 6);

http://www.randyshavergolf.com/grantinfo.pdf

http://randyshavercancerfund.org/donations-at-work/

http://www.cancer.umn.edu/news/ccupdate/2012/ccupdate2012_0410.html

h.     On March 9, 2012, Defendant Bazzaro submitted a grant application to the Minnesota Ovarian Cancer Alliance identified as PRF ID#: 713725 entitled: "Novel Small-Molecule Inhibitor(s) of De-Ubiquitinating enzymes (DUBs) with Therapeutic Potential for Ovarian Cancer Treatment" containing Dr. Olga Issaenko's Copyrighted Images and Works.  Defendant Bazzaro's application sought $99, 187.00.

i.     On May 10, 2012 submitted a presentation at the 3rd International Symposium, University of Pittsburgh, PA containing Dr. Olga Issaenko's Copyrighted     Images     and     Works.     See     URL http://events.upmcpr.net/files/2012/02/S464-Ovarian_Brochure_06.pdf.

j.     On October 5, 2012, Defendants filed a Grant RO-1 (5 years) application with the NIH containing Dr. Olga Issaenko's Copyrighted Images and Works identified as PRF ID # 734862 entitled "Deubiquitinating enzymes inhibition for ovarian cancer treatment". With this proposal, Defendants sought

25

30% for Defendant Bazzaro towards her personal salary and 52% to Defendant University of Minnesota out of the total $1,915,338.00 requested.

k.      On October 26, 2012 Defendant Bazzaro made a presentation utlizing Dr. Olga Issaenko's Copyrighted Images and Works at the Garibaldi Research Conference at the University of Minnesota, entitled: *"Targeting Protein Degradation Pathways for Ovarian Cancer Treatment"* <u>See</u> http://www.med.umn.edu/hot/fridayconferences/home.html https://intranet.ahc.umn.edu/dom/intranet/hotintranet/12-13Sept-June/index.htm

l.      On February 18, 2013, Defendants filed a R21 (3 years) grant application "Activity Profile of De-Ubiquitinating Enzyme Inhibitors" containing Dr. Olga Issaenko's Copyrighted Images and Works seeking $418,000.00 in Federal funding with 52% going to Defendant University of Minnesota and 20% toward Defendant Bazzaro's personal salary.

m.      On information and belief, Defendant Bazzaro indicated in the grant application above that a new patent application is being filed utilizing Dr. Olga Issaenko's Copyrighted Images and Works.

n.      On March 8, 2013, Defendant Bazzaro filed a grant application with the Minnesota Ovarian Cancer Alliance utilizing Dr. Olga Issaenko's Copyrighted Images and Works entitled "Targeting resistance-associated pathways in ovarian cancer" seeking $100,000.00.  On May 7, 2013, The Minnesota Ovarian Cancer Alliance awarded $85,000.00 to Defendant Bazzaro.

26

See http://mnovrian.org/promoting-research and http://mnovarian.org/promoting-research/past-moca-research-grants.

    o.    On October 28, 2013, Defendant Bazzaro filed a grant (5 years) application with the NIH containing Dr. Olga Issaenko's Copyrighted Images and Works identified as PRF ID # 771277 entitled "Deubiquitinating enzymes inhibition for ovarian cancer treatment". With this proposal, Defendants sought 30% for Defendant Bazzaro towards her personal salary and 52% to Defendant University of Minnesota out of the total $1,927,252.00 requested.

    p.    On October 4, 2013, Defendant Bazzaro filed a grant application with the American Cancer Society containing Dr. Olga Issaenko's Copyrighted Images and Works identified as PRF ID # 770364 entitled "Targeting deubiquitinating enzymes (DUBs) for treatment of recurrent ovarian cancer treatment". With this proposal, Defendants sought 20% for Defendant Bazzaro towards her personal salary and 20% to Defendant University of Minnesota out of the total towards her personal salary out of the total $792,000.00 requested.

    q.    On information and belief, Defendants intentionally copied and/or created derivative works of Dr. Olga Issaenko's Copyrighted Images and Works.

88.    On information and belief, Defendants intentionally copied and/or created derivative works of Dr. Olga Issaenko's Copyrighted Images and Works.

89.    On information and belief, Defendants published an article in the August 2011, PLoS One Journal containing derivative works of Dr. Olga Issaenko's Copyrighted Images and Works. See URL at

http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fournal.pone.0023888

90.    After submitting an article containing Plaintiff's copyrighted works to the Journal of Medicinal Chemistry in January 2011 without acknowledging Plaintiff's authorship therein, the matter was investigated and Plaintiff was granted rights of authorship in the article. http://www.ncbi.nlm.nih.gov/pubmed/21186794.

91.    On information and belief, Defendant Bazzaro used and continues to use Dr. Olga Issaenko's resume in Defendant's grant applications even after Plaintiff separated from employment with Defendant University of Minnesota.

92.    Defendants' copying of Dr. Olga Issaenko's works of authorship and all of the other conduct alleged above creates a high likelihood of confusion, mistake and/or deception in the industry and among consumers as to the origin or source of Defendants' and Dr. Olga Issaenko's works, and/or a connection, sponsorship, or affiliation between Defendants and Dr. Olga Issaenko's.

### Defendant's Acted Willfully and Intentionally

93.    Dr. Olga Issaenko, her works of authorship, and her Copyrighted Images and Works, are well known to Defendants.

94.    Dr. Olga Issaenko has not licensed or otherwise authorized Defendants to market, make grant applications, solicit grants, display, distribute, sell, offer for sale, publicly display, or use any copies or derivative works of Dr. Olga Issaenko's works of authorship or her Copyrighted Images and Works nor has Dr. Olga Issaenko sponsored, endorsed, or approved the conduct of either Defendant.

95.    Dr. Olga Issaenko is informed and believes that Defendants have

intentionally copied and/or created derivative works of Dr. Olga Issaenko's works of authorship and/or her Copyrighted Images and Works with knowledge of Dr. Olga Issaenko's rights therein, in an attempt to misappropriate the value created by Dr. Olga Issaenko in such proprietary images and be unjustly enriched thereby.

96.    Dr. Olga Issaenko has notified Defendants in writing that their activities violate Dr. Olga Issaenko's valuable intellectual property rights. To date, Defendants have failed to acknowledge Dr. Olga Issaenko's rights or to cease their activities.

97.    In addition, Defendants have informed at least one publication that Plaintiff improperly obtained compounds for experimentation, improperly used compounds and laboratory equipment and products, and produced data, and published data and information without authorization from Defendants or any legal right.

98.    The circulation and publication of the false, inaccurate, and improper statements and writings by Defendants have injured Plaintiff, caused her own published manuscript to be retracted and an "Expression of Concern" to be published on the internet and entered into scientific databases and records, and published in hard copies of the Cell Cycle May and August 2013 issues regarding the integrity of Plaintiff's published manuscript.

**TRIAL BY JURY**

99.    Plaintiff is entitled to and hereby demands a trial by jury.

**CAUSES OF ACTION**

**COUNT I**
**COPYRIGHT INFRINGEMENT**
**17 U.S.C. §101, *et seq.***

100. Plaintiff restates and incorporates herein all prior allegations contained herein this Complaint and further states:

101. Dr. Olga Issaenko's Copyrighted Images and Works consist of wholly original works of authorship and are copyrightable subject matter under the copyright laws of the United States.

102. Having full knowledge of and access to Dr. Olga Issaenko's Copyrighted Images and Works, Defendants induced, caused, or materially contributed to the infringement of Dr. Olga Issaenko's Copyrighted Images and Works in violation of the Copyright Act, 17 U.S.C. § 101, *et seq.,* by using, making grant applications, soliciting for grants, seeking patents, distributing, publicly displaying, offering for sale, and/or selling images that were copied, caused to be copied from, or constitute derivative works of Dr. Olga Issaenko's Copyrighted Images and Works, and which are virtually identical and/or substantially similar to those Copyrighted Images.

103. On information and belief, Defendants possessed the right and ability to supervise the infringing activity and possessed an obvious and direct financial interest in Dr. Olga Issaenko's exploited works of authorship and/or her Copyrighted Images and Works.

104. On information and belief, Defendants' using, making grant applications, soliciting for grants, seeking patents, distributing, publicly displaying, offering for sale, and/or selling of infringing copies or derivative works of Dr. Olga Issaenko's Copyrighted Images and Works was deliberate, willful, malicious, oppressive, and

without regard to Dr. Olga Issaenko's proprietary rights.

105.   Defendants direct, indirect, contributory and/or vicarious copyright infringement has caused, and will continue to cause Dr. Olga Issaenko to suffer substantial injuries, loss, and damage to her proprietary and exclusive rights to the Copyrighted Images and Works, and has damaged Dr. Olga Issaenko's reputation and goodwill, diverted her potential trade, and caused lost opportunities, and lost profits, all in an amount yet to be determined.

106.   Dr. Olga Issaenko's Copyrighted Images and Works are eligible for statutory damages.  Therefore, Dr. Olga Issaenko is entitled to an award of statutory damages per work infringed per number of infringements of Dr. Olga Issaenko's Copyrighted Images and Works pursuant to 17 U.S.C. § 504.

107.   Because of the willful nature of the copyright infringement, Plaintiff is entitled to an award of statutory damages equal to $150,000 per work infringed per number of infringements of Dr. Olga Issaenko's Copyrighted Images and Works pursuant to 17 U.S.C. § 504.

108.   Alternatively, Dr. Olga Issaenko is entitled to receive actual damages suffered by her as a result of Defendants' wrongful acts and infringements of Dr. Olga Issaenko's Copyrighted Images and Works pursuant to 17 U.S.C. § 504 in an amount in excess of seventy-five thousand dollars ($75,000.00), the exact amount to be proven at trial.

109.   In addition, Dr. Olga Issaenko is alternatively also entitled to receive the profits made by Defendants as a result of Defendants' wrongful acts and

infringements of Dr. Olga Issaenko's Copyrighted Images and Works pursuant to 17 U.S.C. § 504.

110.    Plaintiff is entitled to her attorney's fees in prosecuting this action.

111.    Plaintiff is also entitled to her attorneys' fees in securing protection for and enforcing the intellectual property rights in Dr. Olga Issaenko's Copyrighted Images and Works prior to this lawsuit.

112.    Defendants' direct, indirect, contributory and/or vicarious copyright infringement, and any continuing copyright infringement has caused, and will continue to cause Olga Issaenko repeated and irreparable injury. It would be difficult to ascertain the amount of money damages that would afford Dr. Olga Issaenko adequate relief at law for Defendants' acts and continuing acts. Dr. Olga Issaenko's remedy at law is not adequate to compensate her for the injuries already inflicted and further threatened by Defendants. Therefore, Dr. Olga Issaenko is entitled to preliminary and permanent injunctive relief pursuant to 17 U.S.C. § 502, and to an order under 17 U.S.C. § 503 and 28 U.S.C. § 1651(a) that the infringing copies of the Copyrighted Images be seized, impounded and destroyed.

## COUNT II
## VIOLATION OF MINNESOTA UNIFORM DECEPTVE TRADE PRACTICE ACT

113.    Plaintiff restates and incorporates herein all prior allegations contained herein this Complaint and further states:

114.    Defendants have engaged in deceptive trade practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, *et seq.*

115.   Defendants' actions create a high likelihood of confusion, mistake, and/or deception in the industry and among consumers as to the origin or source of Defendants' and Dr. Olga Issaenko's Copyrighted Images and Works.

116.   Defendants' actions have created a high likelihood of confusion, mistake, and/or deception in the industry and among consumers as to an affiliation, connection, and/or association of themselves and their images, publications, and activities with Dr. Olga Issaenko and her Copyrighted Images and Works, publications, and activities.

117.   Defendants have otherwise engaged in the conduct consistent with the allegations herein this Complaint that creates a likelihood of confusion or misunderstanding.

118.   As a result of Defendants' actions, Dr. Olga Issaenko has been or is likely to be injured.

119.   As a result of Defendants' conduct, Dr. Olga Issaenko has incurred and will incur attorneys' fees and costs in defending her rights.

120.   As a direct and proximate result of Defendants' conduct, Dr. Olga Issaenko has been damaged in an amount in excess of seventy-five thousand dollars ($ 75,000.00), the exact amount to be proven at trial.

121.   Defendants' wrongful acts have proximately caused and will continue to cause Dr. Olga Issaenko substantial injury, including loss and/or diminution of opportunities, and dilution of goodwill.  The harm these wrongful acts cause to Dr. Olga Issaenko will be difficult to ascertain if these acts continue.  Dr. Olga Issaenko has no adequate remedy at law.  At present, the total amount of such damages cannot be fully

ascertained by Dr. Olga Issaenko.

122.   Unless Defendants' activities are preliminarily and permanently enjoined, Dr. Olga Issaenko and her goodwill and reputation will suffer irreparable injury of the insidious and continuing sort that cannot be adequately calculated or compensated with money.  Dr. Olga Issaenko is entitled to an injunction, pursuant to Minn. Stat. § 325D.45, restraining Defendants and their officers, agents, and employees, and all persons acting in concert with them, from engaging in any further such acts in violation of the Minnesota Uniform Deceptive Trade Practices Act.

## COUNT III
## UNFAIR COMPETITION

123.   Plaintiff restates and incorporates herein all prior allegations contained herein this Complaint and further states:

124.   Defendants have engaged in unfair competition in violation of Minnesota common law.

125.   Defendants' actions have caused a likelihood of confusion and/or misunderstanding as to the source, sponsorship, approval, or certification of themselves and their images, publications, and activities with Dr. Olga Issaenko and her Copyrighted Images, publications, and activities.

126.   Defendants' actions have created a high likelihood of confusion, mistake, and/or deception in the industry and among consumers as to an affiliation, connection, and/or association of themselves and their images, publications, and activities with Dr. Olga Issaenko and her Copyrighted Images and Works, publications, and activities.

127. Defendants have otherwise engaged in the conduct consistent with the allegations herein this Complaint that creates a likelihood of confusion or misunderstanding.

128. As a result of Defendants' actions, Dr. Olga Issaenko has been or is likely to be injured.

129. As a result of Defendants' actions, Dr. Olga Issaenko has incurred and will incur attorneys' fees and costs in defending her rights.

130. Defendants' wrongful acts have proximately caused and will continue to cause Dr. Olga Issaenko substantial injury, including without limitation dilution of goodwill, diminution of opportunity, and costs to remediate the confusion and harm to good will and reputation caused by Defendants.

131. As a direct and proximate result of conduct, Dr. Olga Issaenko has been damaged in an amount in excess of $ 75,000, the exact amount to be proven at trial.

## COUNT IV
## UNJUST ENRICHMENT

132. Plaintiff restates and incorporates herein all prior allegations contained herein this Complaint and further states:

133. Defendants have unlawfully received benefits from their misappropriation of Dr. Olga Issaenko proprietary and Copyrighted Images and Works.

134. Defendants accepted and retained the aforementioned benefits knowing that their conduct was unjust and that retaining the aforementioned benefits was inequitable.

135.   Defendants have been and continue to be, unjustly enriched by retaining the benefits they have received as a result of their unlawful conduct.

136.   Dr. Olga Issaenko has sustained injury, loss, and damages as a result of Defendants' actions.

137.   As a direct and proximate result of Defendants' conduct, Dr. Olga Issaenko has been damaged in an amount in excess of $ 75,000, the exact amount to be proven at trial.

## COUNT V
## DEFAMATION / DEFAMATION PER SE
## (PUBLISHING/CIRCULATING FALSE STATEMENTS)

138.   Plaintiff restates and incorporates herein all prior allegations contained in herein this Complaint and further states:

139.   The actions of Defendants in making and sending statements and correspondence to the publication *Cell Cycle* which falsely stated that Defendants owned data and copyrighted information found in Dr. Olga Issaenko's scientific article "Chalcone-based small-molecule inhibitors attenuate malignant phenotype via targeting deubiquitinating enzymes" published in *Cell Cycle* was calculated to and in fact did imply, connote, and insinuate that Dr. Olga Issaenko improperly took, appropriated, and used data and information allegedly belonging to Defendants.

140.   The actions of Defendants in making and sending statements and correspondence to the publication *Cell Cycle* which falsely stated that Dr. Olga Issaenko impermissibly and without a required authorization used and removed data and compounds, respectively, found in Defendants' laboratory and used in Dr. Olga

Issaenko's scientific article "Chalcone-based small-molecule inhibitors attenuate malignant phenotype via targeting deubiquitinating enzymes" published in *Cell Cycle* was calculated to and in fact did imply, connote, and insinuate that Dr. Olga Issaenko improperly took, appropriated, and used data and information allegedly belonging to Defendants.

141.   The actions of Defendants in making and sending statements and correspondence to the publication *Cell Cycle* which falsely stated that data, information, and figures incorporated in Dr. Olga Issaenko's scientific article "Chalcone-based small-molecule inhibitors attenuate malignant phenotype via targeting deubiquitinating enzymes" which was published in *Cell Cycle* without disclosing that Dr. Issaenko provided that same information, data, and figures to Defendant Bazarro which she developed independently was calculated to and in fact did imply, connote, and insinuate that Dr. Olga Issaenko improperly took, appropriated, and used data and information allegedly belonging to Defendants.

142.   The actions of Defendants in making and sending statements and correspondence to the publication *Cell* Cycle stating that Defendant University of Minnesota "claims ownership" of data in Dr. Olga Issaenko's scientific article "Chalcone-based small-molecule inhibitors attenuate malignant phenotype via targeting deubiquitinating enzymes" published in *Cell Cycle* was calculated to and in fact did imply, connote, and insinuate that Dr. Olga Issaenko improperly took, appropriated, and used data and information allegedly belonging to Defendants because the claim of ownership itself false.

143.   The actions of Defendants in making and sending statements and correspondence to the publication *Cell* Cycle falsely alleging to have "confirmed ownership of data from Table 1 and parts of Figures 1-6" in Dr. Olga Issaenko's scientific article "Chalcone-based small-molecule inhibitors attenuate malignant phenotype via targeting deubiquitinating enzymes" published in *Cell Cycle* was calculated to and in fact did imply, connote, and insinuate that Dr. Olga Issaenko improperly took, appropriated, and used data and information allegedly belonging to Defendants.

144.   The actions of Defendants in making, causing to have made, and sending statements and correspondence to the Journal of Molecular Cancer Therapeutics falsely alleging that Dr. Olga Issaenko was under a "misconduct investigation" by the University of Minnesota was calculated to and in fact did imply, connote, and insinuate that Dr. Olga Issaenko was under investigation for scientific misconduct and unethical behavior.

145.   The actions of Defendants in making, causing to have made, and sending false statements in the Memorandum issued by Defendants on September 10, 2010 and circulated within the community that Dr. Olga Issaenko inappropriately used and/or shared data was calculated to and in fact did imply, connote, and insinuate that Dr. Olga Issaenko was under investigation for scientific misconduct and unethical behavior when in fact an investigation was commenced into the misconduct of Defendant Bazzaro, and not the Plaintiff.

146.   The actions of Defendants in making, causing to have made, and sending false statements in the Memorandum issued by Defendants on September 10, 2010 and

making the Memorandum available for review and circulating and publishing the Memorandum within the community within the last two years that Dr. Olga Issaenko inappropriately used and/or shared data was calculated to and in fact did imply, connote, and insinuate that Dr. Olga Issaenko had been under investigation for scientific misconduct and unethical behavior when in fact an investigation was commenced into the misconduct of Defendant Bazzaro, and not the Plaintiff.

147. Defendants made, caused, and published the false statement regarding Dr. Olga Issaenko that *"these data are not owned by you; they are the property of Dr. Bazzaro and, ultimately, the University of Minnesota. You are not permitted to share these data with any other individuals without written approval from University of Minnesota"* in the Memorandum issued by Defendants on September 10, 2010 and made the Memorandum available for review and circulated and published the Memorandum within the community within the last two years (emphasis added).

148. Regarding Dr. Olga Issaenko's research and Copyrighted Images and Works, Defendants made, caused, and published the false statement that "Dr. Issaenko worked under the direction of Dr. Bazzaro" in a letter to Cell Cycle dated December 18, 2012.

149. Regarding Dr. Olga Issaenko's research and Copyrighted Images and Works, Defendants made, caused, and published the false statement that a "[s]ubstantial portion of the data reported in the paper were generated in Dr. Bazzaro's laboratory" in a letter to Cell Cycle dated December 18, 2012.

150. In correspondence to Cell Cycle regarding Dr. Olga Issaenko's research and

Copyrighted Images and Works, Defendants made, caused, and published the false statement that "Table 1. Almost this exact table was in Dr. Bazzaro's laboratory notebook dated 6/16/2010" when, in fact, it was Plaintiff's handwritten notebook and not Defendant Bazzaro's.

151. In correspondence to Cell Cycle regarding Dr. Olga Issaenko's research and Copyrighted Images and Works, Defendants made, caused, and published the false statement that "Figure 1.  Dr Bazzaro has identical figures in *her* laboratory notebook" when, in fact, it was Plaintiff's handwritten notebook and not Defendant Bazzaro's (emphasis added).

152. In correspondence to Cell Cycle regarding Dr. Olga Issaenko's research and Copyrighted Images and Works, Defendants made, caused, and published the false statement that "Figure 2. B. Photographs identical to figure 2B are *in Dr. Bazzaro's materials* from 6/16/2010" when, in fact, it was Plaintiff's materials and the referenced figure was created by Plaintiff from the scans of the clonogenic test Plaintiff performed in Dr. Polunovsky's lab (emphasis)

153. In correspondence to Cell Cycle regarding Dr. Olga Issaenko's research and Copyrighted Images and Works, Defendants made, caused, and published false statements that Plaintiff's figures, information, and works were found in "Dr. Bazaro's materials" and "Dr. Bazzaro's notebook" when, in fact, it was Plaintiff's materials and notebooks.

154. In correspondence to Cell Cycle regarding Dr. Olga Issaenko's research and Copyrighted Images and Works, Defendants made, caused, and published the false

statement that ". . . they [figures] use *her* **[Bazzaro's]** compound" when, in fact, the proprietary rights belong to Drs. Khan and Roden, John Hopkins University, each of whom had no objection to Plaintiff using the compounds in her research and/or publishing Plaintiff's author's works (emphasis added).

155.   Defendants knew or should have known that their actions in spreading false, misrepresented, or inaccurate allegations regarding any alleged use and article publication by Dr. Olga Issaenko would damage Dr. Olga Issaenko's reputation; and, in fact, Dr. Olga Issaenko was damaged by Defendants' false satements.

156.   Nevertheless, Defendants made no attempt or effort to correct this intentional, false, and misleading information.

157.   Defendants' conduct and false representations concerning Dr. Olga Issaenko and her business as a scientist impugn Dr. Olga Issaenko's personal and business reputation and her integrity.

158.   Defendants' conduct and false representations concerning Dr. Olga Issaenko and her business as a scientist are detrimental to her ability to secure employment, and, in fact, resulted in her inability to secure employment now and in the future.

159.   Defendants' conduct constitutes defamation and defamation *per se.*

160.   As a direct and proximate result of Defendants' publication and circulation of false, libelous, and defamatory statements to third parties, Dr. Olga Issaenko has been damaged in an amount in excess of seventy-five thousand dollars ($ 75,000.00), the exact amount to be proven at trial.

## COUNT VI
### TORTIOUS INTERFERENCE WITH PROSPECTIVE
### BUSINESS ADVANTAGE AND ECONOMIC EXPECTANCY

161.   Plaintiff restates and incorporates herein all prior allegations contained in herein this Complaint and further states:

162.   At all times relevant to this proceeding, Dr. Olga Issaenko was poised to secure grants, publication of results, and employment based upon her scientific discoveries.

163.   Defendants' unjustified and improper actions in suggesting that Dr. Olga Issaenko misappropriated data and compounds and used images and data without permission and/or authorization in Plaintiff's scientific article "Chalcone-based small-molecule inhibitors attenuate malignant phenotype via targeting deubiquitinating enzymes" published in *Cell Cycle*, in attempting to restrict Dr. Olga Issaenko's use and publication of her Copyrighted Images and Works, in causing her article to be retracted from publication, in blocking her potential employment opportunities, and in defaming her in her trade and employment/business have caused pecuniary harm including financial instability to Dr. Olga Issaenko having induced or caused others not to enter into employment relationships, publish articles, and enter into research arrangements and constitutes tortious interference with her prospective business, employment, and economic advantage.

164.   Although Plaintiff's qualifications exceeded what was required for a job opening with Dr. Susanta Hui at the University of Minnesota, the position was only Assistant Scientist (requiring a Bachelor's degree only), and the salary was only

$35,000.00 (less than her previous salary), Plaintiff agreed to accept this position. Plaintiff agreed to those terms because Dr. Hui stated he interviewed all candidates and was interested in hiring Plaintiff, and that they should meet after January 1, 2012 when he would be back from Christmas break.  However, after speaking with Mellissa Daufelt, Cancer Center Human Resources at the University of Minnesota who told him to look into Plaintiff's file, and, on information and belief, speaking to Defendant Bazzaro, Dr. Hui withdrew his proposal on January 9, 2012.

165.   Indeed, as recently as November 2013, Defendants have blocked and restricted Plaintiff's employment opportunities.

166.   In addition, a job offer with Dr. Aksan, Department of Mechanical Engineering at the University of Minnesota was first made then withdrawn recently in November 2013.  Dr. Aksan knew about Plaintiff's "difficult experience" with Defendant Bazzaro, but made the offer anyway.   On information and belief, after reviewing Plaintiff's personnel file and discussing the offer with internal management at the University of Minnesota the job offer was withdraw.

167.   Dr. Olga Issaenko enjoyed a reasonable expectation of economic advantage or benefit in her employment, publishing opportunities, and securing grants.

168.   Defendants knew or should have known of Dr. Olga Issaenko's reasonable expectations.

169.   Absent Defendants' wrongful acts, it is reasonably probable that Dr. Olga Issaenko would have realized her economic benefit and/or advantage.

170.   As a direct and proximate result of Defendants' interference with Dr. Olga

Issaenko's prospective economic advantage, Dr. Olga Issaenko has suffered damages in excess of seventy-five thousand dollars ($75,000.00), the exact amount to be proven at trial.

**COUNT VII**
**PROMISSORY ESTOPPEL**

171.    Plaintiff restates and incorporates herein all prior allegations contained in herein this Complaint and further states:

172.    Defendant Bazzaro clearly and definitely promised Dr. Olga Issaenko that if she disclosed her research, data, images and works they would jointly publish an article, crediting and recognizing Dr. Olga Issaenko as a first author, based on, among other things, Dr. Olga Issaenko's research, data, images and works.

173.    Defendant Bazzaro expected, or reasonably should have expected, the promise to induce definite and substantial action by Dr. Olga Issaenko.

174.    Defendant Bazzaro's did in fact induce such action from Dr. Ola Issaenko.

175.    Defendant Bazzaro broke her promise and breached her agreement with Dr. Olga Issaenko.  Bazzaro published her article in 2011 PLoS one journal on the topic Plaintiff worked on without listing Plaintiff as author.  The University of Minnesota disregarded Plaintiff's claim of her contribution.

176.    The promise and agreement must be enforced to avoid an injustice to Dr. Olga Issaenko.

177.    Defendant Bazzaro's conduct has caused injury to Dr. Olga Issaenko's reputation and economic opportunities, and caused her damage.

178.    As a direct and proximate result of Defendants' conduct, Dr. Olga Issaenko has suffered damages in excess of seventy-five thousand dollars ($75,000.00), the exact amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, in consideration of the foregoing, Plaintiff, Dr. Olga Issaenko respectfully requests that this Court enter an Order granting the following relief:

1.    That the Court enter judgment against Defendants that Defendants have:

   (a)    Infringed Dr. Olga Issaenko's rights in federally registered copyrights for the compilations titled *K59=RA1*, TXu 1-734-882; *DUBS Collection*, TXu 1-735-042; and *P5341-SAHA–CHLOROQUINE Collection*, TXu 1-735-042 under 17 U.S.C. § 501;

   (b)    defamed Dr. Olga Issaenko;

   (c)    tortuously interfered with Dr. Olga Issaenko's prospective employment and business advantages and opportunities;

   (d)    have been unjustly enriched by their actions;

   (e)    engaged in deceptive trade practices in violation of Minnesota law;

   (f)    competed unfairly with Dr. Olga Issaenko in violation of Minnesota common law;

   (g)    caused injury and damages to Dr. Olga Issaenko because of her reliance on Defendants' broken promises;

2.    That Defendants be required by mandatory injunction to deliver up to Dr. Olga Issaenko for destruction any and all infringing i t e m s in their possession,

custody, or control comprising or embodying unauthorized copying of Dr. Olga Issaenko's Copyrighted Images and Works;

3.   That Defendants pay to Dr. Olga Issaenko damages for Defendants' copyright infringement, including, without limitation, actual damages in an amount to be determined at trial, together with prejudgment and post-judgment interest;

4.   That Dr. Olga Issaenko be awarded all profits and property acquired by means of Defendants' unfair competition, together with prejudgment and post-judgment interest.

5.   That Dr. Olga Issaenko be awarded statutory damages per work infringed per number of infringements of Dr. Olga Issaenko's Copyrighted Images and Works pursuant to 17 U.S.C. § 504(c)(2);

6.   That Dr. Olga Issaenko be awarded any and all permissible statutory, compensatory, actual, and enhanced, multiplier, and punitive damages

7.   That Dr. Olga Issaenko be awarded an amount equal to her last annual salary and benefits package multiplied by the number of years between the date of the defamatory conduct and her retirement age;

8.   That the Court issue a permanent injunction enjoining and restraining Defendants and their respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, from copying, reproducing, manufacturing, duplicating, disseminating, distributing, or infringing copies of Dr. Olga Issaenko's Images and Works;

9. That the Court issue an Order at the conclusion of the present matter that the infringing products be seized, impounded and destroyed;

10. That the Court issue a permanent injunction enjoining and restraining Defendants and their respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, from engaging in any defamatory conduct against Dr. Olga Issaenko;

11. That the Court issue an Order for equitable relief to Dr. Olga Issaenko in the form of requiring Defendants to withdraw their objection to Plaintiff's article submitted to Cell Cycle titled *Chalcone-based small-molecule inhibitors attenuate malignant phenotype via targeting deubiquitinating enzymes*, submit a retraction of their objection to Cell Cycle, and to cooperate with Plaintiff and her representatives in obtaining a retraction from Cell Cycle of the "Expression of Concern" and "Comment on Expression of Concern";

12. That the Court issue an Order for equitable relief requiring Defendants to remove from circulation within University of Minnesota scientific community, including from the Plaintiff's Employment/Personnel File, the Memorandum, issued by the University to the Plaintiff on September 10, 2010, regarding the authorship in the Journal of Medicinal Chemistry article and alleged "inappropriate sharing" of Dr. Olga Issaenko's Copyrighted Works and Images and Plaintiff's responsive memorandum

13. That the Court issue a permanent injunction enjoining and restraining Defendants and their respective agents, servants, employees, successors and assigns,

and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, from contacting scientific journals, publishers, NIH/ORI, funders and other sponsoring agencies, and collaborators, and co-authors, and employers and hiring supervisors, including within the University of Minnesota and making statements about Plaintiff and/or her work(s) or interfere by other means with her exclusive rights to using, making grant applications, soliciting for grants, seeking patents, distributing, publicly displaying, offering for sale, and/or selling her Copyrighted Images and Works or images and works that were copied, caused to be copied from, developed or constitute derivative works of Dr. Olga Issaenko's Copyrighted Images and Works.

14.    That the Court issue an Order for equitable relief requiring Defendants to retract and withdraw from local, state, and federal agencies, funders, and/or publishers, all submitted grants, manuscripts, patents, and any other application or documentation containing Dr. Olga Issaenko's Copyrighted Images and Works and any images or works that were copied, caused to be copied from, developed or constitute derivative works of Dr. Olga Issaenko's Copyrighted Images and Works.

15.    That the Court issue an Order for equitable relief requiring Defendants to return to Dr. Olga Issaenko her personal and professional property including, but not limited to, the compact disc containing her camera software, her yellow envelope containing x-ray films, her blue binder with data she procured independently in Dr. Polunovsky's lab, and a digital copy of her burgundy colored research notebook.

16.    That the Court award Dr. Olga Issaenko her reasonable attorneys' fees;

17.    That the Court award Dr. Olga Issaenko her costs and expenses incurred

herein;

18.   That Dr. Olga Issaenko have such other or further relief as the Court may

deem just and proper.

Dated: <u>December 23, 2013</u>

**WARD LAW GROUP**

By: _____

Damon L. Ward, ID # 221442
301 Fourth Avenue South
Suite 378N
Minneapolis, MN 55415
(612) 353-9770 Main
(612) 282-3060 Direct

**ATTORNEYS FOR PLAINTIFF
DR. OLGA ISSAENKO**