# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| OLGA ISSAENKO, | Civil No. 13-3605 (JRT/SER) |
| Plaintiff, | |
| v. | |
| UNIVERSITY OF MINNESOTA; MARTINA BAZZARO, *in her personal, individual and official capacity as faculty of the University of Minnesota*; REGENTS OF THE UNIVERSITY OF MINNESOTA, *a constitutional corporation of the State of Minnesota*; RICHARD B. BEESON, DEAN E. JOHNSON, CLYDE E. ALLEN, LAURA M. BROD, LINDA A. COHEN, THOMAS W. DEVINE, JOHN R. FROBENIUS, DAVID M. LARSON, PEGGY E. LUCAS, DAVID J. MCMILLAN, ABDUL M. OMARI, and PATRICIA S. SIMMONS, *in their official capacities as Regents*; KAREN HANSON, *in her official capacity as Senior Vice President of Academic Affairs and Provost*; DOUGLAS YEE, *in his official capacity as Director, Masonic Cancer Center*; TUCKER W. LEBIEN, *in his official capacity as Associate Vice-President, Academic Health Center Office of Research*; LINDA CARSON, *in her official capacity as Professor and Head of Department of Obstetrics, Gynecology, and Women's Health*; and FRANCES LAWRENZ, *in her official capacity as Associate Vice-President for Research, Office of the Vice-President for Research*, | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

---

Damon L. Ward **WARD LAW GROUP**, 301 Fourth Avenue South, Suite 378N, Minneapolis, MN 55415, for plaintiff.

Brian J. Slovut, **UNIVERSITY OF MINNESOTA OFFICE OF THE GENERAL COUNSEL**, 200 Oak Street S.E., Suite 360, Minneapolis, MN 55455, for defendants.

This case arises out of Plaintiff Olga Issaenko's brief tenure as a research scientist

in the laboratory of Defendant Dr. Martina Bazzaro at the University of Minnesota's

Masonic Cancer Center.   The heart of Issaenko's claims is that, without Bazzaro's knowledge or assistance, she developed written materials and figures based on experiments and research that she performed during her employment at the Masonic Cancer Center and that Bazzaro later claimed to own the copyrights in those materials. Issaenko brings eleven statutory, constitutional, and common law claims against Bazzaro in her official and individual capacities, the University of Minnesota and the Regents of the University of Minnesota (collectively, "the University"), as well as seventeen employees and regents of the University ("the Individual Defendants") in their official capacities.

Defendants move to dismiss the First Amended Complaint in its entirety. Issaenko later moved for leave to file a second amended complaint.  Finally, Issaenko brought a motion seeking preliminary injunctive relief based on her copyright infringement claim.  Because the Court concludes that it lacks subject matter jurisdiction over a number of Issaenko's claims and that, with the exception of Issaenko's claims for promissory estoppel and tortious interference, the First Amended Complaint fails to state claims upon which relief can be granted, the Court will grant Defendants' motion to dismiss, except to the extent it seeks dismissal of the promissory estoppel and tortious interference claims brought against Bazzaro in her individual capacity.  The Court also concludes that amendment of the complaint would be futile with respect to all claims except the tortious interference claim to the extent it is asserted against Defendants Frances Lawrenz and Tucker LeBien in their individual capacities, and therefore will grant the motion to amend only with respect to that claim.  Finally, the Court will deny

Issaenko's motion for a preliminary injunction, as she has failed to demonstrate either

likelihood of success on the merits or irreparable harm.

## BACKGROUND

## I.    THE RESEARCH SCIENTIST POSITION

Issaenko holds a Ph.D. in biology and has worked in the area of academic cancer

research for a number of years.  (Am. Compl. ¶ 30, Jan. 16, 2014, Docket No. 7.)[1]  On

September 14, 2009, the University offered Issaenko a position as a scientist in

Dr. Martina Bazzaro's laboratory at the University's Masonic Cancer Center.  (*Id.*, Ex. 4

at 8, Ex. 5 at 11.)[2]  Issaenko accepted the job on September 28, 2009.  (*Id.* ¶ 36.)  In that

position, Issaenko was responsible for employing "molecular biology approaches for

studying the role of protein degradation pathways in cancer setting for targeted treatment

of ovarian and cervical cancer."  (*Id.*, Ex. 5 at 11.)  The position involved the following

duties and responsibilities:

> 70%: Responsible to conduct research investigations from experimental
> design and reagent preparation to interpretation of experimental results.
> Evaluate, suggest alternate methods, modify or develop new procedures
> and techniques to aid in the investigation of a total research problem or
> program.

---

[1] For purposes of reciting the factual allegations, this Order cites to Issaenko's First
Amended Complaint, not the proposed Second Amended Complaint, although the majority of the
factual allegations are identical.  Issaenko filed an amended complaint shortly after the filing of
the original complaint, (*see* Am. Compl., Jan. 16, 2014, Docket No. 7; Compl., Dec. 23, 2013,
Docket No. 1), which replaced the original complaint as the operative complaint.  This Order
refers to the amended complaint filed January 16, 2014, as the "First Amended Complaint" to
avoid confusion with the proposed Second Amended Complaint discussed below.

[2] Unless otherwise noted all page number references are to the CMECF pagination.

20%:  Analyze research data.  Write reports and papers on research results. Author or co-author manuscripts for publication.  Make presentations at professional meetings.  Discuss and plan new avenues of investigation. Assist in drafting proposals to procure research funding.  Required meetings with supervisor.

10%:  Laboratory management including inventory of laboratory supplies, reagents, and equipments.  Train new personnel, including undergraduate and graduate students.  Ensure compliance with necessary record keeping for all members of the Lab.

(*Id.* ¶ 37, Ex. 5 at 11.)

## II.   ISSAENKO'S INDEPENDENT RESEARCH

Issaenko alleges that for the first three months after beginning her job, she "managed the lab (ordering chemical supplies and equipment)."  (*Id.* ¶ 42.)  Between January and March 2010 Issaenko alleges that Bazzaro would instruct Issaenko as to what work to perform but Issaenko "expanded experiments to correct incorrect assumptions, modify the protocol deficiencies, or enhance the experiments."  (*Id.* ¶ 43.) Issaenko alleges that Bazzaro "provided little to no input to the development of research projects," "refused to provide certain, necessary software and support for Plaintiff to perform . . . experiments" and "was dismissive of the work/experimentation Plaintiff was conducting."  (*Id.* ¶ 44.)[3]

---

[3] A number of Issaenko's allegations are directed to her perception of Bazzaro's demeanor, various confrontations between Issaenko and Bazzaro, and accusations that Bazzaro does not have the educational credentials she claims.  (*See, e.g.*, Am. Compl. ¶¶ 44-46, 70, 77.) None of these allegations appear to be relevant to Issaenko's legal claims and instead appear to be part of what can only be characterized as a contentious history between Bazzaro and Issaenko. *See, e.g.*, *Bazzaro v. Issaenko*, No. A12-2017, 2013 WL 2927431, at *1 (Minn. Ct. App. June 17,

(Footnote continued on next page.)

Between January and April 2010 Issaenko worked on two projects "under the general supervision of Defendant Bazzaro." (*Id.* ¶ 47.)  The first project related to the survival of ovarian and cervical cancer cells after certain types of treatments.  (*Id.* ¶ 48.)  For this project, Issaenko obtained raw data from Dr. Polunovsky, her former supervisor in a different department at the University, and provided the data to Bazzaro.  (*Id.*)  Issaenko then, "without Defendant Bazzaro's knowledge or input or instruction," used this data to compile tables and graphs at home.  (*Id.* ¶ 49.)  With respect to this project, Issaenko suggested to Bazzaro in March 2010 that they perform experiments using a certain type of cell sorting, which Bazzaro declined to do after deciding that such experiments "were not needed."  (*Id.* ¶ 50.)  Issaenko proceeded to perform these experiments and the resulting analysis with the help of Dr. Polunovsky.  (*Id.* ¶¶ 51-55.)  Issaenko alleges that she performed the analysis "at her own initiative after hours on her free and unpaid time at home, on which she used her own software [or Dr. Polunovsky's computer] to generate tables and figures."  (*Id.* ¶¶ 55-56.)  Issaenko shared her data and analysis resulting from these experiments with Bazzaro.  (*Id.* ¶ 53.)

With respect to the second "independent" project discussed in the First Amended Complaint, Issaenko alleges that she "provided raw data to Defendant Bazzaro and also worked at home on compilations of tables and graphs, and draft[s] of a joint manuscript,"

_____

(Footnote continued.)

2013) (discussing a harassment restraining order obtained by Bazzaro against Issaenko). Because these allegations do not appear to relate to the claims presently at issue in Issaenko's First Amended Complaint, the Court does not discuss them in detail.

which Issaenko and Bazzaro planned to submit to the Journal of Medicinal Chemistry ("JMC") in May 2010.  (*Id.* ¶ 57.)  Issaenko conducted numerous experiments related to the second project, and alleges that when she asked Bazzaro for help, Bazzaro either did not provide it or asked for more information about Issaenko's questions.  (*Id.* ¶¶ 58, 63.) Issaenko alleges that Bazzaro was unaware of the nuances of many of these experiments and Issaenko "worked on statistical analyses for this project at her own home us[ing] her own software because none was provided [by] Defendants" and that "Defendants did not pay for this after hours work."  (*Id.* ¶ 60; *see also id.* ¶¶ 59-62.)  Issaenko alleges that, also without Bazzaro's instruction, she "conceived, designed and performed additional experiments."  (*Id.* ¶ 62.)  Issaenko alleges that based on her independent experiments she "created compilations of tables, graphs and images," and asked Bazzaro to include them in the joint manuscript to be submitted to the JMC.  (*Id.* ¶ 63.)  Issaenko continued to conduct experiments that Bazzaro determined were unnecessary, and submitted to Bazzaro the figures she made at home as a result of these experiments.  (*Id.* ¶¶ 64-65.) Bazzaro denied Issaenko's request to have this material included in the joint manuscript. (*Id.* ¶ 66.)

## III.   TERMINATION

In May and June 2010, Bazzaro went on vacation.  (*Id.* ¶ 79.)  During this time period, Issaenko alleges that she performed experiments that had been requested by Bazzaro and provided her with the raw data and compilations that resulted from those experiments.  (*Id.* ¶¶ 77-79.)  During Bazzaro's vacation Issaenko also "conceived ideas

and designed several additional experiments" but was unable to work on them in

Bazzaro's lab as she did not have the financial resources to purchase the necessary

supplies and certain equipment was not functioning.  (*Id.* ¶ 78.)  Instead, Issaenko

decided to conduct these experiments in Dr. Polunovsky's laboratory.  (*Id.* ¶ 79.)

Issaenko compiled the results of these experiments into tables, graphs, and images using

her own software.  (*Id.* ¶ 80.)  Later in June, when Bazzaro returned from vacation,

Issaenko presented Bazzaro with the independent work she had done in Dr. Polunovsky's

lab. (*Id.* ¶¶ 82, 84.)  Bazzaro requested that Issaenko provide her with copies of her work

and raw data so that Bazzaro could draft a joint manuscript on which Issaenko would be

listed as the first author.  (*Id.* ¶ 87.)  Issaenko provided the requested information.  (*Id.*

¶ 88.)  Issaenko alleges that afterward, when Issaenko returned to work from vacation on

July 1, 2010,

> she was escorted out of the building and her job appointment was
> terminated before its expiration.  Defendants never returned Plaintiff's
> research binder, an envelope with x-ray films she produced in
> Dr. Polunovsky's lab[,] and the USB drive with digital files of all of her
> compilations and now Copyrighted Images and Works.  Plaintiff never
> received back her CD with the software for Plaintiff's personal $450.00
> Canon digital camera (which she cannot use now because Defendant
> Bazzaro has the software).  Defendants also never returned Plaintiff's
> handwritten notes where Plaintiff drafted future grant proposals.

(*Id.*)  It is unclear from Issaenko's allegations whether she was actually terminated on

July 1, 2010, because she also alleges, as discussed below, that she was terminated in

early 2011.  It does not appear, however, that the timing of Issaenko's termination is

critical to any of her claims, and the Court therefore need not resolve this discrepancy in

the allegations in ruling on the present motions.

## IV.    THE JOINT MANUSCRIPT

Issaenko alleges that in August 2010 Bazzaro used Issaenko's research findings and figures in the joint manuscript submitted to the JMC and although she told Issaenko that Issaenko had been listed as an author, Bazzaro in fact did not list Issaenko as an author.  (*Id.* ¶¶ 67-68; *see also id.*, Ex. 15 at 41.)  Bazzaro also signed a publishing license agreement with the JMC, which Issaenko alleges transferred to the journal Issaenko's copyright in the works she had created.  (*Id.* ¶ 67, Ex. 16 at 43.)  But Issaenko also alleges that pursuant to this agreement, Issaenko "retained non-exclusive copyrights and all proprietary rights on the research presented with that article."  (*Id.* ¶ 68.)

Because of her concerns over authorship of the joint manuscript Issaenko contacted several University professors regarding Bazzaro's behavior, and ultimately on August 26, 2010, Issaenko submitted a letter to Defendant Linda Carson, head of the Department of Obstetrics, Gynecology and Women's Health at the University indicating her belief that Bazzaro had violated the University of Minnesota Policy – Code of Conduct.  (*Id.* ¶ 69, Ex. 18 at 59-60.)  Issaenko's letter stated that "[r]esults of my work were included in one manuscript submitted for publication in Journal of Medicinal Chemistry (JMC), one manuscript in preparation (or already submitted for publication in JMC or elsewhere) and 2 or 3 additional manuscript[s] were planned in the future."  (*Id.*, Ex. 18 at 59.)  In the letter Issaenko requested that her co-authorship be reflected as to the compilations she had created that were included in the manuscript and requested that "this matter be investigated by your Office, and my authorship in current manuscript and

corresponding patent, and all future publications . . . be properly assigned." (*Id.*, Ex. 18 at 60.)

Defendants Carson, Douglas Yee (the director of the Masonic Cancer Center) Frances Lawrenz (associate vice president for research), and Tucker LeBien (associate vice president of the Academic Health Center Office of Research) responded to Issaenko's complaint by letter dated September 10, 2010. (*Id.*, Ex. 19 at 63-64.)  In the letter Defendants indicated that if the joint manuscript was accepted by the JMC for publication, Issaenko would "be included as a co-author" provided that Issaenko reviewed the manuscript and agreed to its publication, and subject to a final decision by the Editor of the JMC. (*Id.* ¶ 71, Ex. 19 at 63.)  With respect to authorship on future publications the letter explained:

> There are published guidelines established at the University of Minnesota and most scientific journals for authorship on any publication.  Decisions on authorship are under the authority of the senior author/PI/Head of the laboratory.    In this case, the final decision about the intellectual contributors rests with Dr. Bazzaro.  If she felt you should be included as a co-author on any future publications, you would be contacted.  However, the fact that you were an employee in her laboratory who generated data that could be used in future manuscript submissions does not entitle you to authorship, nor does it obligate Dr. Bazzaro to include you as a co-author.

(*Id.*, Ex. 19 at 63.)  The letter also informed Issaenko that she was not permitted to share, send, or present "preliminary data to individuals that are not part of Dr. Bazzaro's laboratory" both because the data was preliminary and therefore "not suitable for publication or communication in any form" and because "these data are not owned by you; they are the property of Dr. Bazzaro and, ultimately, the University of Minnesota." (*Id.*, Ex. 19 at 64.)

Issaenko alleges that at some point during this time period Bazzaro "made damaging statements to the University Administration that Plaintiff 'improperly shared' with her co-authors . . . Plaintiff's independently created works." (*Id.* ¶¶ 72-73.)

## V.    COPYRIGHT APPLICATIONS AND POST-TERMINATION EVENTS

In early 2011 Issaenko sought and was granted copyrights in three different compilations related to the projects described above (collectively, "the Copyrighted Works"). (*Id.* ¶ 90, Exs. 1-3.)  In a letter dated January 28, 2011 Issaenko notified the University that she had sought this copyright protection, and also responded to the September 10, 2010 letter, noting that she still had concerns about her authorship rights particularly over work that she had performed on her own "personal and un-paid time and not at the direction or knowledge of Dr. Bazzaro or any other University representative." (*Id.*, Ex. 24 at 89; *see also id.* ¶ 91.)  Issaenko also responded that she had never "inappropriately shared data" and had only presented or discussed data with "authors of the corresponding manuscript(s) and/or patent(s) on which I was working at the time." (*Id.*, Ex. 24 at 90.)  Issaenko also noted that she "consider[ed] any communication that states or implies that I acted inappropriately or unethically regarding my work to be defamatory, and I expressly reserve all my rights and claims in that regard as well" (*id.*) and requested that the University place this "rebuttal letter" into her personnel file (*id.*, Ex. 24 at 91).

Issaenko alleges that in January and February 2011 she performed additional experiments in the laboratory of Dr. Zukowska's – another University professor – who

gave her permission to perform the experiments and publish the results.  (*Id.* ¶ 93.)
Issaenko alleges that after she notified the University on January 28, 2011, that she
intended to seek copyright protection for her work she was terminated.  (*Id.*)

 After her termination Dr. Polunovsky continued to perform work on Issaenko's
data samples, and Issaenko used those results as well as her previous research to generate
figures for an article which she drafted in April 2011.  (*Id.* ¶¶ 94-95.)  Issaenko alleges
that "[w]hen Defendants learned of Plaintiff's intent to publish her authors' works, they
engaged in intimidation and threats and allegations of unlawful and/or illegal activity."
(*Id.* ¶ 96.)

 Despite these apparent threats, Issaenko alleges that she sought and received
approval from the other contributors to her research and submitted her article to the
Journal of Molecular Cancer Therapeutics in the fall of 2011.  (*Id.* ¶ 97.)  Issaenko
alleges that the journal refused to publish her article because "Defendant Bazzaro made
false allegations to the journal that Plaintiff was under a 'misconduct investigation' by
the University of Minnesota."  (*Id.* ¶ 97 (citing *id.*, Ex. 25 at 93).)[4]  Issaenko then
published the article in the Cell Cycle journal's May 1, 2012 issue.  (*Id.* ¶ 98.)  After the
article's publication, the University contacted Cell Cycle and notified the journal that
"Dr. Bazzaro and the University of Minnesota did not give Dr. Issaenko permission to
use the data or materials from Dr. Bazzaro's laboratory for independent publication

---

 [4] The exhibit Issaenko cites for this proposition is a letter from Defendant LeBien.  But
the letter in the exhibit is addressed to the editor in chief of Cell Cycle magazine, and it is
therefore unclear how this exhibit supports Issaenko's allegation that Bazzaro communicated
with the Journal of Molecular Cancer Therapeutics.

purposes.  In fact, University officials explicitly informed Dr. Issaenko that she was not authorized to submit manuscripts based on research or materials from Dr. Bazzaro's laboratory."  (*Id.*, Ex. 25 at 93; *see also id.* ¶ 98.)  In the letter to Cell Cycle, Defendant LeBien explained that "[b]ased on my review of the above referenced paper and my knowledge of the research reported by Dr. Issaenko, it is my opinion that a substantial portion of the data reported in the paper were generated in Dr. Bazzaro's laboratory," and therefore requested that Cell Cycle "review this matter and determine whether the published paper meets the journal's authorship and publication requirements in view of the information I have provided."  (*Id.*, Ex. 25 at 93.)

In response, Cell Cycle published a retraction of Issaenko's manuscript on May 1, 2013, noting that the University had reviewed the manuscript and determined that the tables and figures in the paper were generated by Issaenko "while working as a staff member in the laboratory of Dr[.] Martina Bazzaro from September 2009 to July 2010 and were used by Dr[.] Issaenko without permission from Dr[.] Bazzaro or the University."  (*Id.*, Ex. 25 at 94.)  Issaenko alleges that the article was only temporarily retracted, and that "Defendants then threated [sic] the journal and demanded that it publish defamatory statements about Plaintiff and her work."  (*Id.* ¶ 98.)  Specifically, Cell Cycle published an expression of concern regarding the May 1, 2012 manuscript, noting that in October 2012 Issaenko "claimed copyright infringement of her work by a competing researcher Dr[.] Martina Bazzaro of the University of Minnesota," and that "[i]n return, the University of Minnesota performed a review of Dr[.] Bazzaro's laboratory materials from 2010 and claim ownership of data from Table 1 and Parts of

Figures 1-6.  These claims have been denied, and the dispute is ongoing." (*Id.*, Ex. 26 at 98 (emphases omitted).)

The University objected to the language used in this expression of concern, and suggested that the expression of concern should read:

> The University of Minnesota claims ownership of data in this paper and reports that its faculty member, Dr[.] Martina Bazzaro, alerted UMN officials to the fact that data published in the paper was generated during the time Dr[.] Issaenko was a staff member/employee in the laboratory of Dr[.] Bazzaro.  University officials evaluated Dr[.] Bazzaro's computer files and laboratory notebooks and confirmed ownership of data from Table 1 and parts of Figures 1-6.  Dr[.] Issaenko disputes the University's claim of data ownership.

(*Id.*, Ex. 26 at 98 (emphases omitted); *see also id.* ¶ 98.)  The journal noted that "[t]his conflict appears to extend past the bounds of this journal, and the publisher wishes to remain impartial.  We leave it to the two parties involved to settle this matter in an appropriate venue." (*Id.*, Ex. 26 at 98.)

## VI.   ISSAENKO'S CLAIMS

Issaenko initiated this action on December 23, 2013.  (Compl., Dec. 23, 2013, Docket No. 1.)  On January 16, 2014, Issaenko filed the First Amended Complaint bringing claims against the University, all of the University's Regents in their official capacities,[5] a variety of University officials in their official capacities (Senior Vice President of Academic Affairs and Provost Karen Hanson, Director of the Masonic

---

[5] The Regent Defendants are Richard B. Beeson, Dean E. Johnson, Clyde E. Allen, Laura M. Brod, Linda A. Cohen, Thomas W. Devine, John R. Frobenius, David M. Larson, Peggy E. Lucas, David J. McMillan, Abdul M. Omari, and Patricia S. Simmons.

Cancer Center Douglas Yee, Associate Vice President of the Academic Health Center Office of Research Tucker W. LeBien, Professor and Head of the Department of Obstetrics, Gynecology, and Women's Health Linda Carson, and Associate Vice President for Research Frances Lawrenz), and Bazzaro in her personal, individual, and official capacity as faculty of the University.  (Am. Compl. at 1.)

The First Amended Complaint alleges that all Defendants are liable for copyright infringement, violation of Minnesota's Uniform Deceptive Trade Practice Act, unfair competition, unjust enrichment, defamation, tortious interference with a prospective business advantage, promissory estoppel, violations of the Privileges and Immunities Clause, and violations of the Due Process Clause.  Issaenko seeks injunctive relief as well as damages.  (*Id.* at 56-57.)  Specifically, Issaenko alleges that Defendants' actions resulted in her inability "to secure employment in academic science or the scientific industry and . . . to further develop her research or procure funding to support such research with grant applications." (*Id.* ¶ 99.)  Issaenko further contends that Defendants' actions "irreparably harmed Plaintiff's professional reputation and standing as well as her career development" and "destroyed all of the Plaintiffs['] educational investments, hard work and effort to advance the knowledge in her field of cancer research science." (*Id.* ¶¶ 100-101.)

- 14 -

**ANALYSIS**

## I.     MOTION TO DISMISS/MOTION TO AMEND

Defendants bring a motion to dismiss Issaenko's First Amended Complaint in its entirety under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Mot. to Dismiss, Feb. 14, 2014, Docket No. 10.)  Several months later, Issaenko filed a motion to amend seeking permission to file a Proposed Second Amended Complaint ("Second Amended Complaint") which dismisses the Individual Defendants that are regents of the University, seeks to sue the remaining Individual Defendants in their individual as well as official capacities, and adds some factual allegations regarding the identities of the various Individual Defendants and additional details with respect to the defamation claim. (Mot. to Amend, June 5, 2014, Docket No. 38; *see also id.*, Ex. 2 ("Second Am. Compl.").)  In response to the motion to amend, Defendants argue that the Court should deny the motion because amendment would be futile.  (*See generally* Defs.' Mem. in Opp'n to Mot. to Amend, June 26, 2014, Docket No. 47.)  As explained more fully below, deciding a motion to dismiss and determining whether amendment would be futile employ the same standard of review.  Because these motions employ an identical standard of review and raise identical substantive issues, with respect to each claim or relevant group of claims, this Order will first discuss whether dismissal of the claims raised in the First Amended Complaint is appropriate.  With that law and analysis in mind, the Order will then address whether anything in the Second Amended Complaint alters the conclusion reached with respect to the First Amended Complaint.

## A.      Motion to Strike Responsive Memorandum

Before considering the merits of the motions to dismiss and for leave to amend,

the Court will address an initial procedural matter.  Prior to oral argument on the pending

motions Issaenko filed a motion to strike Defendants' memorandum in response to her

motion seeking leave to file the Second Amended Complaint.  (Mot. to Strike, July 1,

2014, Docket No. 58.)  Issaenko argues that the memorandum must be struck because it

was untimely.   Specifically, Issaenko argues that because a motion to amend is a

nondispositive matter, the memorandum in opposition should have been filed seven days

after service of the motion, which occurred on June 5, 2014, and was therefore due on

June 12, 2014, but was not filed until June 26, 2014.  (Pl.'s Mem. in Supp. of Mot. to

Strike at 2, July 1, 2014, Docket No. 60); *see also* D. Minn. LR 7.1(b)(2) (providing that

"[w]ithin 7 days after filing of a nondispositive motion and its supporting documents . . .

the responding party must file and serve" a memorandum of law and any accompanying

affidavits or exhibits).  Issaenko explains that "Defendants have neither offered excusable

neglect nor requested an extension of the filing and service date" and that "[t]herefore

Defendants' submissions were untimely and should be stricken."  (Pl.'s Mem. in Supp. of

Mot. to Strike at 2.)  Issaenko also asks for a general award of "her expenses" and "fees,"

although she does not specify an amount of fees, or to what those fees are related.  (*Id.* at

3.)

Defendants concede that their memorandum was untimely filed, but explain that

the mistake was made in good faith and their confusion about the deadline for that

memorandum was caused, to some extent, by Issaenko's filing of a motion for

preliminary injunction shortly before the hearing and the Court's entry of a briefing schedule with respect to that motion.   (Defs.' Mem. in Opp'n to Mot. to Strike at 2, July 2, 2014, Docket No. 62.)   Defendants argue, however, that their brief should not be stricken because Issaenko has suffered no prejudice.   Defendants also argue that striking the memorandum will only unnecessarily delay the case because if the Court declines to consider their arguments that the motion to amend is futile and allows Issaenko to file her Second Amended Complaint, it will require that another motion to dismiss that complaint be filed, which will raise the same arguments found in Defendants' current memorandum in opposition to the motion to amend.

The Court agrees that, although Defendants' memorandum was untimely, that untimeliness is harmless under these circumstances.   The lack of prejudice to Issaenko is demonstrated in particular by the fact that Defendants' arguments against the filing of the Second Amended Complaint are almost identical to their arguments made in connection with the motion to dismiss the First Amended Complaint.   In other words, the late-filed memorandum primarily explains how the proposed amendments do not cure the deficiencies identified in the original motion to dismiss.   Therefore there does not appear to be any unfair surprise, nor has Issaenko argued that the late-filing caused her to be unable to prepare for the hearing on the motion or otherwise prejudiced her case.   Here, the sanction requested – exclusion of the entire memorandum – is out of proportion to any possible inconvenience suffered by Issaenko.   Because Issaenko has failed to demonstrate any prejudice caused by the Court's consideration of Defendants'

memorandum, the Court will deny the motion to strike, and will also deny Issaenko's general request for fees and costs.

### B.      Standards of Review

Rule 15(a) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). But "[a] district court may appropriately deny leave to amend where there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005) (internal quotation marks omitted). Where, as here, futility is raised as a basis for opposing proposed amendments to a complaint, the Court must determine whether the proposed claims state a claim for relief at this stage of the case. *See Briscoe v. Cnty. of St. Louis, Mo.*, 690 F.3d 1004, 1015 (8th Cir. 2012) ("When the court denies leave to amend on the basis of futility, it means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure . . . ." (alteration and internal quotation marks omitted)); *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010). Thus, the question in determining whether to permit amendment is "whether the proposed amended complaint states a cause of action under the *Twombly* pleading standard." *Zutz*, 601 F.3d at 850-51.

In reviewing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states "'a claim to relief that is plausible on its face.'" *Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action . . . .'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed.  *Id.* (internal quotation marks omitted).  Finally, Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

Defendants have also moved to dismiss for lack of subject matter jurisdiction on sovereign immunity grounds pursuant to Federal Rule of Civil Procedure 12(b)(1).  *See Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000) (explaining that "sovereign immunity is a jurisdictional question" and properly addressed as a Rule 12(b)(1) motion to dismiss (alteration and internal quotation marks omitted)).  A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) may challenge the plaintiff's complaint either on its face or on the factual truthfulness of its averments. *See Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1999).  Defendants'

jurisdictional argument based on sovereign immunity is a facial challenge because it does not call upon the Court to "engage[] in a factual review" by "inquir[ing] into and resolv[ing] factual disputes." *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002). In a facial challenge to jurisdiction, the court "determine[s] whether the asserted jurisdictional basis is patently meritless by looking to the face of the complaint, and drawing all reasonable inferences in favor of the plaintiff." *Biscanin v. Merrill Lynch & Co.*, 407 F.3d 905, 907 (8th Cir. 2005) (citation omitted). With these standards in mind, the Court proceeds to address Issaenko's claims in the context of Defendants' motion to dismiss and Issaenko's motion to amend.

### C.      Copyright Infringement (Count I)

With respect to her copyright infringement claim, in the First Amended Complaint Issaenko alleges generally that she "has not authorized Defendants to copy, reproduce, solicit for grants, duplicate, disseminate, distribute, sell, offer for sale, use, or display images that are the same, substantially similar, or confusingly similar to any of Plaintiff's works of authorship, including her Copyrighted Images and Works," but that Defendant has in fact so used the Copyrighted Works. (Am. Compl. ¶¶ 102-105.) In Count I Issaenko alleges that Defendants infringed her copyrights in the Copyrighted Works "by using, making grant applications, soliciting for grants, seeking patents, distributing, publicly displaying, offering for sale, and/or selling images that were copied, caused to be copied from, or constitute derivative works of Dr. Olga Issaenko's Copyrighted Images and Works, and which are virtually identical and/or substantially similar to those

Copyrighted Images." (*Id.* ¶ 121.)  Issaenko lists specific uses made of her Copyrighted

Works – including Bazzaro's submission of a patent application, various presentations of

Bazzaro's, and various of the University's grant applications.  (*Id.* ¶ 106.)  The only

Defendant specifically named in any of these allegations is Bazzaro.  (*See id.* ¶¶ 102-

111.)   Issaenko further alleges that "Defendants possessed the right and ability to

supervise the infringing activity and possessed an obvious and direct financial interest in

Dr. Olga Issaenko's exploited works of authorship and/or her Copyrighted Images and

Works" (*id.* ¶ 122) and that

> Defendants['] direct, indirect, contributory and/or vicarious copyright
> infringement has caused, and will continue to cause Dr. Olga Issaenko to
> suffer substantial injuries, loss, and damage to her proprietary and exclusive
> rights to the Copyrighted Images and Works, and has damaged Dr. Olga
> Issaenko's reputation and goodwill, diverted her potential trade, and caused
> lost opportunities, and lost profits, all in an amount yet to be determined

(*id.* ¶ 124).  Issaenko seeks statutory and actual damages, profits made by Defendants,

and injunctive relief "that the infringing copies of the Copyrighted Images be seized,

impounded and destroyed."  (*Id.* ¶ 132; *see id.* ¶¶ 125-128.)


### 1.    Eleventh Amendment

Defendants first argue that the copyright infringement claim must be dismissed

against the University and all of the Individual Defendants and Bazzaro to the extent they

are sued in their official capacities[6] because those Defendants are immune from suit under the Eleventh Amendment.

### a.  Eleventh Amendment Immunity

The Eleventh Amendment bars suits against state governments brought in federal court unless the state has clearly and unequivocally waived its immunity, *Faibisch*, 304 F.3d at 800, or Congress has abrogated the states' Eleventh Amendment immunity with respect to that particular cause of action, *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-56 (1996).   Eleventh Amendment immunity extends to the University of Minnesota because it is "an instrumentality of the state."   *Humenansky v. Regents of Univ. of Minn.*, 152 F.3d 822, 824 (8th Cir. 1998) (internal quotation marks omitted). "Additionally, the Eleventh Amendment prohibits federal-court lawsuits seeking monetary damages from individual state officers in their official capacities because such lawsuits are essentially 'for the recovery of money from the state.'"   *Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996) (footnote omitted) (quoting *Ford Motor Co. v. Dep't of the Treasury*, 323 U.S. 459, 464 (1945)); *see also Grand River Enters. Six Nations, Ltd. v. Beebe*, 467 F.3d 698, 701 (8th Cir. 2006) ("The Eleventh Amendment protects states from being sued in federal court without their consent and also bars suits against state officers acting in their official capacities when the state itself is 'the real, substantial party in interest.'" (quoting *Ford Motor Co.*, 323 U.S. at 464)).

---

[6] For purposes of the First Amended Complaint, as explained above, this includes all Defendants with the exception of Bazzaro, who is sued in both her official and individual capacity.  The individual capacity claim against Bazzaro will be discussed separately.

Issaenko does not dispute that Defendants have not clearly and unequivocally waived their Eleventh Amendment immunity. Instead, the parties dispute whether Congress abrogated the states' Eleventh Amendment immunity with respect to violations of the Copyright Act. To determine whether Congress has abrogated immunity, the Court employs "a two-prong analysis." *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 (8th Cir. 1999) (citing *Seminole Tribe*, 517 U.S. at 55). First, the Court must "determine whether Congress has unequivocally expressed its intent to abrogate the immunity." *Id.* Second, the Court must ascertain whether, when Congress effectuated that abrogation, it acted pursuant to a valid exercise of its power under the enforcement provision found in Section 5 of the Fourteenth Amendment. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 364 (2001) ("[T]he Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. As a result . . . Congress may subject nonconsenting States to suit in federal court when it does so pursuant to a valid exercise of its § 5 power." (citations and internal quotation marks omitted)). Where Congress has failed to act pursuant to a proper exercise of its power under Section 5 of the Fourteenth Amendment "there is no valid abrogation" of states' Eleventh Amendment immunity from private suit in federal court, and accordingly the district court will lack subject matter jurisdiction over claims relying on such abrogation. *See Alsbrook*, 184 F.3d at 1010 (holding "that the extension of Title II of the ADA to the states was not a proper exercise of Congress's power under Section 5 of the Fourteenth Amendment. Consequently, there is no valid abrogation of Arkansas' Eleventh Amendment immunity

from private suit in federal court and the district court lacked subject matter jurisdiction over the ADA claim.").

### b.      Waiver of Immunity in the CRCA

In the Copyright Remedy Clarification Act ("CRCA" or "Copyright Act"), under which Issaenko brings her copyright claims, Congress clearly expressed an intent to abrogate state immunity.  Section 511 of the Act states:

> Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity, shall not be immune, under the Eleventh Amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person, including any governmental or nongovernmental entity, for a violation of any of the exclusive rights of a copyright owner provided by sections 106 through 122 . . . or for any other violation under this title.

17 U.S.C. § 511(a); *see also* 17 U.S.C. § 501(a) ("Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.").  Therefore, the relevant question for purposes of Defendants' motion is whether that abrogation was made pursuant to a valid exercise of Congress' power under Section 5 of the Fourteenth Amendment.

The Fourteenth Amendment provides, in relevant part, that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Section 5 of the Amendment provides that "The Congress shall have power to enforce, by appropriate legislation, the

provisions of this article." U.S. Const. amend. XIV, § 5. Section 5 is "a positive grant of legislative power" to Congress. *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966). But that power is a "remedial" one, which "extends only to enforcing the provisions of the Fourteenth Amendment." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997) (alterations and internal quotation marks omitted), *superseded on other grounds by statute as stated in Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). In other words, Congress "has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the 'provisions of [the Fourteenth Amendment].'" *Id.* (alteration in original). The Supreme Court has held that in order to be a valid exercise of Section 5's enforcement power "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520.

Neither the United States Supreme Court nor the Eighth Circuit has addressed whether Congress acted pursuant to a valid exercise of its Section 5 power when it abrogated state sovereign immunity under § 511 of the CRCA. But the Fifth Circuit and numerous district courts have concluded that Congress did **not** act pursuant to a valid exercise of Section 5 power, and therefore state sovereign immunity is not waived under the CRCA. To fully understand and appreciate the reasoning and import of these courts' holdings, it is useful to begin with a discussion of the Supreme Court's opinion in *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627 (1999), which held that Congress' attempt to abrogate states' immunity from patent

- 25 -

infringement claims was invalid as beyond the scope of Congress' Section 5 power.  In

*Florida Prepaid*, the Court considered the Patent Remedy Act, which provided:

> Any State, any instrumentality of a State, and any officer or employee of a
> State or instrumentality of a State acting in his official capacity, shall not be
> immune, under the eleventh amendment of the Constitution of the United
> States or under any other doctrine of sovereign immunity, from suit in
> Federal court by any person . . . for infringement of a patent under section
> 271, or for any other violation under this title.

*Id.* at 632 (alteration in original) (internal quotation marks omitted).  The Court began by

acknowledging that "in enacting the Patent Remedy Act, Congress has made its intention

to abrogate the States' immunity unmistakably clear in the language of the statute" and

went on to consider "[w]hether Congress had the power to compel States to surrender

their sovereign immunity for these purposes."  *Id.* at 635 (internal quotation marks

omitted).

    With respect to Congressional power, the Court noted that Congress had justified

its passage of the Patent Remedy Act under the Patent Clause, U.S. Const. art. I, § 8,

cl. 8, the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and Section 5 of the Fourteenth

Amendment.  *Id.* at 635-36.  But the Court explained that "Congress may not abrogate

state sovereign immunity pursuant to its Article I powers; hence the Patent Remedy Act

cannot be sustained under either the Commerce Clause or the Patent Clause."  *Id.* at 636

(citing *Seminole Tribe*, 517 U.S. at 72-73).  The Court therefore focused its analysis on

the propriety of abrogation pursuant to Section 5 of the Fourteenth Amendment.  The

Court began by reviewing the legislative history that Congress had considered in passing

the Patent Remedy Act and concluded that the Act could not "be viewed as remedial or

preventive legislation aimed at securing the protections of the Fourteenth Amendment for patent owners" because "[i]n enacting the Patent Remedy Act . . . Congress identified no pattern of patent infringement by the States, let alone a pattern of constitutional violations." *Id.* at 639-40. The Court distinguished the Patent Remedy Act from, for example, voting rights cases where Congress was confronted with an "undisputed record of racial discrimination" that it was remedying. *Id.* at 640. Unlike those cases, the Court explained that with respect to patents

> Congress came up with little evidence of infringing conduct on the part of the States. The House Report acknowledged that many states comply with patent law and could provide only two examples of patent infringement suits against the States. The Federal Circuit in its opinion identified only eight patent-infringement suits prosecuted against the States in the 110 years between 1880 and 1990.

*Id.* (citations and internal quotation marks omitted).

The Court also concluded that, although the relevant question for purposes of assessing state constitutional violations was whether states were depriving individuals patents without due process of law, Congress had failed to consider the availability of state remedies for patent infringement, and had thus not demonstrated any congruence or proportionality between the remedies in the Patent Remedy Act and any unconstitutional conduct by states. *Id.* at 643-45. In light of Congress' failure to identify widespread unconstitutional conduct in need of remedying, the Court concluded that "the provisions of the Patent Remedy Act are so out of proportion to a supposed remedial or preventive object that they cannot be understood as responsive to, or designed to prevent,

unconstitutional behavior."  *Id.* at 646 (alteration and internal quotation marks omitted).

In particular, the Court noted:

> Despite subjecting States to this expansive liability, Congress did nothing to limit the coverage of the Act to cases involving arguable constitutional violations, such as where a State refuses to offer any state-court remedy for patent owners whose patents it had infringed.  Nor did it make any attempt to confine the reach of the Act by limiting the remedy to certain types of infringement, such as nonnegligent infringement or infringement authorized pursuant to state policy; or providing for suits only against States with questionable remedies or a high incidence of infringement.

*Id.* at 646-47.  Based on this reasoning the Court concluded:

> The historical record and the scope of coverage therefore make it clear that the Patent Remedy Act cannot be sustained under § 5 of the Fourteenth Amendment.   The examples of States avoiding liability for patent infringement by pleading sovereign immunity in a federal-court patent action are scarce enough, but any plausible argument that such action on the part of the State deprived patentees of property and left them without a remedy under state law is scarcer still.  The statute's apparent and more basic aims were to provide a uniform remedy for patent infringement and to place States on the same footing as private parties under that regime.  These are proper Article I concerns, but that Article does not give Congress the power to enact such legislation after *Seminole Tribe*.

*Id.* at 647-48 (footnote omitted).

The Fifth Circuit in *Chavez v. Arte Publico Press*, 204 F.3d 601 (5th Cir. 2000) applied the rationale from *Florida Prepaid* to the CRCA.  The *Chavez* court began by noting that Congress' abrogation of state sovereign immunity in the CRCA was invalid because Congress relied explicitly on the Copyright Clause in Article I in enacting the CRCA, and the court was therefore not required to "consider another ground of constitutionality – the Fourteenth Amendment – that Congress did not invoke."  *Id.* at 604 (citing *Florida Prepaid*, 527 U.S. at 642 n.7 ("There is no suggestion in the language of

the statute itself, or in the House or Senate Reports of the bill which became the statute, that Congress had in mind the Just Compensation Clause of the Fifth Amendment.  Since Congress was so explicit about invoking its authority under Article I and its authority to prevent a State from depriving a person of property without due process of law under the Fourteenth Amendment, we think this omission precludes consideration of the Just Compensation Clause as a basis for the Patent Remedy Act.”)).

Despite Congress’ failure to explicitly rely on Section 5 as the basis for its authority to abrogate state sovereign immunity under the CRCA, the *Chavez* court went on to consider whether the CRCA was a proper exercise of Congress’ power to enforce the Due Process Clause.  *Id.* at 605.  As in *Florida Prepaid*, the *Chavez* court first looked to the legislative history of the CRCA to determine whether Congress had identified a pattern of copyright infringement or constitutional violations by the States that warranted remedial legislation.  *Id.* at 605.  The court concluded that “[a]lthough the legislative history for the CRCA documents a few more instances of copyright infringement than the [Patent Act] legislative history did of patent violations, the CRCA’s history exhibits similar deficiencies.”  *Id.*  For example, testimony showed that states were not involved in wholesale violation of the copyright laws, there had not been a significant number of takings of copyright rights by states or state entities, and the Copyright Office reported no more than seven incidents of state copyright infringement enabled by the Eleventh Amendment.  *Id.* at 605-06.  The court concluded that “[r]ather than expose a current epidemic of unconstitutional deprivations, the testimony before Congress worried principally about the **potential** for future abuse.”  *Id.* at 606 (emphasis in original).

The *Chavez* court also considered "whether Congress studied the existence and adequacy of state remedies for injured copyright owners when a state infringes their copyrights." *Id.* at 606. The court found that the CRCA's history was "parallel" to the Patent Act in that "Congress barely considered the availability of state remedies for infringement." *Id.* Finally, the court "examined the breadth of coverage of the legislation," and found that the remedies in the CRCA were overly broad and therefore were not "proportionate to legitimate section 5 ends." *Id.* at 607. Therefore, the court concluded:

> Since the record does not indicate that Congress was responding to the kind of massive constitutional violations that have prompted proper remedial legislation, that it considered the adequacy of state remedies that might have provided the required due process of law, or that it sought to limit the coverage to arguably constitutional violations, we conclude that the CRCA is, like the [Patent Act], an improper exercise of Congressional legislative power.

*Id.*; *see also Rodriguez v. Tex. Comm'n on the Arts*, 199 F.3d 279, 281 (5th Cir. 2000) ("It is appropriate for us to adopt [the analysis from *Florida Prepaid*] in the copyright context. The interests Congress sought to protect in each statute are substantially the same and the language of the respective abrogation provisions are virtually identical.").

Although neither the Supreme Court nor the Eighth Circuit has addressed the issue, all of the other courts to consider the question to date have concluded that Congress lacked a valid grant of constitutional authority to abrogate the states' sovereign immunity under the CRCA. *See, e.g.*, *Jacobs v. Memphis Convention & Visitors Bureau*, 710 F. Supp. 2d 663, 674-82 (W.D. Tenn. 2010) (conducting an extensive, independent review of the legislative history of the CRCA before determining that "the attempt at

abrogation of state sovereign immunity contained in the Copyright Remedy Clarification Act of 1990, codified at 17 U.S.C. § 511, cannot be sustained as appropriate prophylactic legislation under § 5 of the Fourteenth Amendment"); *Mktg. Info. Masters, Inc. v. Bd. of Trs. of Cal. State Univ. Sys.*, 552 F. Supp. 2d 1088, 1094-95 (S.D. Cal. 2008) (dismissing copyright infringement claims against state university actors after concluding that "the CRCA fails to meet the 'congruence and proportionality' test and is not a valid exercise of Congress's power under § 5 of the Fourteenth Amendment").  Some courts have concluded that Congress did not validly abrogate sovereign immunity in the CRCA because it explicitly cited only Article I as a basis for its action, and did not rely on its Section 5 power.  *See Coyle v. Univ. of Ky.*, Civ. No. 12-369, 2014 WL 866626, at *2-3 (E.D. Ky. Mar. 4, 2014) (finding that the CRCA did not abrogate sovereign immunity, but relying on the basis that Congress cited only Article I and not, therefore, engaging in an analysis of whether Congress' action would have been valid under § 5); *Jehnsen v. N.Y. State Martin Luther King Jr., Inst. for Nonviolence*, 13 F. Supp. 2d 306, 310 (N.D.N.Y. 1998) (same).  Most courts have, however, gone on to analyze whether Congress acted pursuant to a valid exercise of its Section 5 power in abrogating state sovereign immunity under the CRCA, and concluded that it did not.  *See Whipple v. Utah*, Civ. No. 10-811, 2011 WL 4368568, at *20 (D. Utah Aug. 25, 2011); *Romero v. Cal. Dep't of Transp.*, Civ. No. 08-8047, 2009 WL 650629, at *3-5 (C.D. Cal. Mar. 12, 2009); *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of Univ. Sys. of Ga.*, Civ. No. 07-084, 2008 WL 1805439, at *16 (M.D. Ga. Apr. 18, 2008), *affirmed in part, vacated in part on other grounds by* 633 F.3d 1297 (11th Cir. 2011); *InfoMath, Inc. v.*

*Univ. of Ark.*, 633 F. Supp. 2d 674, 679-80 (E.D. Ark. 2007); *De Romero v. Inst. of Puerto Rican Culture*, 466 F. Supp. 2d 410, 416-18 (D.P.R. 2006); *Hairston v. N.C. Agric. & Tech. State Univ.*, Civ. No. 04-1203, 2005 WL 2136923, at *8 (M.D.N.C. Aug. 5, 2005); *Salerno v. City Univ. of N.Y.*, 191 F. Supp. 2d 352, 355-56 (S.D.N.Y. 2001); *Rainey v. Wayne State Univ.*, 26 F. Supp. 2d 973, 976 (E.D. Mich. 1998).

The Court finds persuasive the reasoning of *Chavez* and the numerous district courts that have concluded that Congress failed to act pursuant to a valid exercise of its enforcement powers under Section 5 when it sought to abrogate state sovereign immunity in the CRCA. Issaenko makes two primary arguments in support of her position that the Court should reach the opposite conclusion. First, Issaenko cites the dissent in *Florida Prepaid*, which stated in a footnote, "there is hope that the Copyright Remedy Clarification Act of 1990 may be considered 'appropriate' § 5 legislation. The legislative history of that Act includes many examples of copyright infringements by States – especially state universities." 527 U.S. at 658 n.9 (Stevens, J., dissenting). Second, Issaenko argues that, consistent with the contention in that footnote, the legislative history of the CRCA shows that Congress did find that states were engaged in constitutional violations with respect to copyright ownership that warranted remedial action. Specifically, Issaenko cites several comments from a senate hearing during which witnesses stated that publishers in the educational field were particularly vulnerable to state infringement of their textbooks. (*See* Pl.'s Mem. in Opp'n to Mot. to Dismiss at 13, Mar. 24, 2014, Docket No. 20.)

But other courts have concluded that, despite the footnote in the *Florida Prepaid* dissent "upon closer examination, the legislative record created during the consideration of the Copyright Remedy Clarification Act does not establish that Congress found a sufficient pattern of prior unconstitutional conduct by the states." *Jacobs*, 710 F. Supp. 2d at 675. Although Issaenko is correct that the legislative history of the CRCA demonstrates that some witnesses testified about copyright infringement in the field of educational publishing specifically and Congress did find some examples of copyright infringement by states, these examples "were ultimately few in number and show nothing more than that some states have engaged in sporadic, individual acts of infringement." *Id.* at 676; *see also Mktg. Info. Masters, Inc.*, 552 F. Supp. 2d at 1094 ("The testimony and evidence demonstrated at most sporadic violations, not widespread violations by states."). Additionally, most of the harms considered by Congress were prospective in nature, and did not identify an existing pattern of constitutional abuses. *See* S. Rep. No. 101-305 (1990), *available at* 1990 WL 259306 ("The Copyright Office concludes and the committee agrees that copyright owners have demonstrated that they **will** suffer immediate harm if they are unable to sue infringing States for damages. The copyright owners' primary concern is that States or their instrumentalities **would engage** in widespread uncontrollable copying of their work without renume[r]ation." (emphases added)). This evidence in the legislative history does not demonstrate the widespread and persistent violations required to justify remedial action by Congress. *Compare Garrett*, 531 U.S. at 369-70 (finding that "half a dozen examples from the record" of discrimination by states "taken together fall far short of even suggesting the pattern of

unconstitutional discrimination on which § 5 legislation must be based"); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 89 (2000) (finding legislative history insufficient to support remedial legislation where the evidence of constitutional violations "consists almost entirely of isolated sentences clipped from floor debates and legislative reports" and relied on unsubstantiated statements that there was "ample evidence" and "strong indications" of unconstitutional behavior (internal quotation marks omitted)), *with Tennessee v. Lane*, 541 U.S. 509, 527 (2004) (concluding that Congress had sufficient evidence of widespread constitutional violations to enact remedial legislation where, among other evidence "[a] report before Congress showed that some 76% of public services and programs housed in state-owned buildings were inaccessible to and unusable by persons with disabilities"). Accordingly, the Court concludes that Issaenko's citations to the legislative history do not alter its conclusion that Congress failed to support passage of the CRCA with sufficient evidence of widespread and persistent constitutional violations by states.

Furthermore Issaenko's argument ignores the additional reasons that the *Chavez* and other courts found Congress' abrogation of states' immunity to be invalid. The legislative history cited by Issaenko does not demonstrate that Congress considered the scope of state remedies,[7] nor does it demonstrate that the expansive remedies provided in

---

[7] With respect to the availability of state remedies, Issaenko argues that "[i]n its memorandum of law . . . the State does not even suggest that it provides a remedy to persons whose copyrights are infringed by the State of Minnesota." (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 18.) Therefore, Issaenko argues that "absent some showing that Minnesota provides an adequate remedy for state copyright infringement, the Court should not presume that the

(Footnote continued on next page.)

the CRCA were tailored to address proportionally any constitutional violations by states of which Congress had evidence.  *See Jacobs*, 710 F. Supp. 2d at 678, 681 (explaining that "even if Congress had properly found a pattern of unconstitutional conduct by the states, however, the Court would still conclude that the scope of the remedy created by the [CRCA] lacks the congruence and proportionality required of a prophylactic remedy under § 5" because Congress did not "attempt[] to minimize the number of actual cases in which a state would be held liable for actions that violated copyright law but that did not also deprive the plaintiff of due process"). Therefore, the Court concludes that Congress did not have the authority to abrogate state sovereign immunity in the CRCA pursuant to its Section 5 powers to remedy states' violations of the Due Process Clause.

Finally Issaenko argues that even if Congress was not validly enforcing the Due Process Clause of the Fourteenth Amendment when it sought to abrogate sovereign immunity in the CRCA, the abrogation was valid as an enforcement of the Privileges and

_____

(Footnote continued.)

CRCA is unconstitutional."  (*Id.*)  But the relevant inquiry for purposes of determining whether Congress acted pursuant to a valid grant of authority under Section 5 is whether Congress acted properly based on the legislative history before it at the time the CRCA was passed.  *Whipple*, 2011 WL 4368568 at *20 ("Plaintiff has argued that *Chavez* does not apply to this particular case . . . however, Plaintiff misunderstands the analysis the court must follow.  The court does not examine whether or not Congress acted properly based upon individual cases; instead, the court examines the Congressional Record to determine whether Congress acted properly when it tried to abrogate the states' sovereign immunity **when the Act was passed**." (emphasis in original)); *Jacobs*, 710 F. Supp. 2d at 679 ("Plaintiff correctly notes that the Department has not shown how Tennessee state law provides an aggrieved copyright holder with an alternative remedy . . . . Plaintiff, on the other hand, has not pointed to any evidence in the legislative history indicating that Congress considered the unavailability of remedies under state law in deciding to abrogate the states' immunity from federal suit, and the House and Senate Reports lack discussion of this topic.").

Immunities Clause of the Fourteenth Amendment.   In support of her privileges and immunities argument, Issaenko relies upon *Saenz v. Roe*, 526 U.S. 489 (1999), a case in which the Supreme Court addressed a California statute which placed a durational residency requirement on the receipt of certain state benefits to needy families.   In that case, the Court held that the Privileges and Immunities Clause protects an aspect of a citizen's right to travel, namely "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State."   *Id.* at 502.   The Court concluded based upon this, and other constitutional provisions, that California's scheme of requiring individuals to reside in California for a period of time before receiving benefits discriminated against citizens with respect to their right to interstate travel.   *Id.* at 505.   Citing the dissent from *Saenz*, Issaenko argues that the Privileges and Immunities Clause protects "'the right to acquire and possess property of every kind'" and therefore protects copyrights as well.   (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 21 (quoting *Saenz*, 526 U.S. at 525 (Thomas, J., dissenting)).)

But Issaenko's argument that Congress' action in abrogating state immunity under the CRCA was valid as remedial legislation to enforce the Privileges and Immunities Clause does not avoid the problems identified by numerous courts with respect to Congress' authority under the Due Process Clause.   In other words, in order to be a valid exercise of its Section 5 power, Congress must still have been able to identify constitutional violations by states – whether they be of the Due Process Clause or the Privileges and Immunities Clause – prior to passing remedial legislation.   Furthermore, Congress must craft legislation that is congruent and proportional to those problems.

Because the Court has already concluded that Congress did not identify a pattern of states infringing copyrights in an unconstitutional manner and did not tailor the remedies in the CRCA to address any constitutional violations by states, the Court concludes that Congress did not act pursuant to a valid exercise of its power to enforce the Privileges and Immunities Clause in passing the CRCA.

Because the CRCA did not validly waive state immunity under the Eleventh Amendment, the Court will grant Defendants' motion to dismiss for lack of subject matter jurisdiction with respect to the University. The Court will also grant the motion with respect to the Individual Defendants, who are sued only in their official capacities, and Bazzaro in her official capacity, to the extent Issaenko's copyright claims seek damages.[8]

### c.    Injunctive Relief

Issaenko argues that even if her claim for damages against Bazzaro in her official capacity and the Individual Defendants are subject to dismissal under the Eleventh Amendment, she may still pursue injunctive relief against those Defendants.

Under *Ex Parte Young*, 209 U.S. 123 (1908) "state officials may be sued in their official capacities for prospective injunctive relief without violating the Eleventh Amendment." *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) (explaining

---

[8] With respect to the claims that the Court finds barred by the Eleventh Amendment, the Court will dismiss without prejudice. *See Roth v. United States*, 476 F. App'x 95 (8th Cir. 2012) (clarifying that dismissal on sovereign immunity grounds is a subject matter jurisdiction determination and therefore should be without prejudice).

that this doctrine applies only to state officials and "does not extend to states or state agencies"). Therefore, courts have declined to dismiss claims brought for injunctive relief against state employees in their official capacities. *See, e.g.*, *Klinger v. Dir., Dep't of Revenue*, 281 F.3d 776, 777 (8th Cir. 2002) (reversing "district court's order dismissing the plaintiffs' claim for declaratory and injunctive relief, but affirm[ing] its dismissal of the claim for damages" against state officials in their official capacity); *B.K. ex rel. Kroupa v. 4-H*, 877 F. Supp. 2d 804, 815 (D.S.D. 2012) ("Thus, defendants' motion to dismiss B.K.'s claims for monetary damages from Nielson and Geppert in their official capacities is granted but, to the extent that defendants move to dismiss B.K.'s claims for injunctive relief from Nielson and Geppert in their official capacities, that motion is denied.").

In her First Amended Complaint, Issaenko seeks injunctive relief against all Defendants with respect to her copyright infringement claim. (Am. Compl. ¶ 132.) Because injunctive relief against the Individual Defendants and Bazzaro in their official capacities is not barred by the Eleventh Amendment, the Court declines to grant Defendants' motion to dismiss Issaenko's copyright claim for lack of subject matter jurisdiction under Rule 12(b)(1) on the basis of sovereign immunity to the extent the claim seeks injunctive relief against the Individual Defendants and Bazzaro in their official capacities.

### 2. Adequacy of Allegations of Official Capacity Liability for Injunctive Relief

Although Issaenko's copyright infringement claim for injunctive relief against the Individual Defendants and Bazzaro in their official capacities is not barred by Eleventh Amendment immunity, Defendants argue that it must be dismissed for failure to adequately plead a claim upon which relief could be granted. The Supreme Court has explained "that official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal quotation marks omitted) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). "Suits against state officials in their official capacity therefore should be treated as suits against the State. . . . Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's policy or custom must have played a part in the violation of federal law.'" *Id.* (internal quotation marks omitted) (quoting *Graham*, 473 U.S. at 116). Therefore, to establish liability of an individual in an official capacity suit, a plaintiff must show that the official took an action pursuant to an unconstitutional or unlawful governmental policy or custom, or that he or she possessed final authority to establish policies over the subject matter at issue and used that authority in an unconstitutional or unlawful manner. *See Nix v. Norman*, 879 F.2d 429, 433 (8th Cir. 1989) (citing *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (but applying that case's reasoning in the context of state, not municipal actors) and *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)).

With respect to her copyright infringement claim, Issaenko alleges:

> Defendants induced, caused, or materially contributed to the infringement
> of Dr. Olga Issaenko's Copyrighted Images and Works . . . by using,
> making grant applications, soliciting for grants, seeking patents,
> distributing, publicly displaying, offering for sale, and/or selling images
> that were copied, caused to be copied from, or constitute derivative works
> of Dr. Olga Issaenko's Copyrighted Images and Works, and which are
> virtually identical and/or substantially similar to those Copyrighted Images.

(Am. Compl. ¶ 121.)  Issaenko also alleges that "[o]n information and belief, Defendants possessed the right and ability to supervise the infringing activity and possessed an obvious and direct financial interest in Dr. Olga Issaenko's exploited works of authorship and/or her Copyrighted Images and Works." (*Id.* ¶ 122.)  But Issaenko's First Amended Complaint contains no allegations about a policy or custom at the University of unlawfully infringing employees' copyrighted works.  Nor does Issaenko's First Amended Complaint contain any allegations that the Individual Defendants and/or Bazzaro had final authority to establish University policies regarding copyright and exercised that authority in an unlawful manner.  The only reference in the First Amended Complaint to a University policy or practice is Issaenko's citation to the University's copyright policy which provides that "[c]onsistent with academic tradition, University faculty and students shall own the copyrights in the academic works they create[] unless otherwise provided in a written agreement between the creator(s) and the University." (*Id.* ¶ 40 (internal quotation marks omitted).)  But this allegation does not bear upon whether an unlawful or unconstitutional policy or custom of the University "played a part in the violation of federal law."  *Hafer*, 502 U.S. at 25 (internal quotation marks omitted). Accordingly, the Court concludes that Issaenko has failed to state a plausible claim for relief against the Individual Defendants and Bazzaro in their official capacities, and will

grant Defendants' motion to dismiss the copyright claim against them in their official capacities to the extent that claim seeks prospective injunctive relief. *See Vogel v. Turner*, Civ. No. 11-446, 2012 WL 5381788, at *2 (D. Minn. Nov. 1, 2012) (dismissing official capacity claim against state employee of the Minnesota Department of Corrections because the complaint did not plausibly allege that the employee was "'an official who has the final authority to establish governmental policy'" (quoting *Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642, 645 (8th Cir. 1990))).

### 3. Qualified Immunity for Individual Capacity Claims

In the First Amended Complaint Issaenko also brings her copyright claim against Bazzaro in her individual capacity. Defendants argue that this claim must be dismissed because Bazzaro is protected by qualified immunity.

Qualified immunity shields government officials from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether Bazzaro is entitled to qualified immunity, the Court examines "(1) whether the facts alleged or shown, construed in the light most favorable to [Issaenko], establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that her actions were unlawful." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012). "A Rule 12(b)(6) dismissal based on qualified immunity is appropriate when the immunity is established on the face of the

complaint." *Dornheim v. Sholes*, 430 F.3d 919, 926 (8th Cir. 2005) (internal quotation marks omitted).

Although qualified immunity is typically applied in the context of suits under 42 U.S.C. § 1983, courts have also applied the protection to suits alleging copyright violations by state officials. *See Assoc. for Info. Media & Equip. v. Regents of the Univ. of Cal.*, Civ. No. 10-9378, 2012 WL 7683452, at * 5 (C.D. Cal. Nov. 20, 2012) (noting that "[w]hile most cases applying qualified immunity are in the civil rights context, some courts have applied the doctrine in the copyright cases"); *Campinha-Bacote v. Bleidt*, Civ. No. 10-3481, 2011 WL 4625394, at *3 (S.D. Tex. Oct. 3, 2011); *Molinelli-Freytes v. Univ. of Puerto Rico*, 792 F. Supp. 2d 150, 156-57 (D.P.R. 2010); *Nat'l Ass'n of Bds. of Pharmacy*, 2008 WL 1805439 at *21-23; *Lane v. First Nat'l Bank of Boston*, 687 F. Supp. 11, 15-17 (D. Mass. 1988). Issaenko does not dispute that the doctrine of qualified immunity is applicable to allegations of violations of the CRCA. Accordingly, the Court, finding the above-cited authority persuasive, will analyze Bazzaro's liability for copyright infringement under this doctrine.

Defendants argue, as an initial matter, that Issaenko's rights under the CRCA that she claims were violated were not clearly established at the time of the alleged violation.[9] The Court's determination as to whether a right is clearly established "is undertaken in light of the law as it existed at the time and the 'specific context of the case, not as a

---

[9] In some cases, "it is plain that a [statutory] right is not clearly established but far from obvious whether in fact there is such a right." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). Thus, the Court has discretion to select the order in which it addresses the prongs of the qualified immunity test. *See id.* at 236-37.

broad general proposition.'"  *Young v. Selk*, 508 F.3d 868, 875 (8th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also Assoc. for Info. Media*, 2012 WL 7683452 at *5 ("The Court must determine not whether copyright law is clearly established in a broad sense, but whether a specific right is clearly established under copyright law.").  "The Supreme Court, however, has made it clear that there need not be a case with 'materially' or 'fundamentally' similar facts in order for a reasonable person to know that his or her conduct would violate [a statute]."  *Young*, 508 F.3d at 875.  In other words, "[t]he question before the Court as to the Defendants in their individual capacity is not whether their actions as alleged violate a law, but whether a reasonable Defendant would have known that the alleged actions violated clearly established copyright law."  *Assoc. for Info. Media*, 2012 WL 7683452 at *6; *see also Campinha-Bacote*, 2011 WL 4625394 at *3 ("The issue then is whether [defendants] had an objectively reasonable belief that they were in compliance with copyright law.").

Defendants characterize Issaenko's copyright claim as alleging essentially that "(a) she generated the 'work' while employed by the University; (b) her job as Scientist was to work in Dr. Bazzaro's lab on assigned research projects; (c) she, without Dr. Bazzaro's knowledge, performed some work at home; and (d) Dr. Bazzaro made use of this 'work' in research activities."  (Defs.' Mem. in Supp. of Mot. to Dismiss at 13, Feb. 14, 2014, Docket No. 12 (citations omitted).)  Defendants argue that a reasonable person in Bazzaro's position would not have known that this conduct was a violation of the Copyright Act because, among other things, Bazzaro would have been reasonable in

believing that Issaenko's work fell within the work for hire exception to copyright protection under the CRCA.

The Copyright Act "provides that copyright ownership 'vests initially in the author or authors of the work.'" *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (quoting 17 U.S.C. § 201(a)). Typically, this provision affords copyright protection to "the party who actually creates a work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Id.* But "[t]he Act carves out an important exception . . . for 'works made for hire.'" *Id.*; *see* 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."). A work made for hire is further defined, in relevant part, under the Act as "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. "Although the Copyright Act does not define either 'employee' or 'scope of employment,' these terms must be 'understood in light of the general common law of agency.'" *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1015 (9th Cir. 2012) (quoting *Reid*, 490 U.S. at 739-41). Citing this guidance, numerous courts have adopted the three-part test under the Second Restatement of Agency "for determining when a work is made by an employee 'within the scope' of employment." *Id.* (citing *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994); *Saul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 117, 186 (2d Cir. 2004)). Under this three-part test, in determining whether a work was prepared within the scope of

employment, courts consider whether the work "is of the kind [the employee] is employed to perform," "occurs substantially within the authorized time and space limits," and "is actuated, at least in part, by a purpose to serve the master." *Rouse v. Walter & Assocs., L.L.C.*, 513 F. Supp. 2d 1041, 1056 (S.D. Iowa 2007) (citing Restatement (Second) of Agency § 228 (1958)).  When the first element of the test is met "courts have tended not to grant employees authorship rights solely on the basis that the work was done at home on off-hours." *Avtec Sys., Inc.*, 21 F.3d at 571 (collecting cases); *see also Rouse*, 513 F. Supp. 2d at 1058; *Vanderhurst v. Colo. Mountain Coll. Dist.*, 16 F. Supp. 2d 1297, 1307 (D. Colo. 1998) (concluding that a work was one for hire even though the outline in question was prepared on the employee's own time and using his own materials because it was connected directly with the work for which he was hired to perform).

Issaenko's sole argument that Bazzaro would have been unreasonable in believing that the Copyrighted Works were works for hire is based upon her allegation in the First Amended Complaint "that the Copyrighted Images and Works (compilations of tables, graphs, and images) were created on her own time, at her home, using her own resources, her own software, and her own computer." (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 27 (citing Am. Compl. ¶¶ 48-81).)  But these allegations are contradicted by numerous portions of the First Amended Complaint which refer to Issaenko working on this research at the lab and consulting with Bazzaro about the research.  Furthermore, the case law is clear that merely conducting work on non-work time, using an employee's own resources, does not transform the nature of a work for hire creation.

Issaenko's allegations demonstrate that Bazzaro could reasonably have concluded, based on existing law, that the work Issaenko performed on her own was the type she was employed to perform.  When analyzing the first factor – whether the work in question was of the type of the employee was employed to perform – courts "rely heavily on the employee's job description."  *Fleurimond v. N.Y. Univ.*, 876 F. Supp. 2d 190, 202 (E.D.N.Y. 2012) (internal quotation marks omitted).  Here, Issaenko's job description provided, in relevant part,

> 70%:  Responsible to conduct research investigations from experimental design and reagent preparation to interpretation of experimental results.  Evaluate, suggest alternate methods, modify or develop new procedures and techniques to aid in the investigation of a total research problem or program.

> 20%:  Analyze research data.  Write reports and papers on research results.  Author or co-author manuscripts for publication.  Make presentations at professional meetings.  Discuss and plan new avenues of investigation.  Assist in drafting proposals to procure research funding.  Required meetings with supervisor.

(Am. Compl. ¶ 37, Ex. 5 at 11.)  Based on the allegations in the First Amended Complaint, a supervisor could have reasonably concluded that the independent work that Issaenko alleges she performed falls within this description.  With respect to the first project related to the survival of ovarian and cervical cancer cells, Issaenko alleges specifically that she asked Bazzaro whether she should perform experiments using a certain type of cell sorting, and then proceeded to perform those experiments even after Bazzaro told her they were unnecessary.  This conduct falls within the scope of "[e]valuat[ing], suggest[ing] alternate methods, modify[ing] or develop[ing] new procedures and techniques to aid in the investigation of a total research problem or

program," (*id.* ¶ 37), regardless of whether Bazzaro specifically authorized or approved the experiments. *See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 640-41 (2d Cir. 2004) ("There is no need for the employer to be the precipitating force behind each work created by a salaried employee, acting within the scope of her regular employment. Many talented people . . . are expected by their employers to produce the sort of work for which they were hired, without any need for the employer to suggest any particular project.").

As for the second project that resulted in one of the Copyrighted Works, Issaenko alleges that she "provided raw data to Defendant Bazzaro and also worked at home on compilations of tables and graphs, and draft[s] of a joint manuscript," which Issaenko and Bazzaro planned to submit to the JMC in May 2010. (Am. Compl. ¶ 57.) Issaenko conducted numerous experiments for this project, asked Bazzaro for help, and inquired whether the experiments should be conducted for purposes of the joint manuscript. (*Id.* ¶¶ 58, 63.) A supervisor could also reasonably conclude that this work was encompassed within Issaenko's job description which provided that she would be required to "[a]nalyze research data," "[a]uthor or co-author manuscripts for publication," and "[d]iscuss and plan new avenues of investigation." (*Id.* ¶ 37.) That Issaenko made the decision to conduct certain experiments on her own does not take her work related to the Copyrighted Works outside the realm of her employment. *See Fleurimond*, 876 F. Supp. 2d at 204-05 (finding that a "mascot design project was at least incidental to [Plaintiff's] job responsibilities of creating promotional materials for the NYU Athletic Department" and "the fact that the Plaintiff chose to create her own design while working

on other trial [mascot] cats at NYU's direction does not take it outside the scope of her employment" (alteration and internal quotation marks omitted)).

It is also apparent from the allegations in the First Amended Complaint that a reasonable professor in Bazzaro's position could have concluded that Issaenko's research was motivated, at least in part, to serve Bazzaro's purposes, as it was conducted with respect to research supervised by Bazzaro, Issaenko frequently asked for Bazzaro's opinions on the work and provided copies of the work to Bazzaro, and some of the work was specifically intended to be part of a joint manuscript which Issaenko and Bazzaro planned to submit to the JMC. *See Rouse*, 513 F. Supp. 2d at 1060 ("[T]he Restatement does not require that the servant's only motivation be to help his or her employer; the motivation need only be partial." (alteration in original) (internal quotation marks omitted)).

Based on the allegations in the First Amended Complaint, the Court concludes that the law was not clearly established that the type of work performed by Issaenko with respect to the Copyrighted Works would not fall within the work for hire provision, and Bazzaro therefore did not act unreasonably in concluding that Issaenko was not the owner of the Copyrighted Works.  Accordingly, the Court will grant Defendants' motion to dismiss the copyright claim on the basis that Bazzaro is entitled to qualified immunity with respect to that claim.[10]

---

[10] Because the Court concludes that Bazzaro was entitled to qualified immunity on the basis that it would not have been unreasonable for Bazzaro to conclude that the Copyrighted Works were actually works made for hire, and therefore not owned by Issaenko, it need not

(Footnote continued on next page.)

### 4.     New Allegations in the Second Amended Complaint

Having determined that the copyright claim in the First Amended Complaint must be dismissed, the Court will go on to consider whether any of the new allegations in the Second Amended Complaint cure the deficiencies discussed above, and therefore whether amendment of this claim would not be futile.

In the Second Amended Complaint Issaenko removes as Defendants all of the individually named Regents of the University.  (*See* Second Am. Compl. at 1.)  Issaenko also adds claims against the remaining Individual Defendants in their individual capacities.  With respect to these changes, Issaenko explains that "[t]he Second Amended Complaint caption now identifies Defendants LeBien, Lawrenz, Carson, Hanson, and Yee in their personal, individual, and official capacities.  The amended caption provides clarity and a more definite statement regarding the nature of the capacity of suit in which each has been sued."  (Pl.'s Mem. in Supp. of Mot. to Amend at 29-30, June 5, 2014, Docket No. 40.)

Although the bulk of the changes in the Second Amended Complaint relate to Issaenko's defamation claim, which is discussed below, it appears that certain of the allegations are aimed at bolstering Issaenko's copyright claim against the Individual

_____

(Footnote continued.)

address Defendants' alternative arguments – that the University copyright policy provided copyright ownership to Bazzaro and that Bazzaro's use of the Copyrighted Works falls within the fair use exception to the Copyright Act.

Defendants in their official and individual capacities.[11]   With respect to the role of each

Defendant regarding copyright issues, in the "Parties" section of the Second Amended

Complaint, Issaenko alleges that Defendant the Regents of the University "is responsible

for administration and enforcement of the University's Policies on 'Copyright' and

'Commercialization of Intellectual Property Rights' and violations thereof pursuant to the

Board of Regents Academic Policies." (Second Am. Compl. ¶ 10.) Issaenko also alleges

that Karen Hanson oversees the University's policies regarding copyright ownership, and

that Frances Lawrenz oversees the University's policy on "Openness in Research." (*Id.*

¶¶ 12, 15.) Issaenko further alleges:

> Defendants University of Minnesota and the Regents of the University of Minnesota supervise the copyright and copyright ownership policies and commercialization of their intellectual property.
>
> Defendants' copyright policies provide that heads of departments/centers [including Yee, LeBien, and Carson] have the aforementioned delegated authority.
>
> The Individual Defendants have delegated copyright authority.
>
> Furthermore, because the use of the intellectual property of the University of Minnesota is covered by policies on codes of conduct and scientific misconduct, corresponding activity falls within the jurisdiction of the Research Integrity Officer, Dr. Lawrenz.
>
> Furthermore, on information and belief, Defendant Hanson and her office failed to supervise Defendant [Bazzaro]'s infringing and defamatory

---

[11] Nothing in the Second Amended Complaint alters the Court's conclusion that the copyright claim against the University is barred by the Eleventh Amendment. Furthermore, nothing in the Second Amended Complaint alters the Court's conclusion that to the extent the copyright claim seeks damages against the Individual Defendants and Bazzaro in their official capacity this claim is also barred. Accordingly, the Court finds that the proposed amendments would be futile with respect to these claims.

activities, and the office of the Provost failed to supervise her compliance with the law and university policies.

On information and belief, Defendants Hanson, Yee and LeBien and the Board of Regents are and were authorizing Defendant [Bazzaro]'s grant applications that contain Plaintiff's Copyrighted Images and Works and/or unauthorized derivations thereof.

(*Id.* ¶¶ 18-23; *see also id.* ¶¶ 13-14, 16.)

The Court concludes that these allegations do not cure the deficiencies in Issaenko's copyright claim pled in the First Amended Complaint, and therefore finds that amendment with respect to the copyright claim would be futile. With respect to the claim asserted against the Individual Defendants in their official capacities, the Second Amended Complaint still fails to plead the existence of a policy or custom at the University of unlawfully infringing employees' copyrighted works. *See supra* § I.B.2. Nor does the Second Amended Complaint contain allegations that either the Individual Defendants and/or Bazzaro had final authority to **establish** University policies regarding copyright and intellectual property and exercised that authority in an unlawful manner. *See Hafer*, 502 U.S. at 25; *Nix*, 879 F.2d at 433. Therefore, the Second Amended Complaint fails to state a claim against Bazzaro and the Individual Defendants in their official capacities, and accordingly, amendment would be futile. Furthermore, the allegations in the Second Amended Complaint – although they provide some detail about the Individual Defendants' role in enforcing copyright policy at the University – contain only facts which establish "a broad general obligation to prevent a violation" of copyright law and therefore fail to establish the requisite "nexus between the violation of federal law" and those defendants. *Pennington Seed, Inc. v. Produce Exch. No. 299*, 457 F.3d

1334, 1342 (Fed. Cir. 2006); *see also Ass'n for Info. Media & Equip.*, 2012 WL 7683452 at *4 (dismissing allegations for copyright infringement where the complaint alleged only that defendants "overs[aw] or supervis[ed] the infringing activity").

As for the copyright claim that the Second Amended Complaint asserts against the Individual Defendants in their individual capacities, the Court concludes that the qualified immunity analysis of the work for hire doctrine discussed above with respect to the claim against Bazzaro in her individual capacity, *see supra* § I.B.3, applies with equal force to the Individual Defendants.  Accordingly, amendment to assert a copyright claim against the Individual Defendants in their individual capacities would be futile, and the Court will deny the motion to amend to the extent it seeks to amend Issaenko's copyright claim.

### D.    Section 1983 Claims (Counts VIII, IX, X, and XI)

Issaenko brings claims for damages and injunctive relief pursuant to 42 U.S.C. § 1983 under the Privileges and Immunities and Due Process Clauses of the Fourteenth Amendment, alleging that Defendants violated her constitutional rights by infringing the Copyrighted Works.[12]  With respect to her Privileges and Immunities claim, Issaenko alleges that the Copyrighted Works are a form of property protected by the Privileges and Immunities Clause, which provides that "[n]o state shall make or enforce any law which

---

[12] Counts VIII and X both allege identical Privileges and Immunities violations but Count VIII seeks damages and Count X seeks injunctive relief.  Similarly, Counts IX and XI both allege identical Due Process Clause violations but Count IX seeks damages and Count XI seeks injunctive relief.

shall abridge the privileges or immunities of citizens of the United States."  (Am. Compl. ¶¶ 200, 203-304, 228, 231-232 (citing U.S. Const. amend. XIV, § 1).)  Issaenko further alleges that "Defendants engaged in actual violations of Plaintiff's constitutional rights, by willful and knowing violations of her protected property interests secured by the provisions of Amendment XIV of the United States Constitution" and their "direct, indirect, contributory and/or vicarious copyright infringement" has caused Issaenko damages.  (*Id.* ¶¶ 205, 207-208, 233, 235-236.)  In her Privileges and Immunities § 1983 claim, Issaenko also alleges that "Plaintiff's right in her Copyrighted Images and Works is a right secured by Federal law" (*id.* ¶¶ 202, 230), and that "Defendants' liability is legislatively established by and under 17 U.S.C. § 511 for Defendants' direct violation of Amendment XIV of the United States Constitution" (*id.* ¶¶ 209, 237).

Issaenko's allegations related to her § 1983 claim for violation of the Due Process Clause are similar.  Specifically, Issaenko alleges that the Copyrighted Works are "a form of property" and "[t]he Due Process Clause protects Plaintiff's right to be free from copyright infringement by the state and state actors."  (*Id.* ¶¶ 216-217, 244-245.)  Issaenko alleges that Defendants violated her procedural and substantive due process rights through their "direct, indirect, contributory and/or vicarious copyright infringement."  (*Id.* ¶¶ 220, 222, 248, 250.)  Issaenko again cites federal law and 17 U.S.C. § 511 as a basis for Defendants' liability for this § 1983 claim.  (*Id.* ¶¶ 215, 225, 243, 253.)

The Court concludes that because these § 1983 claims are expressly premised on the same violations of the Copyright Act that form the basis of Issaenko's claim for

copyright infringement in Count I, they are subject to the same analysis regarding immunity and failure to plead viable claims that required dismissal of Count I. Specifically, the University is not a person within the meaning of § 1983, and therefore cannot be subject to liability under the statute. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63 (1989). Furthermore, the Eleventh Amendment bars § 1983 suits for damages against the Individual Defendants and Bazzaro in their official capacities. *See Nix*, 879 F.2d at 432. With respect to the claims for injunctive relief against the Individual Defendants and Bazzaro in their official capacities, these claims are deficient because they fail to plead that any constitutional violations perpetrated by the Individual Defendants and/or Bazzaro that were the result of an unconstitutional policy or custom of the University. *See Hafer*, 502 U.S. at 25; *Nix*, 879 F.2d at 433. Finally, because Issaenko's § 1983 claims are premised on violations of the Copyright Act, the Court's analysis of Bazzaro's entitlement to qualified immunity applies with equal force here. Accordingly, the Court will grant Defendants' motion to dismiss Issaenko's § 1983 claims.

Issaenko argues that "Defendants erroneously assume that the claims under 42 U.S.C. Section 1983 are premised upon the enforcement of the Copyright Act." (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 31.) Issaenko appears to be arguing that because her § 1983 claims are separate and distinct from her claims alleging violations of the Copyright Act, the same analysis applicable to those claims does not bar her § 1983 claims. (*See id.* at 33 ("Thus, it is not the enforcement of the federal statutory regulatory scheme which is at play as Defendants argue – but rather the well-established right of

plaintiffs to enforce deprivation of property interests . . . .").)[13]  With respect to the

constitutional nature of her § 1983 claims, Issaenko argues that "the Copyright Clause is

itself a textual source of rights enforceable by individual citizens against the government

– apart from any congressional scheme of statutory enforcement." (*Id.* at 32.)  But

Issaenko's § 1983 claims do not allege a violation of the Copyright Clause, instead they

specifically cite the Copyright Act and the Fourteenth Amendment as the basis for

liability.  (*See, e.g.*, Am. Compl. ¶ 209.)  Even if Issaenko's § 1983 claims did allege a

violation of the Copyright Clause, however, this claim would not entitle Issaenko to

relief, as the Copyright Clause does not secure to individuals a particular right, but rather

is a clause that enables legislative action by Congress.  U.S. Const. art. I, § 8, cl. 8

(vesting in Congress the legislative power "[t]o promote the Progress of Science and

useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right

to their respective Writings and Discoveries").

Finally, to the extent Issaenko's brief can be construed as making an argument that

her Privileges and Immunities and Due Process Clause claims entitle her to greater

protection than would be available under the Copyright Act, the Court concludes that

---

[13] Issaenko's briefing also indicates at points, however, that she **is** seeking to enforce the Copyright Act itself through the mechanism of a § 1983 suit. (*See* Pl.'s Mem. in Opp'n to Mot. to Dismiss at 32 ("Copyright, although arguably contained in the Constitution itself, is certainly defined by federal statutes."), 33 ("There is, therefore, nothing inconsistent in a private or individual assertion of rights against a state actor to protect a property interest conferred by congressional power and the congressional regime of the CRCA.").)  Because reliance on the rights protected by the Copyright Act itself could not possibly entitle Issaenko to relief, as explained above, the Court focuses on Issaenko's argument that she is not, in fact, seeking to enforce the Copyright Act in her § 1983 claims, but rather her constitutional property rights.

these claims would also fail.  Issaenko has not pled a policy of the University that was unconstitutional under either these clauses.  Furthermore, Issaenko has presented no argument or citation to any authority which would indicate that her constitutional rights to the Copyrighted Works under these clauses – which exceeded the scope of protection provided by the Copyright Act – were clearly established at the time of the alleged violation, such that a reasonable University employee in the position of Bazzaro would have known she was committing constitutional violations.  Therefore, the Court finds that dismissal of the § 1983 claims is required for failure to state a claim.[14]  Because nothing in the Second Amended Complaint cures the deficiencies in Issaenko's § 1983 claims, the Court will also deny the motion to amend as futile with respect to these claims.

## E.    Immunity From State Law Claims

Issaenko's First Amended Complaint also brings a number of state law claims against all of the named Defendants.  Defendants argue, and Issaenko does not dispute, that her state law claims brought against the University are barred by the Eleventh Amendment.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98, 121 (1984) (concluding that the Eleventh Amendment's bar applies with equal force to state law claims brought into federal court under pendent jurisdiction); *see also Minn. Pharmacists Ass'n v. Pawlenty*, 690 F. Supp. 2d 809, 815-16 (D. Minn. 2010).  Additionally, the Eleventh Amendment bars the claims against the Individual Defendants and Bazzaro in

---

[14] Because the Court concludes that Issaenko's § 1983 claims fail to adequately plead entitlement to relief, it need not reach Defendants' argument that § 1983 cannot be used to enforce violations of the Copyright Act.

their official capacities to the extent the claims seek **either** damages or injunctive relief. *See Pennhurst State Sch. & Hosp.*, 465 U.S. at 106 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. . . . We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law."); *Cooper v. St. Cloud State Univ.*, 226 F.3d 964, 968 (8th Cir. 2000) ("The Eleventh Amendment bars federal court jurisdiction over state law claims against unconsenting states or state officials when the state is the real, substantial party in interest, regardless of the remedy sought.").  Therefore, the Court will dismiss all of Issaenko's state law claims to the extent they are brought against the University and the other Defendants in their official capacities.  Having concluded that the state law claims are potentially viable only to the extent they seek relief against the non-University Defendants in their individual capacities, the Court will go on to consider each of the state law claims separately as they relate to Bazzaro – the only Defendant who has been sued in her individual capacity.

### F.    Minnesota Uniform Deceptive Trade Practice Act (Count II)

Issaenko alleges that Defendants have engaged in deceptive trade practices in violation of Minnesota's Uniform Deceptive Trade Practices Act, ("MUDTPA") Minn. Stat. §§ 325D.44, *et seq.*, by creating "a high likelihood of confusion, mistake, and/or deception in the industry and among consumers as to the origin or source of Defendants' and Dr. Olga Issaenko's Copyrighted Images and Works" and as to the "affiliation, connection, and/or association of themselves and their images, publications, and activities

with Dr. Olga Issaenko and her Copyrighted Images and Works, publications, and activities.  (Am. Compl. ¶¶ 135-136.)  Issaenko seeks damages and injunctive relief as remedies.  (*Id.* ¶¶ 140, 142.)[15]

Defendants argue that Issaenko's MUDTPA claim must be dismissed because it is preempted by the Copyright Act.  The Act "preempts state laws that attempt to protect rights exclusively protected by federal law," *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005), providing:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title.  Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a).  Under this provision "[a] state cause of action is preempted if: (1) the work at issue is within the subject matter of  copyright as defined in §§ 102 and 103 of the Copyright Act, and (2) the state law created right is equivalent to any of the exclusive rights within the general scope of copyright as specified in § 106." *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 428 (8th Cir. 1993).

---

[15] "Under Minnesota law, 'the sole statutory remedy for deceptive trade practices is injunctive relief.'" *Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1041 (D. Minn. 2013) (quoting *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. Ct. App. 1999)); *see also* Minn. Stat. § 325D.45, subd. 1 ("A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable.").  Because damages are not appropriate relief recoverable under the MUDTPA, the claim would be independently subject to dismissal to the extent it seeks damages.

Section 106 of the Copyright Act provides the owner of a copyright with the exclusive right "to do and to authorize," among other things, reproduction of the copyrighted work, preparation of derivative works, distribution of copies of the copyrighted work, and public display of the copyrighted work. 17 U.S.C. § 106. With respect to whether a right under state law is equivalent, the Copyright Act preempts only those state causes of action that "may be abridged by an act which, in and of itself, would infringe one of the exclusive rights provided by federal copyright law." *Nat'l Car Rental Sys., Inc.*, 991 F.2d at 431 (internal quotation marks omitted). "If an extra element is required, instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright and there is no preemption. *Id.* (internal quotation marks omitted).

The parties do not dispute that the first prong of the preemption test has been satisfied because the subject matter of Issaenko's MUDTPA claim is the Copyrighted Works. (*See* Am. Compl. ¶¶ 135-136.) With respect to the second prong of the preemption test, some courts have reasoned that causes of action similar to those provided under MUDTPA are nothing more than a disguised copyright claim or the "natural consequence[] of a Copyright Act violation" because the basic allegations are merely that "Defendants have represented [plaintiff's] copyrighted materials to the public as their own." *Rutledge v. High Point Reg'l Health Sys.*, 558 F. Supp. 2d 611, 620-21 (M.D.N.C. 2008) (emphasis omitted). For example, the Ninth Circuit found a claim under California's unfair competition law to be preempted by the Copyright Act where the complaint alleged that defendants "have been publishing and placing on the market

for sale products bearing the images subject to the copyright ownership of the plaintiff and ha[ve] thereby been engaging in unfair trade practices and unfair competition." *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (internal quotation marks omitted). The court concluded that this unfair competition claim was "expressly base[d] . . . on rights granted by the Copyright Act," including the "rights to reproduce the copyrighted work in copies, to prepare derivative works based upon the copyrighted work, to distribute copies . . . to the public, and to display the copyrighted works publicly." *Id.* at 1213 (alteration in original) (internal quotation marks omitted); *see also Defined Space, Inc. v. Lakeshore E., LLC*, 797 F. Supp. 2d 896, 901-03 (N.D. Ill. 2011) (finding claims under Illinois statutes for consumer fraud and deceptive business and trade practices were preempted because "the rights asserted under Illinois state law in this case are not qualitatively different from the rights conferred under the Copyright Act"); *Costar Grp. Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 714 (D. Md. 2001) (concluding that an unfair competition claim was preempted where the claim alleged that defendant copied photographs and "passed them off as its own" because "[t]he same act which constitutes LoopNet's alleged copyright infringement, the unauthorized copying of CoStar's photographs, also constitutes CoStar's unfair competition claim").

The Court concludes that the MUDTPA claim, as pled by Issaenko, is preempted by the Copyright Act. *See Kodadek*, 152 F.3d at 1212 (noting that for purposes of a preemption analysis the court does not analyze a cause of action in the abstract but instead "examine[s] the nature" of plaintiff's claim "to discern what rights [plaintiff] seeks to enforce with state law"). The relevant question is whether Issaenko's MUDTPA

- 60 -

claim requires an extra element, in addition to the acts of reproduction or distribution that would support a claim for violation of the Copyright Act. *See Nat'l Car Rental Sys., Inc.*, 991 F.3d at 431. Here, the allegations in the First Amended Complaint indicate that Issaenko's MUDTPA claim is based solely on conduct that, if true, would result in violation of the Copyright Act. The conduct Issaenko alleges in support of her MUDTPA claim is Defendants' use and distribution of the Copyrighted Works, which is equivalent to the exclusive rights protected by the Copyright Act. In other words, Issaenko's claim is that Defendants used the Copyrighted Works without her permission. By doing so, she argues that they created confusion about the ownership of the work by claiming that the work was their own. This claim falls within the scope of the rights protected by the Copyright Act and is therefore preempted. *See Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 713 F. Supp. 2d 215, 232 (S.D.N.Y. 2010) (finding claims under the UDTPA preempted because "claims alleging misrepresentations of the ownership or origin of an idea do not differ from the inherent misrepresentations that accompany unauthorized copying and reproduction of another's copyrighted work," and "the core of plaintiffs' statutory claims relate to the defendants' alleged misuse of the plaintiffs' property by misrepresentation of ownership or authorship" (internal quotation marks omitted)); *Randolph v. Dimension Films*, 630 F. Supp. 2d 741, 750 (S.D. Tex. 2009) (concluding that a claim under the Texas DTPA was preempted because "the gravamen

of the plaintiff's complaint is the wrongful copying of her work and the distribution of the infringing work").[16]

Issaenko attempts to distinguish her claim by arguing that it requires an additional showing of a misrepresentation and creation of confusion.   These arguments are misplaced.   MUDTPA specifically states that a plaintiff "need not prove . . . actual confusion or misunderstanding."  Minn. Stat. § 325D.44, subd. 2; *see also Claybourne v. Imsland*, 414 N.W.2d 449, 451 (Minn. Ct. App. 1987) ("The Uniform Deceptive Trade Practices Act does not require actual confusion or misunderstanding for a violation to be found and relief granted.  The mere likelihood of such confusion is sufficient.").  Instead, Issaenko's claim that Defendants created confusion is based solely on her allegation that Defendants improperly used her Copyrighted Works.   Issaenko's First Amended Complaint does not include, for example, allegations that Defendants used misleading statements or deceptive representations apart from simply using the Copyrighted Works as if they owned the works.  *See Integrative Nutrition, Inc. v. Academy of Healing Nutrition*, 476 F. Supp. 2d 291, 296-97 (S.D.N.Y. 2007) (finding an unfair competition claim preempted where "[t]he core of the unfair competition claim is the plaintiff's

---

[16] The Court notes that at least one case from this District allowed a MUDTPA claim to go forward in a case that also alleged copyright infringement.  *See Coyne's & Co. v. Enesco, LLC*, 565 F. Supp. 2d 1027, 1044-45 (D. Minn. 2008).  But the court in that case did not analyze whether the MUDTPA claim was preempted, and instead only analyzed defendant's motion for dismissal which argued that plaintiff lacked standing to bring the claim and that the claim was not pled with the requisite specificity.  *See id.*  Because *Coyne's* did not address the issue of preemption with respect to the MUDTPA claim, the opinion in that case is of little relevance to the Court's present preemption analysis.

allegation that similarities between Integrative's Intellectual Property and the Plagiarized Website will cause confusion among the public" because the claim did not contain an "element to qualitatively differentiate it from those areas protected by copyright" such as allegations of fraud or breach of confidence (internal quotation marks omitted)).[17] Therefore, the Court concludes that Issaenko's claim under the MUDTPA is preempted by the Copyright Act, and will grant Defendants' motion to dismiss the claim.

### G.    Unfair Competition (Count III)

In her unfair competition claim, Issaenko alleges that "Defendants' actions have caused a likelihood of confusion and/or misunderstanding as to the source, sponsorship, approval, or certification of themselves and their images, publications, and activities with Dr. Olga Issaenko and her Copyrighted Images, publications, and activities," and that "Defendants' actions have created a high likelihood of confusion, mistake, and/or deception in the industry and among consumers as to an affiliation, connection and/or association of themselves and their images, publications, and activities with Dr. Olga

---

[17] Issaenko attempts to further distance her MUDTPA claim from the reach of the Copyright Act by explaining that her claim is **qualitatively different** from a copyright infringement claim," because, among other reasons it "creates questions about ethical breaches of scientific/research duties and protocol" and because "Dr. Issaenko has alleged that Defendants caused her article to be retracted from publication, blocked her potential employment opportunities, defamed her in her trade and employment/business, and induced or caused others not to enter into employment relationships, publish articles, and enter into research arrangements." (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 43-44 (emphasis in original).) But these allegations cited by Issaenko are not contained in her MUDTPA claim, and instead relate to other claims that she has pled in the First Amended Complaint. Whether or not her tortious interference and defamation claims are different from claims brought under the Copyright Act is irrelevant to whether her MUDTPA claim is preempted.

Issaenko and her Copyrighted Images and Works, publications, and activities."  (Am. Compl. ¶¶ 145-146.)

Defendants argue that this claim must be dismissed as duplicative of the MUDTPA claim and preempted by the Copyright Act.  "Unfair competition is not a tort with specific elements; it describes a general category of torts which courts recognize for the protection of commercial interests" including "product disparagement," "tortious interference with contractual interests and improper use of trade secrets."  *Zimmerman Grp., Inc. v. Fairmont Foods of Minn., Inc.*, 882 F. Supp. 892, 895 (D. Minn. 1994) (internal quotation marks omitted).  "[T]o remain viable, a common law unfair competition claim 'must identify the underlying tort which is the basis for the claim.'"  *LensCrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1490 (D. Minn. 1996) (alteration omitted) (quoting *Zimmerman Grp., Inc.*, 882 F. Supp. at 895)).  Furthermore, where an unfair competition claim is duplicative of another claim in the complaint, the unfair competition claim should be dismissed.  *See Zimmerman Grp., Inc.*, 882 F. Supp. at 895 (explaining with respect to an unfair competition claim that "[t]o the extent that the claim is based upon interference with contract, it is duplicative of Count V which also asserts an interference with contract claim based upon the same conduct.  As Zimmerman does not identify another tort upon which to base its unfair competition claim, this claim must be dismissed in its entirety.").  As with other state law claims, claims for unfair competition are preempted by the Copyright Act to the extent they are "based upon acts of copyright infringement."  *Id.*

The Court concludes that Issaenko's unfair competition claim must be dismissed as duplicative of her MUDTPA claim, and preempted by the Copyright Act.  Issaenko argues that her unfair competition claim is not duplicative of her MUDTPA claim, because she has properly identified the underlying tort upon which the unfair competition claim is based by incorporating by reference "the tort of tortious interference with prospective business advantage."  (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 39-40.)  But even if Issaenko's unfair competition claim could be properly construed as alleging a tortious interference claim, according to Issaenko's own argument that claim would be identical to the tortious inference claim she asserts in Count VI and incorporates by reference into her unfair competition claim.  Accordingly, to the extent the unfair competition claim is based upon the tort of tortious interference, the Court concludes that the unfair competition claim is duplicative of Count VI and must be dismissed.  *See Zimmerman Grp., Inc.*, 882 F. Supp. at 895.

Issaenko goes on to argue that her unfair competition claim is not duplicative of her MUDTPA claim because it is based on the underlying tort that Defendants have "'create[d] a likelihood of confusion or misunderstanding.'"  (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 40 (quoting Am. Compl. ¶ 147).)  These are identical, however, to the allegations that underlie Issaenko's MUDTPA claim, and therefore to the extent her unfair competition claim is based upon those allegations, the claim is duplicative of the MUDTPA claim, and preempted by the Copyright Act for the same reasons that preemption applies to the MUDTPA claim.  *See Rottlund Co. v. Scott Larson Constr., Inc.*, Civ. No. 02-1238, 2004 WL 742054, at *7 (D. Minn. Mar. 4, 2004) (concluding that

an unfair competition claim was duplicative of a MUDTPA claim where plaintiff described the unfair competition claim as "refer[ring] to the separate torts of false and misleading designation of origin and false advertising").[18]   Accordingly, the Court will grant Defendants' motion to dismiss Issaenko's unfair competition claim.

### H.   Unjust Enrichment (Count IV)

To establish a claim for unjust enrichment under Minnesota law "the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012) (internal quotation marks omitted); *see also Khoday v. Symantec Corp.*, 858 F. Supp. 2d 1004, 1019 (D. Minn. 2012).   A plaintiff must demonstrate not just that "one party benefits from the efforts or obligations of others" but "that a party was unjustly enriched in the sense that the term unjustly could mean illegally or unlawfully."   *Caldas*, 820 N.W.2d at 838 (internal quotation marks omitted).

---

[18]   As support for her argument that her unfair competition claim is not preempted, Issaenko relies on *CSM Investors, Inc. v. Everest Development, Ltd.*, 840 F. Supp. 1304 (D. Minn. 1994), in which the court held that "[u]nfair competition generally involves situations in which a party misrepresents the origin of goods . . . . Thus, under Minnesota law, unfair competition [is] not the equivalent of a claim for copyright infringement." *Id.* at 1314.   But in *CSM Investors* the court did not describe the content of plaintiff's unfair competition claim. Issaenko is certainly correct that *CSM Investors* stands for the proposition that some unfair competition claims are not preempted by the Copyright Act, but she has provided no indication that the allegations of unfair competition that she makes are in any way different in scope than her copyright infringement claims.

Issaenko's unjust enrichment claim arises out of her allegation that "Defendants have unlawfully received benefits from their misappropriation of Dr. Olga Issaenko['s] proprietary and Copyrighted Images and Works." (Am. Compl. ¶ 153.) Issaenko further alleges that "Defendants have been and continue to be, unjustly enriched by retaining the benefits they have received as a result of their unlawful conduct." (*Id.* ¶ 155.) Defendants argue that the unjust enrichment claim must also be dismissed because it too is preempted by the Copyright Act.

The majority of courts to consider the preemption question have determined that state unjust enrichment claims are preempted by the Copyright Act. *See R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1133, 1148 (10th Cir. 2009); *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004); *Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 637-38 (6th Cir. 2001), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Pan-Am. Prods. & Holdings, LLC v. R.T.G. Furniture Corp.*, 825 F. Supp. 2d 664, 695-96 (M.D.N.C. 2011); *Two Palms Software, Inc. v. Worldwide Freight Mgmt., LLC*, 780 F. Supp. 2d 916, 923 (E.D. Mo. 2011); *Blue Nile, Inc. v. Ice.com, Inc.*, 478 F. Supp. 2d 1240, 1251 (W.D. Wash. 2007); *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 769 (N.D. Tex. 2006); *Ott v. Target Corp.*, 153 F. Supp. 2d 1055, 1067 (D. Minn. 2001); *Zimmerman Grp., Inc.*, 882 F. Supp. at 895.

These courts have concluded that, where unjust enrichment claims are based upon the violation of rights protected by the Copyright Act, they "sound[] squarely in copyright infringement" and are therefore preempted. *Ott*, 153 F. Supp. 2d at 1067

(concluding that an unjust enrichment claim based on the allegation that "[b]y failing to compensate Plaintiffs for the use of their dolls and designs, Defendants have been unjustly enriched at the expense of Plaintiffs" was preempted because this claim was based on defendants' distribution and copying of plaintiffs' dolls (internal quotation marks omitted)); *see also Pan-Am. Prods. & Holdings*, 825 F. Supp. 2d at 695 (concluding that an unjust enrichment claim was preempted where "[t]he central allegation is that Defendants used the copyrighted designs, through advertising, distribution and sales, and were enriched thereby. . . . The gravamen of this allegation . . . is that Defendants were unjustly enriched as a result of the wrongful exercise of Pan-American's § 106 rights.").   Furthermore, these courts have concluded that, although actual enrichment is part of an unjust enrichment claim and such enrichment "is not required for copyright infringement," this slight difference between the claims does not go "far enough to make the unjust enrichment claim qualitatively different from a copyright infringement claim."   *Briarpatch Ltd.*, 373 F.3d at 306; *see also Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022, 1027 (N.D. Cal. 2003) ("While a claim for unjust enrichment may require proof that a benefit was conferred on the defendant, where the unjust enrichment arises from defendants' unauthorized use of a copyrighted work, such an extra element does not qualitatively change the rights at issue, the rights the plaintiff holds in the copyrighted work, and does not avoid preemption.").

The Court finds the reasoning of these courts persuasive, and concludes that Issaenko's unjust enrichment claim is preempted by the Copyright Act as it essentially seeks recovery for Defendants' wrongful exercise of her rights protected under § 106 of

the Act.[19]   Specifically Issaenko alleges that Defendants received benefits when they misappropriated the Copyrighted Works.  The examples of this misappropriation include use of the Copyrighted Works in various patent applications, presentations, and grant proposals.  (*See* Am. Compl. ¶ 106.)  These allegations of unauthorized reproduction and distribution fall within the exclusive rights protected by the Copyright Act and therefore indicate that Issaenko's unjust enrichment claim is preempted.

Issaenko argues that her unjust enrichment claim stands in "stark contrast" to the unjust enrichment claims involved in the above cited cases because it uses the term "misappropriation" and "does not state or involve 'use,' 'distribution,' or 'reproduction.'" (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 38.)  But this is a distinction without a difference.   Issaenko's unjust enrichment claim alleges that Defendants have received benefits from their "misappropriation" of the Copyrighted Works.  Misappropriation means "to appropriate dishonestly for one's own **use**."   *Webster's Third New International Dictionary* 1442 (2002) (emphasis added).   Therefore, contrary to Issaenko's suggestion, her use of the term misappropriate, rather than use, does not save

---

[19] The Court notes that one opinion from this district concluded that unjust enrichment claims are not preempted by the Copyright Act.  *See CSM Investors, Inc. v. Everest Dev., Ltd.*, 840 F. Supp. 1304, 1314 (D. Minn. 1994).  In that case the court stated only that "a party claiming unjust enrichment must demonstrate that the other party illegally or unlawfully benefitted from the effort of another," and therefore unjust enrichment claims "are not the equivalent of a claim for copyright infringement" but provided no other reasoning or justification for this conclusion.  *Id.*  Contrary to Issaenko's contention, the Court is not bound by other decisions from this District.  *See Ctr. for Family Med. v. United States*, 614 F.3d 937, 942 (8th Cir. 2010) ("One district court is not bound by the decision or reasoning of another district court involving other parties with the same issue.").  The Court finds the reasoning of other courts to have addressed the preemption issue more thorough and persuasive, and thus declines to follow the decision in *CSM Investors, Inc.*

her claim from preemption.   Furthermore, regardless of the precise word chosen, the allegations in the First Amended Complaint as a whole list exhaustively the uses Issaenko alleges Defendants made of her Copyrighted Works in violation of her rights under § 106 of the Copyright Act.   (*See, e.g.*, Am. Compl. ¶ 114 ("Defendants have intentionally **copied and/or created derivative works** of Dr. Olga Issaenko's works of authorship and/or her Copyrighted Images and Works with knowledge of Dr. Olga Issaenko's rights therein, in an attempt to misappropriate the value created by Dr. Olga Issaenko in such proprietary images and be **unjustly enriched thereby**." (emphasis added)).   All of these allegations have been incorporated by reference into Issaenko's unjust enrichment claim. Therefore, the Court concludes that Issaenko's unjust enrichment claim is preempted by the Copyright Act, and will grant Defendants' motion to dismiss.[20]

## I.       Promissory Estoppel (Count VII)

"To state a claim for promissory estoppel, the plaintiff must show that (1) there was a clear and definite promise, (2) the promisor intended to induce reliance and such reliance occurred, and (3) the promise must be enforced to prevent injustice."   *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 834 (Minn. 2011).   Issaenko brings a claim for promissory estoppel alleging that "Defendant Bazzaro clearly, specifically, and

---

[20] None of the new allegations in the Second Amended Complaint relate to Issaenko's MUDTPA, unfair competition, or unjust enrichment claims except to the extent that the Second Amended Complaint seeks to bring these claims against a number of the Individual Defendants in their individual capacities.   But the amendment to bring this claim against more defendants would not alter the Court's conclusion that these claims are preempted under the Copyright Act. Therefore, the Court concludes that amendment would be futile with respect to these claims.

definitely promised Dr. Olga Issaenko that if she disclosed her research, data, images and works they would jointly publish an article, crediting and recognizing Dr. Olga Issaenko as a first author, based on, among other things, Dr. Olga Issaenko's research, data, images and works."  (Am. Compl. ¶ 192.)  Issaenko alleges that she relied on the statement and was induced to produce her research based on this promise, but "Defendant Bazzaro broke her promise and breached her agreement with Dr. Olga Issaenko" by publishing an article on the topic Issaenko worked on "without listing Plaintiff as author."  (*Id.* ¶¶ 193-195.)

Defendants argue that this claim is preempted because it "essentially alleges that Plaintiff provided contingent authorization to Dr. Bazzaro to use her copyrighted works; namely that Dr. Bazzaro could reproduce and distribute them provided Plaintiff would be listed as first author in any publication."  (Defs.' Mem. in Supp. of Mot. to Dismiss at 27.)  As support Defendants rely on cases which have held that contract or quasi-contract claims based on promises not to violate rights under the Copyright Act are preempted by the Act.  *See, e.g.*, *Am. Movie Classics Co. v. Turner Entm't Co.*, 922 F. Supp. 926, 931 (S.D.N.Y. 1996) ("[A] breach of contract claim is preempted if it is merely based on allegations that the defendant did something that the copyright laws reserve exclusively to the plaintiff (such as unauthorized reproduction, performance, distribution, or display).")  But these courts have also held that "if the breach of contract claim is based on allegations that the parties' contract creates a right not existing under copyright law – a right based upon a party's contractual promise – and the plaintiff is suing to protect that contractual right, then the claim is not preempted."  *Id.*; *see also Nat'l Car Rental Sys.*,

*Inc.*, 991 F.2d at 433 (finding a breach of contract claim was not preempted because the claim was premised on the allegation that defendants were processing data for third parties "a right not existing under the copyright law"); *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 456-59 (6th Cir. 2001).

Here, the Court concludes that Issaenko's allegations fall into the category of contract claims that are not preempted. Her promissory estoppel claim is not based on a promise merely to comply with the Copyright Act. Rather, her allegation is that Bazzaro specifically promised that Issaenko would be named first author on the joint published work if she disclosed certain research – a right that is not guaranteed by the Copyright Act. *See Huckshold v. HSSL, L.L.C.*, 344 F. Supp. 2d 1203, 1207 (E.D. Mo. 2004) (allowing a breach of contract claim to go forward where "Plaintiff's first count requires not a showing . . . that HSSL copied its Software in violation of their agreement but that HSSL permitted a third party, Miller, to copy the Software in violation of their agreement."). Therefore, Issaenko's promissory estoppel claim is not preempted by the Copyright Act, and the Court will deny Defendants' motion to dismiss the claim to the extent it is brought against Bazzaro in her individual capacity.[21]

---

[21] The Second Amended Complaint adds no new factual allegations to the promissory estoppel claim. The Second Amended Complaint does, however, apparently seek to assert this claim against the Individual Defendants in their individual capacities. But the allegations in the promissory estoppel claim in both the First and Second Amended Complaints relate only to conduct by Bazzaro and do not identify any other Defendants involved in the claim. Accordingly, the Court finds that amendment would be futile to the extent it seeks to bring this claim against the Individual Defendants in their individual capacities because the Second Amended Complaint fails to plead any allegations against those Defendants that would entitle Issaenko to relief. *Cf. Tully v. Bank of Am., N.A.*, Civ. No. 10-4734, 2011 WL 1882665, at *6

(Footnote continued on next page.)

### J.      Defamation (Count V)

#### 1.      First Amended Complaint

Under Minnesota law, a defamation claim requires a plaintiff to show "that a statement was false, that it was communicated to someone besides the plaintiff, and that it tended to harm the plaintiff's reputation and to lower him in the estimation of the community." *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 410 (Minn. 1994). The basis of Issaenko's defamation claim is her allegation that Defendants made and sent statements and correspondence to Cell Cycle "which falsely stated that Defendants owned data and copyrighted information found in Dr. Olga Issaenko's scientific article . . . published in" Cell Cycle and that these statements were "calculated to and in fact did imply, connote, and insinuate that Dr. Olga Issaenko improperly took, appropriated, and used data and information allegedly belonging to Defendants." (Am. Compl. ¶ 159; *see also id.* ¶¶ 160, 162.) Issaenko also alleges that Defendants made defamatory statements when they failed to disclose to Cell Cycle that Issaenko had provided the at-issue data to Bazzaro (*id.* ¶ 161), and when they notified Cell Cycle that they had "confirmed

_____

(Footnote continued.)

(D. Minn. May 17, 2011) ("Plaintiffs' Amended Complaint asserts fourteen causes of action involving fourteen different mortgage loans against nine separate Bank Defendants. Plaintiffs assert each of the causes of action against the Defendants generally, but do not otherwise specify which claims are asserted against any particular defendant, or which specific claims each Plaintiff is asserting. Thus, the Bank Defendants, and the Court, are left to guess which Plaintiffs are asserting which claims against which Defendants. The Court concludes that such pleading is inadequate and that Rule 8 requires greater specificity than that found in Plaintiffs' Amended Complaint."). Additionally, because the Second Amended Complaint adds no new factual allegations to the promissory estoppel claim, amendment as it relates to the viable claim against Bazzaro would be unnecessary.

ownership of data" in Issaenko's article (*id.* ¶ 163 (internal quotation marks omitted)). Issaenko also relies on Defendants' correspondence with the Journal of Molecular Cancer Therapeutics "falsely alleging that Dr. Olga Issaenko was under a 'misconduct investigation' by the University of Minnesota." (*Id.* ¶ 164.) Issaenko additionally alleges "false statements in the Memorandum issued by Defendants on September 10, 2010 and circulated within the community that Dr. Olga Issaenko inappropriately used and/or shared data." (*Id.* ¶¶ 165-167.) Finally, Issaenko relies on other communications with Cell Cycle in which Defendants explained that Issaenko worked under Bazzaro's direction, some of the data for the paper was generated in Bazzaro's lab, and referred to Issaenko's notebooks as Bazzaro's notebooks. (*Id.* ¶¶ 169-174.) Issaenko contends that these false statements damaged her reputation. (*Id.* ¶¶ 177-178.)

Defendants argue that all of these defamation claims must be dismissed because they are barred by the statute of limitations. Under Minnesota law, a two-year statute of limitations applies to claims for defamation. *See* Minn. Stat. § 541.07(1) (providing that actions "for libel [and] slander . . . whether based on contract or tort" must be commenced within two years); *see Church of Scientology of Minn. v. Minn. State Med. Ass'n Found.*, 264 N.W.2d 152, 154 (Minn. 1978) (applying the 2-year limitations period in Minn. Stat. § 541.07 to a defamation claim). The statute of limitations on defamation claims "begins to run when the allegedly defamatory material is published." *Church of Scientology of Minn.*, 264 N.W.2d at 154-55. Issaenko filed her complaint on December 23, 2013, so statements made before December 23, 2011 are not actionable. Additionally, because the only Defendant that is properly subject to liability for state law

claims is Bazzaro to the extent she is sued in her individual capacity, the statements alleged to have been made after December 23, 2011, must be attributable to Bazzaro.

The Court concludes that Issaenko's First Amended Complaint does not allege any defamatory statements made by Bazzaro after December 23, 2011, and therefore the defamation claims must be dismissed on statute of limitations grounds. In her memorandum in opposition to the motion, Issaenko describes at length statements that Bazzaro made in 2010 and the fall of 2011. (*See* Pl.'s Mem. in Opp'n to Mot. to Dismiss at 51.) But these statements occurred outside of the statute of limitations, and therefore do not entitle Issaenko to relief against Bazzaro. Issaenko argues that some of the allegedly defamatory statements that Bazzaro placed in Issaenko's personnel file were republished in January of 2012 when Issaenko was applying for jobs, and consequently those statements fall within the statute of limitations. Minnesota has, however, rejected the common law rule that each repetition of a defamatory statement constitutes a separate and distinct publication giving rise to a separate cause of action in the context of mass-produced libel. *See Church of Scientology of Minn.*, 264 N.W.2d at 155. The Eighth Circuit has concluded, based on the reasoning in *Church of Scientology*, that the Minnesota Supreme Court would also apply this rule in other contexts. *See Johnson v. Overnite Transp. Co.*, 19 F.3d 392, 393 (8th Cir. 1994) (concluding that the single publication rule also applies in cases of compelled self-publication). Similarly, the Court concludes here that Minnesota law would adhere to the single publication rule in this instance, and finds that the statute of limitations did not begin to run anew each time someone looked at Issaenko's personnel file. Finally, Issaenko cites a number of

communications that occurred in December 2012 between the University, various Individual Defendants, and Cell Cycle.  (*See* Pl.'s Mem. in Opp'n to Mot. to Dismiss at 52 (citing Am. Compl. ¶¶ 159-160, 170-173).)  But none of these allegations identify Bazzaro as the speaker of the allegedly defamatory statements.  Indeed, the exhibits attached to the First Amended Complaint containing the alleged statements are signed by Defendant LeBien, and do not contain any statements by Bazzaro.  (*See* Am. Compl., Ex. 25 at 93.)  Because the First Amended Complaint fails to allege any defamatory statements made by Bazzaro within the two-year statute of limitations, the Court will grant Defendants' motion to dismiss.

### 2.   New Allegations in Second Amended Complaint

The Second Amended Complaint adds new factual allegations to Issaenko's defamation claim and also seeks to bring the claim against Individual Defendants Hanson, Carson, Yee, LeBien, and Lawrenz in their individual capacities.  For clarity, the Court will discuss the claims against each Defendant individually.[22]  In her memorandum in support of her motion to amend Issaenko lists her new allegations and argues that these "more than satisfy the requirements of the what, by whom, and when requirements to make out a cognizable defamation claim."  (Pl.'s Mem. in Supp. of Mot. to Amend at 29.)

---

[22] Because the University is immune from Issaenko's state law claim for defamation, the Court has not considered in detail the allegations regarding defamatory statements made by the University, as amendment with respect to these claims would be futile.

### a.      Defendant Hanson

With respect to Defendant Hanson, the Second Amended Complaint contains no allegations that Hanson was responsible for the publication of any defamatory statements. Accordingly, amendment of the complaint to assert a defamation claim against Defendant Hanson would be futile.

### b.      Defendant Carson

With respect to Defendant Carson, the Second Amended Complaint alleges only that Carson made defamatory statements in writing in 2010 and 2011. (Second Am. Compl. ¶ 183.)  These statements fall outside the two-year statute of limitations and therefore are not actionable.   Issaenko attempts to bring these statements within the statute of limitations by alleging that she "was forced to republish" this defamatory information "to support her claim for defamation." (*Id.*)  But Issaenko has cited, and the Court has located, no authority for the proposition that republication of allegedly defamatory statements in a complaint for the purposes of bringing a defamation claim in court restarts the statute of limitations.  Indeed, if this were the case, there would be no statute of limitations on defamation claims at all, because the very act of bring a defamation claim would – according to Issaenko's theory – necessarily be an event that triggered a new two-year statute of limitations.  Because the statute of limitations runs from the publication of the defamatory material, not from the date of filing a defamation lawsuit, the Court concludes that amendment with respect to Carson would be futile,

because the only statements attributed to Carson occurred outside the statute of limitations period.

### c.   Defendant Yee

As for the allegations against Defendant Yee, the Second Amended Complaint alleges generally that:

> On information and belief, Defendant Bazzaro repeated, circulated, and publicized [the false allegation that Issaenko was under a misconduct investigation by the University of Minnesota] to Defendant Yee, Defendant LeBien, and Defendant Lawrenz from and through September 2011, October 2011, November 2011, December 2011 and January 2012.

> On information and belief, Defendant Bazzaro, Defendant Yee, Defendant Lawrenz, and Defendant LeBien repeated, circulated, and publicized this false allegation to Dr. Richard Roden of Johns Hopkins University from and throughout September 2011, October 2011, November 2011, December 2011 and January 2012 and to other employees at the University of Minnesota.

(Second Am. Compl. ¶¶ 92-93, 166-167 (citing *id.*, Ex. 29).)   As support for these allegations, the Second Amended Complaint cites to Exhibit 29, which contains the collection of emails that supposedly contained the "repeated, circulated, and publicized" defamatory material.   (*See* Second Decl. of Damon L. Ward, Ex. 29 at 9-17, June 5, 2014, Docket No. 41.)[23]   Although Exhibit 29 contains an email from Bazzaro to Yee dated September 22, 2011 (*id.*, Ex. 29 at 11-12), it contains no emails from Yee to any recipient, and no emails from any sender to any recipient after December 23, 2011 (*see id.*, Ex. 29).   Because the Second Amended Complaint does not contain any allegations

---

[23] The twenty-nine exhibits to the Second Amended Complaint were filed as two separate attachments to the Second Declaration of Damon L. Ward found at Docket Number 41.

that Yee made a defamatory statement within the statute of limitations, amendment with respect to Yee would be futile.  Furthermore, even if the allegations sufficiently alleged a statement within the statute of limitations, Issaenko's claim against Yee fails because she alleges only that he delivered allegedly defamatory statements made by Bazzaro, without alleging that Yee knew, or had reason to know that the material was false and defamatory.  *See Church of Scientology of Minn.*, 264 N.W.2d at 156 ("Those who merely deliver or transmit defamatory material previously published by another will be considered to have published the material only if they knew, or had reason to know, that the material was false and defamatory.").  Accordingly, Yee cannot be liable based on the allegations in the Second Amended Complaint.

### d.      Defendants LeBien and Lawrenz

In the Second Amended Complaint Issaenko brings claims against LeBien and Lawrenz that are identical to the defamation alleged against Yee.  These claims are futile for the same reasons discussed above.  First, the emails cited in the Second Amended Complaint contain no emails sent by either LeBien or Lawrenz, nor do any of the emails fall within the statute of limitations.  (*See, e.g.*, Second Am. Compl. ¶¶ 166-167, Ex. 29.) Second, Issaenko has failed to allege that LeBien and Lawrenz knew or had reason to know that Bazzaro's statement that Issaenko was under a misconduct investigation was defamatory.

Although not a model of clarity, the Second Amended Complaint also appears to base the defamatory claims against LeBien and Lawrenz on letters and a report sent to

Cell Cycle in April 2013.  (*See, e.g.*, Second Am. Compl. ¶¶ 177-180, Ex. 28 at 5-8.)  In

the report, LeBien and Lawrenz state that in response to the publication of Issaenko's

paper in Cell Cycle they

> went over the manuscript with Dr. Martina Bazzaro to determine if any of
> the material in the Figures in the manuscript were based on data from
> Dr. Bazzaro's laboratory. . . . We discussed each Table and Figure in the
> manuscript individually, and compared them to data in Dr. Bazzaro's
> laboratory notebooks and computer files.

(*Id.*, Ex. 28 at 6.)  The report then includes conclusions drawn by LeBien and Lawrenz as

to the origin of the tables and figures and their similarity to the work conducted in

Bazzaro's laboratory.  (*Id.*, Ex. 28 at 6-8.)  The report concludes that

> [d]ata in Table 1 and parts of Figures 1, 2, 3, 4, 5, and 6 were generated by
> Dr. Issaenko when she was employed as a civil service staff member in the
> laboratory of Dr. Bazzaro from September 2009 to July 2010.  She used
> these data in the manuscript without the permission of Dr. Bazzaro or the
> University.  Furthermore, the small molecule inhibitors used in the research
> were obtained by Dr. Bazzaro as part of a prior collaboration with
> colleagues at Johns Hopkins, and Dr. Issaenko would not have been
> authorized to remove from them from Dr. Bazzaro's laboratory or use them
> in some other laboratory location.

(*Id.*, Ex. 28 at 8 (emphasis omitted).)

The Court concludes that even to the extent this report could be construed as

containing false or defamatory statements, the report does not support a defamation claim

because, based on the allegations in the Second Amended Complaint, the statements in it

made by LeBien and Lawrenz are protected by qualified privilege.  "One who makes a

defamatory statement will not be held liable if the statement is published under

circumstances that make it qualifiedly privileged and if the privilege is not abused."  *Bol*

*v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997); *see also Minke v. City of Minneapolis*, 845

N.W.2d 179, 182 (Minn. 2014) (noting that "qualified privilege bars liability only if the 'defamatory statements are publicized in good faith and without malice'" (quoting *Matthis v. Kennedy*, 67 N.W.2d 413, 416 (Minn. 1954)). "Qualified privilege applies when a court determines that statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory." *Bol*, 561 N.W.2d at 149 (internal quotation marks omitted); *see also McClure v. Am. Family Mut. Ins. Co.*, 223 F.3d 845, 854 (8th Cir. 2000). "For a defamatory statement to be protected by a qualified privilege, the statement must be made in good faith and must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause." *Bol*, 561 N.W.2d at 149 (internal quotation marks omitted).

The existence of a qualified privilege "is a matter of law for the court." *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 920 (Minn. 2009). As the Eighth Circuit has explained:

> Th[e] qualified privilege analysis encompasses a two-step approach to determining whether the privilege applies. First, to establish the existence of the privilege, the defendant bears the burden of proving the communication was: (1) made upon a proper occasion, (2) made from a proper purpose, and (3) based upon reasonable and probable grounds. Whether the employer had a proper purpose and whether the employer had a proper occasion in making a communication are always questions of law for the court to decide. Whether the employer had reasonable and probable grounds for making the statement is also generally a question of law for the court, unless the evidence permits of more than one conclusion, when the question becomes one of fact for the jury.

*Sherman v. Rinchem Co.*, 687 F.3d 996, 1008 (8th Cir. 2012) (quoting *Keenan v. Computer Assocs. Int'l, Inc.*, 13 F.3d 1266, 1269-70 (8th Cir. 1994)). Whether qualified

privilege protects a defendant is therefore appropriately considered at the motion to dismiss stage, where, accepting as true the allegations in the complaint, the existence of privilege is apparent from the face of the complaint. *See, e.g.*, *Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988, 1000 (D. Minn. 2013) (determining that qualified privilege applied to the defamatory statements alleged in plaintiff's complaint and granting a motion to dismiss because plaintiff had failed to plead facts which, if true, would demonstrate that defendants had lost the privilege by making statements with actual malice).

"'Statements made in the course of investigating or punishing employee misconduct are generally privileged, based on the employer's interest in protecting against harmful employees.'" *Sherman*, 687 F.3d at 1008 (internal quotation marks omitted) (quoting *Rudebeck v. Paulson*, 612 N.W.2d 450, 453 (Minn. Ct. App. 2000)). "'Communications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose, as the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees.'" *Id.* (emphases omitted) (quoting *McBride v. Sears, Roebuck & Co.*, 235 N.W.2d 371, 374 (Minn. 1975)). In determining whether an employer had reasonable and probable grounds for making the statements in question, the court considers "whether the employer took investigative steps" and the "nature and extent of the investigation." *Rudebeck*, 612 N.W.2d at 454.

The Court concludes that the allegations in the Second Amended Complaint demonstrate, as a matter of law, that LeBien and Lawrenz are entitled to a qualified

privilege in connection with the statements they made to Cell Cycle regarding the Copyrighted Works.  With respect to whether the statements were made on a proper occasion and for a proper purpose, the Court acknowledges that the communications with Cell Cycle were not the type of **internal** communications among University employees regarding an investigation for purposes of punishing Issaenko's potential misconduct that have often been the basis of a qualified privilege determination.  *See Sherman*, 687 F.3d at 1008 (explaining that qualified privilege applies to "[c]ommunications between an employer's agents made in the course of investigating or punishing employee misconduct" (internal quotation marks omitted)).  But the statements were based on an effort to protect Defendants and the public from dishonest behavior by Issaenko, which serves the purpose of the qualified privilege protection.  *See id.*  Furthermore, the Minnesota Supreme Court "has not limited the qualified privilege to particular types of communications or audiences."  *Palmisano v. Allina Health Sys., Inc.*, 190 F.3d 881, 885 (8th Cir. 1999).  Instead, the court has broadly held that "statements made in the course of an employer's investigation into employee misconduct are protected by the qualified privilege," *Bahr*, 766 N.W.2d at 923, and "[t]he privilege turns on whether an employer's statements are made on a proper occasion and for a legitimate purpose," *Palmisano*, 190 F.3d at 885 (finding defendant was entitled to qualified privilege where it had made statements to the media regarding the reasons that plaintiff had been discharged); *Eldeeb v. Univ. of Minn.*, 864 F. Supp. 905, 913 (D. Minn. 1994) (finding that a letter addressing defendant's concerns of research fraud by the plaintiff was protected by qualified privilege).  In *Martin v. First Advantage Background Services Corp.*, Civ. No. 11-3357,

2014 WL 1260392, (D. Minn. Mar. 26, 2014), for example, the court concluded that a report prepared by an employer about an employee's criminal background was protected by qualified privilege even though the report had not been prepared as part of an investigation "of Plaintiff's misconduct on the job." *Id.* at *11. The court explained that "the investigation was still driven by the predominate purpose of protecting the company and the public from dishonest practices by an employee," and therefore concluded that defendants were entitled to qualified privilege. *Id.* The Court concludes that statements made in the course of investigating an employee's misconduct for the purposes of communicating with an academic journal and maintaining the integrity of academic research are the type of statements that should be encouraged, and are therefore statements which are made upon a proper occasion and for a proper purpose.

Additionally, the Court concludes that the allegations in the Second Amended Complaint demonstrate that LeBien and Lawrenz engaged in an adequate investigation that was sufficient to provide them with reasonable or probable cause to make the at-issue statements. Specifically, the Second Amended Complaint alleges that LeBien, Lawrenz, and Bazzaro reviewed the manuscript Issaenko submitted to Cell Cycle and compared each table and figure to materials found in Bazzaro's lab prior to drawing conclusions about the propriety of Issaenko's use of the materials. (Second Am. Compl., Ex. 28.) *See Walker v. Wanner Eng'g, Inc.*, 867 F. Supp. 2d 1050, 1055 (D. Minn. 2012) (finding an investigation "sufficiently thorough" to provide defendants with "reasonable or probable cause for the statements at issue" as a matter of law where "the alleged defamatory statements were made on the basis of a reasonable investigation which

included an eyewitness statement, investigation conducted by three different employees, and the Purchase Ticket Profile verifying that Walker had repeatedly taken scraps to Realliance Steel."). Therefore, the Court concludes that LeBien and Lawrenz are entitled to qualified privilege for their statements made to Cell Cycle.

In order to defeat application of the privilege, Issaenko would have to demonstrate that LeBien and Lawrenz acted with malice. *See Sherman*, 687 F.3d at 1009. But the Second Amended Complaint contains no allegations that could be construed as showing malice on the part of LeBien and Lawrenz. *See Elkharwily*, 955 F. Supp. 2d at 1000 (dismissing a defamation claim after finding that allegations that defendant "was angry at Plaintiff" were insufficient to allege malice, because the allegations, taken as true, did not show that the at-issue statements "were 'made . . . from ill will and improper motives, or causelessly and wantonly for the purpose of injuring plaintiff'" (alteration in original) (internal quotation marks omitted) (quoting *Bahr*, 766 N.W.2d at 920)). Here, the Second Amended Complaint does not even contain an allegation that LeBien and Lawrenz were angry with Issaenko or were otherwise motivated by ill will. Accordingly, the Court finds that the allegations in the Second Amended Complaint, taken as true, do not show that LeBien and Lawrenz are not entitled to qualified privilege, and amendment of the defamation claims as to LeBien and Lawrenz would therefore be futile.

e.      **Defendant Bazzaro**

In the Second Amended Complaint Issaenko brings claims against Bazzaro for statements that occurred in September and October 2011. (Second Am. Compl. ¶¶ 163-

165.)   But these claims are futile because they are barred by the two-year statute of limitations.   Next Issaenko alleges that Bazzaro recirculated these emails to others in January 2012.   These claims are also futile, as explained above, because the emails allegedly containing the defamatory statements were all sent well before December 23, 2011.  (*See, e.g.*, *id.* ¶¶ 166-167, Ex. 29.)

Additionally, Issaenko brings claims against Bazzaro based on defamatory statements of Bazzaro that are allegedly contained in the investigation submitted to Cell Cycle by LeBien and Lawrenz.  (*Id.* ¶¶ 177-179.)   There are only two statements actually attributed to Bazzaro in the investigation submitted to Cell Cycle.  The first is a statement describing the content of a figure, which Issaenko does not allege was false.  (*Id.*, Ex. 28 at 6 ("Dr. Bazzaro said that Figure 2 shows that the compounds AM-146, RA-9, and RA-14 are different from RA-4 and that similar data has been published.").)  The second is a statement that "Dr. Bazzaro believes that Dr. Issaenko likely conducted the experiments and acquired the data in the Bazzaro laboratory, but then did the analysis to produce these Figures elsewhere."  (*Id.*, Ex. 28 at 7.)  But at most this is a statement of an opinion, not a false statement of fact needed to support a defamation claim.  *See Metge v. Cent. Neighborhood Improvement Ass'n*, 649 N.W.2d 488, 498 (Minn. Ct. App. 2002) (concluding that an online "posting represents a statement of opinion and does not contain . . . an omission or juxtaposition of facts as would be necessary to establish genuine issues of material fact for defamation by implication").

Finally, Issaenko claims that Bazzaro's defamatory statements from September and October 2011 were republished when Issaenko filed the present complaint, and were

again republished by the Star Tribune in an article reporting on the instant lawsuit, and therefore a new statute of limitations began to run from the time of this lawsuit and that publication.  (Second Am. Compl. ¶ 184.)  As explained above, a plaintiff cannot avoid the running of the statute of limitations on a defamation claim by filing a lawsuit regarding the defamatory statements.  Accordingly, the Court concludes that amendment with respect to this claim would be futile, as the statute of limitations has run.

Therefore, the Court will deny Issaenko's motion to amend with respect to the defamation claim, as she has failed to state plausible claims for relief against any of the Individual Defendants in their individual capacities, and amendment would thus be futile.

### K.      Tortious Interference with Prospective Business Advantage (Count VI)

### 1.      First Amended Complaint

With respect to her tortious interference claim, Issaenko alleges that at all relevant times she "was poised to secure grants, publication of results, and employment based upon her scientific discoveries" but that

> Defendants' unjustified and improper actions in suggesting that Dr. Olga Issaenko misappropriated data and compounds and used images and data without permission and/or authorization in Plaintiff's scientific article . . . published in Cell Cycle, in attempting to restrict Dr. Olga Issaenko's use and publication of her Copyrighted Images and Works, in causing her article to be retracted from publication, in blocking her potential employment opportunities, and in defaming her in her trade and employment/business have caused pecuniary harm including financial instability to Dr. Olga Issaenko having induced or caused others not to enter into employment relationships, publish articles, and enter into research arrangements, and constitutes tortious interference with her prospective business, employment, and economic advantage.

(Am. Compl. ¶¶ 182-183.)  With respect to specific opportunities, Issaenko alleges that she applied for and was almost offered positions with two professors at the University, but they withdrew the offers shortly after reviewing Issaenko's personnel file and speaking with Bazzaro.  (*Id.* ¶¶ 184-186.)  Finally, Issaenko alleges that she "enjoyed a reasonable expectation of economic advantage or benefit in her employment, publishing opportunities, and securing grants" and that "Defendants knew or should have known of [her] reasonable expectations."  (*Id.* ¶¶ 187-188.)

Minnesota law recognizes two separate torts relating to interference with economic relations: (1) interference with an existing contract; and (2) interference with a prospective business relation.  *See Hern v. Bankers Life Cas. Co.*, 133 F. Supp. 2d 1130, 1137 (D. Minn. 2001).  In order to state a claim for tortious interference with prospective business relations, a plaintiff must show: (1) the existence of a reasonable expectation of economic advantage or benefit belonging to plaintiff; (2) that defendants had knowledge of that expectation; (3) that defendants wrongfully and without justification interfered with plaintiff's reasonable expectation; (4) that in the absence of the defendant's wrongful act, it is reasonably probable that plaintiff would have realized the economic advantage or benefit; and (5) that plaintiff sustained damages.  *Cenveo Corp. v. S. Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1137-38 (D. Minn. 2011); *Harbor Broad., Inc. v. Boundary Waters Broadcasters, Inc.*, 636 N.W.2d 560, 569 (Minn. Ct. App. 2001).

Defendants argue that this claim must be dismissed because in actuality it seeks to challenge employment decisions of the University – specifically the decisions of the two

professors at the University that declined to hire Issaenko after her position with Bazzaro had been terminated – and therefore should have been brought through a petition for writ of certiorari to the Minnesota Court of Appeals. *See Shaw v. Bd. of Regents of Univ. of Minn.*, 594 N.W.2d 187, 190-91 (Minn. Ct. App. 1999); *see also Larson v. City of Fergus Falls*, 229 F.3d 692, 695 (8th Cir. 2000) ("Under Minnesota law, judicial review of a local public employer's discretionary decision to terminate an employee is obtained by petitioning the Minnesota Court of Appeals for a writ of certiorari."); *Williams v. Smith*, 820 N.W.2d 807, 814 (Minn. 2012) (concluding that the University's decision not to hire an individual "is a quasi-judicial decision subject to certiorari review").  Minnesota courts have held that tort claims which necessarily require reviewing the University's discretionary employment decision must be brought through certiorari review.  *See Grundtner v. Univ. of Minn.*, 730 N.W.2d 323, 333 (Minn. Ct. App. 2007) (finding a defamation claim to be barred because "[t]o determine if O'Brien's statement was false, the reasons for appellant's termination must be determined").  But a tort claim "that is separate and distinct from the government agency's employment decision and does not involve any inquiry into the agency's discretionary decision is not subject to certiorari review."  *Williams*, 820 N.W.2d at 814 (internal quotation marks omitted); *see also Rivkin v. Hennepin Cnty.*, Civ. No. 01-670, 2002 WL 31777800, at *7 (D. Minn. Dec. 12, 2002) (explaining that that certiorari doctrine "only prohibits courts from encroaching upon and reassessing the quasi-judicial decisions of executive bodies").

The Court concludes that here, at least a portion of Issaenko's tortious interference claim is viable.  Issaenko's claim focuses primarily on Bazzaro's conduct in hindering

Issaenko's economic opportunities, and does not only seek to challenge the failure of two professors to hire her. Issaenko also includes allegations that Defendants blocked her article from being published, blocked potential employment opportunities generally, and induced others not to enter into publication agreements or research arrangements with Issaenko. (Am. Compl. ¶ 183.) Because many of these allegations do not require inquiry into the discretionary decisions of two professors not to hire Issaenko, the Court concludes that the claim is not subject to dismissal. The Court notes that, for purposes of this motion, and in light of Issaenko's lengthy and somewhat repetitive allegations, it need not parse each of Issaenko's allegations to determine precisely which alleged conduct states a claim for tortious interference and which does not. It is sufficient at this stage to determine, as the Court has, that some aspects of Issaenko's allegations state a plausible claim for relief and therefore are sufficient to survive a motion to dismiss.

Defendants also argue that the tortious interference claim must be dismissed because "there is no cause of action for tortious interference against any employee of the contracting party absent a showing that the interfering actions were predominantly committed in bad faith." (Defs.' Mem. in Supp. of Mot. to Dismiss at 31.) As support Defendants cite *Nordling v. Northern States Power Co.*, 478 N.W.2d 498 (Minn. 1991), which held "that a company officer, agent or employee is privileged to interfere with or cause a breach of another employee's employment contract with the company, if that person acts in good faith, whether competently or not, believing that his actions are in furtherance of the company's business." *Id.* at 507. As explained above, however, Issaenko's tortious interference claim alleges more than Bazzaro's interference with

Issaenko's contracts with the University. Instead, the allegations encompass other lost employment, publishing, and research opportunities. Accordingly, the Court will deny Defendants' motion to dismiss the tortious interference claim to the extent it is brought against Bazzaro in her individual capacity.

### 2.      Second Amended Complaint

Although the Second Amended Complaint contains no new factual allegations specifically targeted at the tortious interference claim, it does seek to bring suit against the Individual Defendants in their individual capacities. And the tortious interference claim includes allegations that Defendants' actions in communicating with Cell Cycle caused Issaenko to lose economic opportunities. In the Second Amended Complaint Issaenko specifies that Defendants LeBien and Lawrenz authored these communications. Because Defendants have offered no argument that the tortious interference claim related to the Cell Cycle article are deficient, the Court concludes that these allegations are sufficient to state a claim against these two defendants in their individual capacities.[24] Accordingly, the Court finds that amendment would not be futile with respect to this claim, and therefore will grant the motion to amend to the extent it seeks to include

---

[24] The Court notes that under Minnesota law a "plaintiff is not permitted to avoid defenses to a defamation claim by challenging the defamatory statements under another doctrine." *Guzhagin v. State Farm Mut. Auto. Ins. Co.*, 566 F. Supp. 2d 962, 969 (D. Minn. 2008). Because Defendants have not raised this as a basis for dismissal of Issaenko's tortious interference claim, however, the Court has not considered whether the Defendants would also be entitled to qualified privilege with respect to this claim.

allegations pertinent to the tortious interference claim against LeBien and Lawrenz in their individual capacities.

## II.     MOTION FOR PRELIMINARY INJUNCTION

Issaenko brings a motion for a preliminary injunction "to protect her proprietary content during the pendency of the lawsuit." (Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 3, June 6, 2014, Docket No. 43.) "A preliminary injunction is an extraordinary remedy . . . ." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The Court considers four factors in determining whether to issue a preliminary injunction: (1) the probability that the moving party will succeed on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance of harms as between the parties; and (4) the public interest. *See Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc.*, 640 F.2d at 113. The burden of establishing the propriety of an injunction is on the movant. *Watkins, Inc.*, 346 F.3d at 844.

### A.     Likelihood of Success on the Merits

As to the first factor, Issaenko, as the moving party, must show that she has a "fair chance of prevailing" on her claims. *Planned Parenthood Minn., N.D., S.D., v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). Likelihood of success does not, however, require the moving party to "'prove a greater than fifty percent likelihood that [s]he will

prevail on the merits.'" *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir.

2007) (quoting *Dataphase Sys, Inc..*, 640 F.2d at 113). In considering whether a movant

is likely to prevail on the merits, "a court does not decide whether the movant will

ultimately win." *Id.*

Although the scope of the injunction Issaenko seeks is not entirely clear, what is

clear is that it relates to her success on the merits of her copyright claims, based on her

contention that "loss of control over her copyrighted works has caused and will continue

to cause irreparable harm to plaintiff" and that "[w]ithout a preliminary injunction,

Defendants are likely to continue their infringing conduct." (Pl.'s Mem. in Supp. of Mot.

for Prelim. Inj. at 3.) Additionally, in the section of her brief devoted to likelihood of

success, Issaenko discusses only the likelihood of prevailing on her copyright

infringement claim. (*Id.* at 25-32.) Because the Court has concluded that Issaenko is not

entitled to relief on her copyright infringement claims and has dismissed those claims, it

finds that Issaenko cannot demonstrate likelihood of success on the merits. *See Cooke v.*

*Stanton*, Civ. No. 08-1175, 2009 WL 424537, at *10 (D. Minn. Feb. 18, 2009)

("[B]ecause this Court concludes that Defendants' Motion to Dismiss should be granted

. . . this Court concludes that the likelihood-of-success-on-the-merits element is not

met.").

## B.      Irreparable Harm

Even if Issaenko had shown a likelihood of success on the merits of her copyright

claim, the Court would conclude that injunctive relief is not appropriate here because

Issaenko has not demonstrated irreparable harm. To demonstrate irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). Issaenko alleges that Defendants' continued use of the Copyrighted Works is causing her irreparable harm because she "is no longer able to control access to, and the distribution of, her works to the public," and that Defendants' "infringing conduct impermissibly and unfairly diverts publishers [and] grant funders, away from Plaintiff's grant applications, scholarly articles, and scientific accomplishments by offering near identical content." (Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 35.) Issaenko's claims of irreparable harm are belied by the fact that the conduct she complained of largely occurred in 2010 and 2011 but she did not bring this suit until December of 2013, and just filed a motion for injunctive relief in June 2014, without identifying any changes in the circumstances of Defendants' use of the Copyrighted Works. This delay indicates that Issaenko has not demonstrated irreparable harm. *See Novus Franchising v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (affirming district court's finding that movant failed to show irreparable harm because in part based on movant's "failure to seek injunctive relief for a period of seventeen months after Dawson quit paying royalties"); *CHS, Inc. v. PetroNet, LLC*, Civ. No. 10-94, 2010 WL 4721073, at *3 (D. Minn. Nov. 15, 2010) (denying a request for injunctive relief where plaintiff waited more than eight months to file for an injunction after knowing of the alleged behavior giving rise to an injury, explaining "that delay in seeking relief 'vitiates much of the force of . . . allegations of irreparable harm'" (quoting *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977))).

Because the failure to show irreparable harm is itself a sufficient ground for denial of injunctive relief, *see Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003), the Court will deny Issaenko's motion for a preliminary injunction.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss [Docket No. 10] is **GRANTED in part** and **DENIED in part** as follows:

   a. The motion is **GRANTED** with respect to all claims brought against Defendants the University of Minnesota and Regents of the University of Minnesota. The claims against these entities are **DISMISSED without prejudice** for lack of jurisdiction.

   b. The motion is **GRANTED** with respect to Counts I, VIII, IX, X, and XI to the extent those claims seek damages and are brought against the Individual Defendants and Defendant Bazzaro in their official capacities. These claims are **DISMISSED without prejudice** for lack of jurisdiction.

   c. The motion is **GRANTED** with respect to Counts I, VIII, IX, X, and XI to the extent those claims seek injunctive relief and are brought against the Individual Defendants and Defendant Bazzaro in their official capacities. These claims are **DISMISSED with prejudice**.

d.      The motion is **GRANTED** with respect to Counts I, VIII, IX, X, and XI to the extent those claims are brought against Defendant Bazzaro in her individual capacity.  These claims are **DISMISED with prejudice.**

e.      The motion is **GRANTED** with respect to Counts II, III, IV, V, VI, and VII to the extent those claims are brought against the University of Minnesota, Regents of the University, and the Individual Defendants and Defendant Bazzaro in their official capacities.  These claims are **DISMISSED without prejudice** for lack of jurisdiction.

f.      The motion is **GRANTED** with respect to Counts II, III, IV, and V, to the extent those claims are brought against Defendant Bazzaro in her individual capacity.  These claims are **DISMISSED with prejudice.**

g.      The motion is **DENIED** with respect to Count VII for promissory estoppel and Count VI for tortious interference to the extent those claims are brought against Defendant Bazzaro in her individual capacity.

2.      Plaintiff's Motion for Preliminary Injunction [Docket No. 36] is **DENIED**. The Clerk of Court shall enter judgment on this motion.

3.      Plaintiff's Motion for Leave to Amend Plaintiff's First Amended Complaint [Docket No. 38] is **GRANTED in part** to the extent it seeks to add allegations related to Defendants LeBien and Lawrenz for purposes of the tortious interference claim (Count VI).  The motion is **DENIED** in all other respects.

4.      Plaintiff's Motion to Strike Defendants' Memorandum in Opposition to
Plaintiff's Motion for Leave to File Second Amended Complaint [Docket No. 58] is
**DENIED**.


DATED:   September 30, 2014                        s/ John R. Tunheim
at Minneapolis, Minnesota.                    _____
                                                      JOHN R. TUNHEIM
                                                  United States District Judge